Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

_____ Division

Case No. 23 CV 10514

(to be filled in by the Clerk's Office)

Keisha D, Hogans

_____
**Plaintiff(s)**
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

-v-

N.Y.C. Comptroller's Office, et al K.D.H. 11/29/23

_____
**Defendant(s)**
*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)*

Jury Trial: *(check one)* ☑Yes ☐No

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Keisha D, Hogans |
| Street Address | 38 Monroe Street, apt, EC-12 |
| City and County | New York |
| State and Zip Code | New York 10002 |
| Telephone Number | (212)- 964-2840 |
| E-mail Address | KHogans4@nyc.rr.com |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

just the Comptroller's because the website did not say a copy for each. I followed the instructions on the website.

**Defendant No. 1**

Name — N.Y.C. Comptroller's Office

Job or Title (if known) — General Counsel's Office

Street Address — 1 Centre Street

City and County — room 530

State and Zip Code — 10007

Telephone Number — (212)-669-3500

E-mail Address (if known)

**Defendant No. 2**

Name — OATH

Job or Title (if known) — Judge Kevin Casey

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address (if known)

**Defendant No. 3**

Name — N.Y.S Human Rights Division

Job or Title (if known) — Civil rights commissioner

Street Address — Carolyn Downy

City and County

State and Zip Code

Telephone Number

E-mail Address (if known)

**Defendant No. 4**

Name — EEOC

Job or Title (if known) — 15 Whitewall

Street Address — Civil Rights Division

City and County

State and Zip Code

Telephone Number

E-mail Address (if known)

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**Defendant No. 1**

Name — Dept. of Justice

Job or Title *(if known)* — Civil Rights Division

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

**Defendant No. 2**

Name — N.Y.S. Attorney General Office

Job or Title *(if known)* — Civil Rights Division

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

**Defendant No. 3**

Name — DC-37

Job or Title *(if known)* — 5 Barclay Street

Street Address — Executive Staff

City and County — General Counsel

State and Zip Code — Local 2627

Telephone Number

E-mail Address *(if known)*

**Defendant No. 4**

Name — N.Y.C. Department of Investigation

Job or Title *(if known)* — Investigation of corruption unit

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**C.     Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

Name                       _N.Y.C. Comptroller's Office_

Street Address             _1 Centre Street_

City and County            _New York_

State and Zip Code         _New York 10007_

Telephone Number           _(212)- 669-3500_

**II.     Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☑ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑ Other federal law *(specify the federal law)*: _Dept. of Justice federal Whistblower Act_

☑ Relevant state law *(specify, if known)*: _Whistleblower Act N.Y.S. Attorney General James_

☑ Relevant city or county law *(specify, if known)*:

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐ Failure to hire me.

☐ Termination of my employment.

☐ Failure to promote me.

☑ Failure to accommodate my disability.

☑ Unequal terms and conditions of my employment.

☑ Retaliation.

☑ Other acts *(specify)*:  I was brought up on false charges

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)* without an investigation

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s) 2/2/18, 9/20, 2/21 2/22 This harassment has been going on for years, I filed a legitimate complaint on 2/2/18 and the video was never entered into evidence.

C.    I believe that defendant(s) *(check one)*:

☑ is/are still committing these acts against me.

☐ is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑ race _____

☑ color _____

☐ gender/sex _____

☐ religion _____

☐ national origin _____

☑ age *(year of birth)* _____ *(only when asserting a claim of age discrimination.)*

☑ disability or perceived disability *(specify disability)* P,T,S,D, I submitted my medical documentation.

E.    The facts of my case are as follows. Attach additional pages if needed. I filed a complaint with N.Y.C. Human Rights, N.Y.S. Human Rights Division, and EEOC. No one investigate my complaint. Each agency and attorney is going by hearsay as opposed to pulling the video. It was available 2019, 2020, 2021 and 2022 on T-mobile's server.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

N.Y.C Comptroller's office general counsel brought me up on charges without an internal investigation. N.Y.C. Comptroller's general counsel based their charge off of hearsay. I am submitting more evidence than the Comptroller's did. I included some transcripts

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A.     It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)* 2019 and 2021, but they were never investigated

B.     The Equal Employment Opportunity Commission *(check one)*:

☑     has not issued a Notice of Right to Sue letter.

☐     issued a Notice of Right to Sue letter, which I received on *(date)* _____ .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

I am writing the Director N.Y.S, EEOC for another investigator

C.     Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☑     60 days or more have elapsed.

☐     less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

I am submitting some evidence to prove the N.Y.C. Comptroller's charges were false and based off of hearsay. The video was missing. I developed P.T.S.D. due to that trial. I lost pay, my reputation was ruined. I have emotional distress, there are punitive damages from my PTSD, lost of overtime, reputation destroyed over lies. This case is public.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

I should have received a ment increase for the past ten years. This trial proved the age and racial discrimination that the N.Y.C. Comptroller's office denied for years. I will look for an attorney, I had to beat the deadline

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  11/29/23

Signature of Plaintiff

Printed Name of Plaintiff  Keisha Denise Hogans

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

# Exhibit A

I have been nervous about filing this complaint, but since NYC Human Rights, NYC Comptroller's office, NYS Human Rights Division, NYS Attorney General James' office, Department of Justice, and EEOC all failed to investigate; I had to submit this. I do not have an attorney yet; I am still looking. I never spoke to my EEOC investigator Gonzalez never investigated anything. I had to read the court transcripts to get more evidence and it was very stressful. I had to read how my colleagues, managers, and Krishna O'Neal degraded me, yet there was never an internal investigation.

I witnessed my manager, Jean Corbett watching a pornographic video on Arthurene Kilgore's personal cellphone at Yomaira Malave's desk. The 3 of them were watching this video on Friday, February 2, 2018, around 2 pm. I emailed H.R. and the EEO officer on 2/2/18 around 2 pm. This is on the NYC Comptroller's email server. General counsel claimed I did not know the date, month or year, but my complaints remain the same with the dates and time.

NYC Comptroller's office could have subpoenaed Arthurene Kilgore's personal cell phone records in 2019, 2020, 2021, and 2022, but they refused to submit this evidence. Yet, general counsel claimed I lied. Judge Kevin Casey, who is also an adjunct law professor ruled that I lied, yet this video was never presented before the court. Judge Casey made a ruling without all the evidence. NYC Civil Service Commission ignored my appeal which states that the video was missing. The NYC Civil Service Commission ignored that the video was missing. NYS Human Rights Commission ignored that the video was missing. EEOC has a copy of my appeal in my portal, in which an attorney wrote that the video was missing.

Since this happened within a NYC politician's office, NYS Attorney General James' office should have investigated. I have limited resources, but I have more evidence to prove the charges written against me were false and since the video was suppressed that proves I was not given a fair trial, in addition to there being a cover up.

I want to include all the witnesses who testified against me on this complaint because they all committed perjury and lied. Shelly Ann Wilkinson admitted under cross examination that she only investigated me, which proves NYC Comptroller's general counsel office wrote charges to have me terminated based off hearsay as opposed to facts, which I included. I will contact the NY director of EEOC to have my charge re-open to be thoroughly investigated, so I can have a Right to Sue letter. I had to submit this today, but I do have a lot more evidence. I just need an investigation and for someone to read the facts. Cellphone records were never subpoena and that the evidence of the entire sexual harassment complaint.

Arthurene Kilgore and I both have T-Mobile as cellphone carriers, so I contacted their executive office in 2020 to find out how I can get this evidence. Again, no one contacted T-Mobile. DC37 hired my formal employee attorney, Richard Washington, and told him not to submit those records.

Sincerely,

11/29/23

Ms. Keisha D. Hogans

**American Federation of State, County & Municipal Employees, AFL-CIO**
125 BARCLAY STREET • NEW YORK, NY 10007-2179



*District Council* **37**

**AFSCME
AFL-CIO**

**LEGAL DEPARTMENT**
Telephone: 212-815-1450
Fax: 212-815-1440

ROBIN ROACH
*General Counsel*

STEVEN E. SYKES
*Associate General Counsel*

ERICA GRAY-NELSON
*Senior Assistant General Counsel*

*Assistant General Counsel*
Dena Klein
Aaron S. Amaral
Terri Nilliasca
Onya Brinson
Seth York
Michael Coviello

June 17, 2022

New York City Civil Service Commission
One Centre Street, Room 2300N
New York, NY 10007

> **Re:    Office of the Comptroller v. Keisha Hogans**
> **Civil Service Law §76 Appeal**

Dear Commissioners,

This office represents the Appellant Keisha Hogans, who hereby appeals the final determination of the Office of the Comptroller of New York City finding her guilty of one charge of misconduct in the above-referenced matter, and imposing the disciplinary penalty of twenty days suspension without pay. This determination and penalty was not based on substantial evidence at trial and was therefore arbitrary, capricious, excessive and shocking to one's sense of fairness. For these reasons, the Appellant respectfully argues that the charge of misconduct should be dismissed and that she should be restored the unpaid suspension time that she wrongfully served.

In a trial held pursuant to Section 75 of the New York Civil Service Law, the Office of the Comptroller alleged that the Appellant, Computer Associate Keisha Hogans, with making false or misleading statements in complaints or reports filed with her employer and other agencies, including the Department of Investigations

("DOI") and her employer's Equal Employment Opportunity Office ("EEO") and Office of General Counsel; submitting false or misleading documents in connection with an investigation; using her employer's resources for personal use; and engaging in conduct prejudicial to good order and discipline. All but one of these charges were dismissed. In the Report and Recommendation ("Report") of Administrative Law Judge ("ALJ") Kevin Casey, dated January 5, 2022, ALJ Casey recommended that only one charge be sustained and that the Appellant be suspended for twenty days. Report, p. 24-25. On January 24, 2022, the New York City Comptroller adopted the Report of ALJ Casey, suspending the Appellant for twenty days based on the one sustained charge of misconduct.

As ALJ Casey acknowledges in his Report and Recommendation, the charges brought against the Appellant all stem from her protected activity, i.e., filing complaints with the agency's EEO Officer, New York City's Commission on Human Rights, and the New York State Division of Human Rights. *Id.*, p. 2-5. ALJ Casey also noted that the charges against the Appellant violate the New York City Human Rights Law ("NYCHRL"), which prohibits discrimination and retaliation against any person who has filed a complaint. "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has [. . .] filed a complaint, testified or assisted in any proceeding under this chapter." NYCHRL, Admin. Code §8-107(7); *see also* Report, p. 8. Notably, the NYCHRL does not include a good faith requirement for the individual filing complaints, although the Appellant did in fact act in good faith when making her complaints. Indeed, the sheer

2

number of charges against the Respondent that were dismissed supports her testimony on the record that she was singled out, targeted and retaliated against for making good faith complaints about other employees' misconduct.

The standard for review of government action in New York State was outlined in *Pell v. Board of Education*, 34 N.Y.2d 222 (1974). Where there is an issue over the exercise of discretion by an administrative agency, the agency's actions can be overturned if they have no rational basis or if the action was arbitrary and capricious. "The arbitrary or capricious test chiefly relates to whether a particular action should have been taken or is justified and whether the administrative action is without foundation in fact." *Id.*, at 231 (internal citations omitted) "Arbitrary action is without sound basis in reason and is generally taken without regard to the facts... Where, however, a hearing is held, the determination must be supported by substantial evidence." *Id.* "Rationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard." *Id.*

In order for an employer to establish misconduct, there must be some showing of fault on the part of the employee. The conduct must be shown to be willful or intentional, *Reisig v. Kirby*, 62 Misc.2d 632, 635, 309 N.Y.S.2d 55, 58 (Sup. Ct. Suffolk Co. 1968), aff'd, 31 A.D.2d 1008, 299 N.Y.S.2d 398 (2d Dep't 1969) or the product of negligence or carelessness, *McGinigle v. Town of Greenburgh*, 48 N.Y.2d 949, 951, 425 N.Y.S.2d 61, 62 (1979); *see also Dep't of Sanitation v. Edgar*, OATH Index No. 2228/01 (Dec. 3, 2001). An error in judgment, lacking in willful intent and not so unreasonable as to be considered negligence, is not misconduct. *See Ryan v. New York State Liquor Auth.*, 273 A.D. 576, 79 N.Y.S.2d 827, 832 (3d Dep't 1948);

3

*Dep't of Sanitation v. Green*, OATH Index No. 1329/02 (Aug. 20, 2002), aff'd, NYC Civ. Serv. Comm'n Item No. CD03-35-SA (Apr. 16, 2003).

Respondent has worked for the Office of the Comptroller for nearly thirty years, has no prior discipline, receives excellent performance evaluations, and is among the hardest working employees in her unit. Report at 2, 25. Despite this, she has not received any promotions or merit raises at work, while she has watched less experienced coworkers be promoted. *Id.* at 2-3.

Several additional facts noted in the Report bear repeating. ALJ Casey found that the Appellant testified in good faith as to events as she recalled them. *Id.* at 7. ALJ Casey also found that the Appellant's complaints to the various City and States agencies were all consistent with one another. *Id.* at 6. The record reflects the Appellant did not file complaints in an attempt to get her coworkers in trouble, but rather because she experienced disparate treatment. *Id.* at 7. Finally, the EEO interview of the Appellant was flawed because it presented an obvious conflict of interest, as the Appellant's representative also represented the subjects of many of the Appellant's complaints. *Id.* at 9.

Based on the evidence presented at trial, and the facts in the record, the Appellant did not intentionally or recklessly commit any misconduct, and the employer did not make a good faith effort to investigate her complaints. Instead, the Appellant engaged in protected activity by making complaints about retaliation and discrimination in good faith based on her observations and experiences, even though there is no requirement under the NYCHRL for complaints to be made in good faith in order to gain protection from retaliation under the statute. Additionally, the

4

Appellant deserves the protection of anti-retaliation statues because it is clear that the misconduct charges stemmed directly from her protected activity under the NYCHRL and other civil rights laws. Therefore, the Appellant's conduct did not rise to the level of misconduct and she should not be subjected to discipline based on the facts established at the trial in this matter.

ALJ Casey concluded that the Appellant did engage in one charge of misconduct, namely the allegation that the Appellant made false or misleading statements in her DOI complaint regarding the discussion and display of pornography in the workplace. However, this finding is contradicted by the record in this case. ALJ Casey believed that the Appellant's complaint to DOI did not merit the same protection as under the NYCHRL because the Administrative Code which protects those individuals who make reports to DOI only applies to claims that an employee "reasonably believes" involve corruption and similar misconduct. Admin. Code §12-113(b)(1).

This finding was made in error because the record does establish that the Appellant had a reasonable basis in her DOI complaint. The Appellant credibly testified about the lewd comments and commotion she observed when others viewed the pornographic video at work. ALJ Casey found that the Appellant had a reasonable basis for her other complaints which were made under very similar circumstances and had a similar good faith basis. It would therefore be arbitrary and capricious, and unsupported by rational evidence, to find that this one complaint was not made in good faith.

5

Furthermore, as ALJ Casey noted, all of the complaints the Appellant made to various agencies were consistent and essentially the same. It is illogical and unfair for a complaint to lack protection because it was made to one City agency when the very same complaint has protection when made to another City agency. Under the totality of the circumstances, it would be unjust to penalize the Appellant for this charge, and the ALJ's Report and the agency's determination were both made in error and disregard of the facts.

The Appellant's procedural due process rights were not adequately protected at the hearing. The only charge sustained against the Appellant was based on a video that was displayed in the workplace, that she did not have in her possession. However, the Petitioner at trial never entered the video into evidence. It was therefore irrational of ALJ Casey to find that the employer sustained its burden of proof when it failed to submit such a critical piece of evidence into the record. The Appellant requested that the employer investigate the video during the investigation into her complaints, but her employer ignored her complaints and requests. The Appellant entered credible testimony and email evidence into the record reflecting the circumstances of her complaint about this issue, but this evidence was ignored in the Report.

On a final note, under the facts of this case, a penalty of a twenty day suspension is excessive and unreasonable. Such a long period of unpaid suspension presents a serious economic harm to the Appellant. The Appellant has worked for the Comptroller for nearly thirty years. The record reflects that she is an extremely capable employee with no prior discipline. As explained above, Appellant's behavior did not rise to the level of misconduct as her complaints were protected activity, she

6

had a reasonable basis to make her complaints, and acted with good faith at all times. Thus, Appellant maintains that the penalty of a twenty-day suspension is so disproportionate to the offenses charged to be shocking to one's sense of fairness.

Based on the above, Appellant respectfully requests the Commission to (1) Reverse the Comptroller's Determination to sustain the charge and suspend Appellant; (2) Restore Appellant's salary for the twenty day period she was suspended; (3) Order that disciplinary charge at issue be expunged from Appellant's personnel file; and, (4) Order any relief that may be deemed just and proper. In the event the Commission upholds the charge, it is Appellant's contention that a twenty day penalty is unreasonably excessive and shocking to ones sense of fairness, and should be reduced in accordance with the particular facts and circumstances of this case.

Respectfully submitted,

Michael Coviello
Assistant General Counsel
District Council 37
AFSCME, AFL-CIO
125 Barclay St. 5th Floor
New York, NY 10007

7

2:17   🔋 💬      ⏰ 🔕 📶 33%▁

⟨   **New conversation**

## Laura Morand cellphone

Wednesday, March 30, 2022

Good morning, I had no clue that DC37 listed me as an inactive member, so my health benefits stopped. My life was turned upside down over lies. I cannot wait for my story to be told. This is beyond disgusting!! I need medication and have to go through all this to have my insurance back up. Smh

9:57 AM

 It was not DC37 that categorized you as inactive. It was your agency that categorized you as inactive. DC37 has no control of how an agency categorizes their employees.

4:14 PM

But who hired Richard Washington? He is the attorney who left out most of my evidence and that made Judge Casey give the decision to suspend me for 20 days with no pay.

4:32 PM

 DC37 General Council outsourced your case to Richard Washington. Richard did not have the right to pull those records

## Keisha Hogans

**From:**          Keisha Hogans <khogans1
               @nyc.rr.com>
**Sent:**          Wednesday, January 5, 2022 6:10 PM
**To:**            'Richard Washington'
**Subject:**       RE: 21-0203 - Office of the
               Comptroller v. Hogans

Good evening,

It was happier until I read this. Are you kidding me? They watched porn
and I get suspended. What the hell? Doug testified. Debbie's answer
said a lot and that was on tape. Shayvonne Jones never gave a
testimony, which I asked for. I also gave the information for T-Mobile,
which was not submitted into evidence. This is crazy. I was denied
CT/OT by Ron Katz about 2 weeks and now I will get suspended for
defending my civil rights. How stupid is this system?

**From:** Richard Washington [mailto:Richard@washington-at-law.com]
**Sent:** Wednesday, January 5, 2022 5:40 PM
**To:** khogans1@nyc.rr.com
**Subject:** Fw: 21-0203 - Office of the Comptroller v. Hogans

Dear Ms. Hogans,

Happy New Year!

I received Judge Casey's decision a few moments ago. It is
attached for your review. The judge dismissed 3 of the 4 charges
and recommended that you be suspended for 20 days without
pay. I will call you tomorrow to discuss next steps.

Have a good night,

1

## LUNAR NEW YEAR STAFF ASSIGNMENTS

### TUESDAY, JANUARY 28, 2020
### Doors Open 5:30 p.m.
### Event from 6:00 p.m. to 8:00 p.m.
### Location-Stephen A. Schwarzman Building- 3rd Floor, Salomon Room
### 476 5th Avenue, New York, NY 10018

### Estimated Program Outline

### 5:30 pm- Doors Open
### 6:15 pm- Program Begins
### 8:00 pm- Reception Ends

| Arrival Time: | Part of Event and Task: | Who's Involved: |
|---|---|---|
| 2:00 PM | Packing Event Supplies from Room 512 | FACILITY STAFF & DRIVER |
| 2:30 PM | Leaving 1 Centre Street (Early Set-up) | Facility Staff Members<br>Aja Meeks<br>Elizabeth Monterrosa<br>Jasper Li<br>Carolyn Askew<br>Claire Mayers |
| 5:00 PM | Lobby Greeters (1st Floor & Side Entrance) | Ivan Hor- (Main Library Entrance)<br>Dwayne Gibson- (Main Library Entrance)<br>Igor Galanter- (Handicap Entrance)<br>Victor Martinez  (Handicap Entrance Elevator) |
| 5:00 PM | (3rd Floor)<br><br>Guest Manual Sign In<br><br>I Pad Guest Sign In | <br><br>Virginia Hunt-Walker<br>I Yan Fung<br><br>Jasper Li |

1

| | | |
|---|---|---|
| 5:30 PM | **Dessert Station** | Talia Hollington<br>I Yan Fung<br>Ivan Hor<br>Josephine Colon<br>Ilona Stadnicka<br><br>Carolyn Askew (Setup)<br>Ivy Soto<br>Christina Mar |
| 5:00 PM | GENERAL RECEPTION<br>**(BEVERAGE HOSTS)**<br><br>**Soda & Water Table #1**<br><br>**Soda & Water Table #2** | Samuel Frisz<br>Paul Cox<br><br>Anthony Bryant<br>Taeka Haraguchi |
| 8:30 PM | END OF EVENT<br>**(PACK UP)** | FACILITY MANAGEMENT STAFF &<br>SPECIAL EVENTS TEAM<br>returning to Manhattan's<br>Municipal Building |

3

Bethina Liu, MD             Discharge Summary  ⚠ 📖      Date of Service: 9/10/2023 11:57 AM
Resident                    Cosign Needed
Med - Internal Medicine

# Inpatient Discharge Summary

### BRIEF OVERVIEW

Admitting Provider: Arthur T Evans, MD
Discharge Provider: Kirsten Homma, MD
Primary Care Physician at Discharge: Claris A. Gautreaux, MD
570 Grand St
New York, NY 10002 Tel: 212-674-8210

Admission Date: 9/1/2023    Discharge Date: Sep 10, 2023

## Admitting Diagnosis
Shortness of breath [R06.02]
Cardiac complaint [R09.89]
Pericardial effusion [I31.39]

## Active Hospital Problems
Principal Problem:
  Shortness of breath
Active Problems:
  Pericardial effusion
Resolved Problems:
  * No resolved hospital problems. *

## Discharge Disposition
Final discharge disposition: 1
Manual discharge disposition (if needed): Home

## Code Status
Chart documented code status: Full
Code Status Documentation: No Code Status Documentation on File

## Active Issues Requiring Follow-up
#Bilateral Pericardial and Pleural Effusions
#Percarditis
- Providers responsible: Cardiology
- To do: titrate diuretics, repeat TTE

#Suspected MGUS
- Provider responsible: PCP, myeloma
- Consider myeloma referral for bone marrow biopsy, would do cross-sectional bone imaging

DocuSign Envelope ID: C9B1A7FD-14F0-403B-B033-52548203AAF9

Office of the New York City Comptroller

# Request for Special Leave

| Name | Keisha Hogans | Employee Reference Number | 02575907 |
|---|---|---|---|
| Bureau | Bureau of Information Systems and Techonology | Civil Service Title | Computer Associate Operations |

I hereby request ___wednesdays___ days of leave   (check one)    [X] With    [ ] Without Pay

From ___06/05/2023___ to ___12/27/2023___ for the reason indicated below
(mm,dd,yy)            (mm,dd,yy)

Check appropriate category below. **You must attach all required documentation to this form.** Medical documentation must be **provided** by a health practitioner licensed by the state in which she/he practices to certify illness or disability.

## 1. LEAVE WITH PAY

[ ] **a) Annual Leave (more than 20 days)**

[ ] **b) Advanced Sick Leave** – 12 Days (one year's accrual) Maximum. (After all sick leave and annual leave are exhausted due to personal illness. Employees must have permanent status.)

[ ] **c) Advanced Annual Leave** – 10 Workdays (two weeks) Maximum.

[ ] **d) Grant** – Up to Three Months. For cases of catastrophic illness. (Must have 10 years of continuous City service and all sick and annual leave exhausted. Permanent employees only. Detailed medical documentation must be provided.)

## 2. FAMILY AND MEDICAL LEAVE ACT (FMLA) LEAVE

**Note:** Employees must be employed for at least one year to take up to 12 weeks of FMLA in a 12-month period.   Employees must use appropriate leave balances, such as annual and sick leave concurrently with FMLA. In most instances, employees must give their supervisors at least 30 days' notice for any leave which is foreseeable. An FMLA form must be completed by the treating physician and submitted by the employee within 15 calendar days of the request for leave under FMLA. Please check the appropriate box below to indicate the reason you plan to take FMLA.

[X]  **a)** Serious Health Condition of Self        [ ]  **b)** Child Care        [ ]  **c)** Care for Covered Family Member

## 3. PAID FAMILY LEAVE (PFL) *(Certain Union Represented Titles Only)*

**Note:** Eligible employees can take up to 10 weeks of Paid Family Leave (PFL) in a rolling 12-month period. If an employee is eligible for FMLA for the same reason, PFL will run concurrent with the FMLA leave. In most instances, employees must give their supervisors at least 30 days' notice for any leave which is foreseeable. Required forms are located on the agency intranet page under "Resources and Forms"- Time/Leave Category. Please check the appropriate box below to indicate the reason you plan to take PFL.

[ ]  **a)** Child Care        [ ]  **b)** Care for Covered Family Member        [ ]  **c)** Care for Family Member due to active military duty

## 4. LEAVE WITHOUT PAY (NOT FMLA)

[ ] **a) Child Care** – (To commence after SL, CT and AL leave balances are  exhausted; and, to immediately follow 12 weeks of FMLA, if applicable.)

[ ] **b) Personal Leave** – Request not to exceed one year. (Leave of absence may be granted to permanent employees with the approval of the agency head or designee. Attach details.  Non-permanent employees may be considered under section 4d.)

[ ] **c) Military Duty** – (must submit military order two weeks prior to departure date.)

[ ] **d) Other** _____ (Circumstances/Status not covered by 4a, b, or c, categories above. Detailed reason for this request and any applicable supporting documentation must be attached.  For example: To care for a family member when the employee is not yet eligible for FMLA. Requires approval of the agency head or designee.)

## 5. PAID PARENTAL LEAVE (PPL) *(Eligibility to be reviewed by Payroll)*

**Note:** Employees who serve in Managerial or Original Jurisdiction (OJ) titles who are in active status shall receive up to 30 days of Paid Parental leave (PPL) once per rolling 12 month period. PPL shall run concurrently with leave provided pursuant to the Family Medical leave Act (FLMA) if the employee is eligible for FMLA leave. Eligible employees are required to complete and submit the Paid Parental Leave and Acknowledgements forms in addition to this request for special leave. These forms are located on agency intranet.

[ ] **a)** Full Usage        [ ] **b)** Intermittent Usage

DocuSign Envelope ID: C9B1A7FD-14F0-403B-B033-52548203AAF9

## 6. EMPLOYEE'S CERTIFICATION AND SIGNATURE *(To be signed and dated by Employee)*

I certify that all information provided is true and accurate to the best of my knowledge.  Should the circumstances change, I will promptly contact and update the Bureau of Administration/HR department with all documentation.  I understand that at that time, the agency may rescind the approval or take other appropriate action.

Should I not report to duty on the designated return to work day listed on this request and I have not received formal pre-approval of at least 2 weeks prior to my scheduled return date from the Bureau of Administration/HR to extend my leave, I shall be considered absent without official leave (AWOL) and may be subject to disciplinary action.

Employee Signature  *Krisha Hogans*    Date: 5/24/2023

## 7. EMPLOYEE CONTACT INFORMATION *(Optional)*

Please provide the preferred number where you can be reached during this leave.

Contact Number: 2129642840    Check One: ☐ Mobile    ☒ Home    ☐ Other

**Approval is tentative until all necessary reviews (e.g. time balances, civil service status and eligibility) are completed by the Bureau of Administration.**

## 8. BUREAU APPROVALS

**Supervisor**

Jean Corbett

Print Name

*Jean Corbett*
Signature

☒ Recommended    ☐ Not Recommended

7/17/2023
Date

**Bureau Chief (or above)**

Ron Katz

Print Name

*Ratks*
Signature

☒ Recommended    ☐ Not Recommended

7/17/2023
Date

## 9. PAYROLL & TIME MANAGEMENT REVIEW

☒ Permanent    ☐ Provisional/Non-Comp    ☐ Exempt

| Years in Service | Current AL (Hours) | Current SL (Hours) | Current CT (Hours) |
|---|---|---|---|
| 32 | 297:18 | 132:00 | 4:45 |

Employee's status, years of service, leave balances allow for approval    ☒ Yes    ☐ No

**Reviewed by:**

*Nicole Dupree*
Signature

8/14/2023
Date

## 10. ADMINISTRATIVE APPROVALS

Deputy Comptroller, Administration

*Erin Villari*
Signature

☒ Approved    ☐ Disapproved

8/14/2023
Date

First Deputy Comptroller or Designee **(For Leave Type 4d)**

☐ Approved    ☐ Disapproved

Signature                                    Date

Request for Special Leave - *Revised 01/23/2019*                                    2/2

The City of New York
Department of Citywide Administrati

**Request for Leave under the Family and** ]

*[handwritten margin note: medical documentation from my P.C.P. *EEO officer did not want to accept this as medical proof  ...ratios]*

Heisha Hogans  Comp
_____                          _____
Employee's Name                          Employ

**ь 69**

N.Y.C Comptroller's Office                Employ
_____
Name of Agency

1 Centre St, room 1225, New Yo
_____
Work Location

I am requesting leave for (Check one):

1.___   Child care due to (Check one):
     a. _____ Birth of child
     b. _____ Placement of child for adoption
     c. _____ Placement of child for foster care

Note:   Child care leave taken under the Family and Medical Leave Act must be concluded 12 months after the birth or placement of the child.  Taking child care leave under the Family and Medical Leave Act does not diminish an employee's right to child care leave under the Citywide Agreement between the City of New York and District Council 37, the "Leave Regulations for Employees Who are Under the Career and Salary Plan," and the "Leave Regulations for Management Employees."

2.___   Care of seriously ill (check one):
     a. _____ spouse
     b. _____ parent
     c. _____ child

___   Check here if intermittent leave or a reduced leave schedule is being requested.

3. ✓  Employee's own serious health condition that makes the employee unable to perform the employee's job functions.

___   Check here if intermittent leave or a reduced leave schedule is being requested.

Note:   All requests for leave under the Family and Medical Leave Act require appropriate documentation (see the applicable certification forms).

Date of commencement of leave   6/7/23  Wednesdays

Probable date of return to work   12/27/23  Wednesdays

Note:   Employees who have worked for the City of New York for at least 12 months, and who have worked 1250 hours in the last 12 months, are entitled to a total of 12 weeks of Family and Medical Leave per year.

_____          6/2/23
Employee's Signature                                Date

**The City of New York**
**Department of Citywide Administrative Services**

**CERTIFICATION OF PHYSICIAN OR OTHER HEALTH CARE PROVIDER**
under the Family and Medical Leave Act

| 1. Employee's Name | 2. Patient's Name (if different from employee) |
|---|---|
| Keisha Hogans | |

3. The attached sheet describes what is meant by a "serious health condition" under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) ____  (2) ____  (3) ____  (4) ✓  (5) ____  (6) ____, or  None of the above ____

4. Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories.

Dx. PTSD (POST TRAUMATIC STRESS DISORDER)

5.a. State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different).

04/2022 - UNKNOWN DURATION (CHRONIC)

b. Will it be necessary for the employee to work only intermittently or to work on a less than full schedule as a result of the condition (including treatment described in Item 6 below)? __YES__  If yes, give the probable duration. UNTIL 12/27/2023 (WEDNESDAY ONLY)

c. If the condition is a chronic condition (condition #4) or pregnancy, state whether the patient is presently incapacitated[2] and the likely duration and frequency of episodes of incapacity[2].

YES, START 6/7/23 - 12/27/23 (WEDNESDAYS)

6.a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments.

N/A

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number of treatments and the intervals between such treatments, actual or estimated dates of treatment, if known, and period required for recovery, if any.

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

DP-2496 (R.6/97)

b. If any of these treatments will be provided by another provider of health services (e.g., physical therapist), please state the nature of the treatments.

*PSYCHOTHERAPY Q WEEKLY , PSYCHIATRY Q MONTHLY*

c. If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment).

*ON ZOLOFT 200mg DAILY*

7.a. If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?

_____

b. If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)? *YES* If yes, please list the essential functions the employee is unable to perform. *PT. UNABLE TO CONCENTRATE AND DO FUNCTION TASK DUE TO PTSD.*

c. If neither a. nor b. applies, is it necessary for the employee to be absent from work for treatment?_____

8.a. If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation? _____

b. If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery? _____

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need.

_____
(Signature of Health Care Provider)

Claris Gautreaux, MD
AdvantageCare Physicians
21 East 22nd Street
New York, (Type of Practice)
Phone: 212-460-7800
Fax: 212-460-7877
License #277460
NPI #1022315 (Telephone Number)

_____
(Address)

**To be completed by the employee needing family leave to care for a family member.**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule.

_____        _____
(Employee Signature)                                (Date)

♡ valerahealth

Date: July 26'2023

To whom it may concern,

The patient,Keisha Hogans, Date of Birth Sep 14'1969, has been under my treatment since May 2023. She has been struggling from severe symptoms of PTSD related to the trauma at her work place. She has been struggling to manage her symptoms while working in the same traumatic environment. Her symptoms are affecting her ability to function and do daily routines. She has been getting mental health responsibly, but I would appreciate it if she could be provided flexibility at her work and allowed to do work from home. I therefore request Ms Hogans to work from home for at least 3 months, starting August 1st till Nov 1st'2023. She will be reevaluated in 3 months.

Sincerely,
Haseeba Ismaiel, MD
Psychiatrist
Valera Health
139 Centre Street NY suite 824 NY 10013
ph.# 6464507748
haseeba.ismaiel@valerahealth.com

**Keisha Hogans**

*handwritten margin note:*
n rdical
- use Valera
Dr's e-mail
4 Dr's asree

**From:** Eileen O'Brien (OLR) <eileen.obrien@olr.nyc.gov>
**Sent:** Wednesday, January 13, 2021 4:22 PM
**To:** khogans1@nyc.rr.com
**Subject:** RE: EAP Support Group Schedule

Hi Keisha,

I wanted to check in with you about a couple things. I was discussing your case with my supervisor (confidentially), and she suggested looking into hiring outside counsel for your case. Perhaps I could help you look into pro bono legal help that handles sexual harassment cases. Have you thought about this at all?

Further, I am happy to keep speaking with you, but ultimately it might make more sense for you to speak to a therapist. A therapist can help document how this experience is affecting you emotionally, mentally, physically, etc, and diagnose you, which can be used in your case. I am a licensed social worker, but as an EAP counselor, I am not able to diagnose you, whereas a therapist can do so.

Let me know your thoughts, and if you'd like to talk at all, I am here until 7 tonight.

Best,
Eileen

Eileen O'Brien, LMSW
Employee Assistance Program Counselor
NYC Office of Labor Relations
347-263-0677
eileen.obrien@olr.nyc.gov



YOU TALK, WE LISTEN

All communications between a client, a counselor, a group, or similar staff is completely confidential. This information will remain within EAP and nothing will go to any supervisor, manager, or any other employee. If you are in danger or a threat to yourself or others, we will be required to get help for you. In this situation, this information is not held confidential. Please contact us if you have any questions or concerns, or if you have any further confidential communications.

**From:** Eileen O'Brien (OLR)
**Sent:** Monday, January 11, 2021 6:55 PM
**To:** khogans1@nyc.rr.com
**Subject:** EAP Support Group Schedule

Menu



**Office of Labor Relations**

Search

# eaphome

Employee Asst Pgrm Flex SpendingMgmt Benefits VDC Program
Select                              ⌄

- A Helping Hand for Employees
- COVID Resources for H+H Employees
- Common Concerns
- Alcohol & Substance Misuse
- Intimate Partner Violence (IPV)
- Healthier Living
- Takeaways
- EAP Frequently Asked Questions

# Employee Assistance Program

## Contacting the Emplo

All EAP services are avail

Please contact the
or call and leav

**Retirees should email their health b**
**or visit the Health Benefits Program**

**Grief and Loss Support Group**

Open to all City employees and their family members.

- Download the Grief and Loss Support Group flyer

## Stress Management Videos

Practice self-care. Be kind to each other. Take five minutes to relax.
Let a NYC EAP Counselor help you breathe.

- Check out our stress relief videos online (videos available in English, Spanish, Creole, Mandarin & Urdu)
- Download the Stress Management flyer

# Employee Assistance Program

## General Information

The City of New York offers its employees and their dependents a helping hand through a network of Employee Assistance Programs. Generally, an EAP provides education, information, counseling and individualized referrals to assist with a wide range of personal and social problems.

The NYC EAP provides services to the City of New York non-uniform Mayoral agencies, NYC Department of Correction, New York City Housing Authority and NYC Health + Hospitals. Employees and their family members of these agencies can receive services by calling (212) 306-7660 or e-mail us at eap@olr.nyc.gov. The NYC EAP is located at 250 Broadway - 28th Floor, New York, NY 10007. Confidentiality laws and regulations protect the personal information that may be discussed with the EAP. Except in certain extreme situations, information will not be released without your written permission.

Employees who are not covered by the NYC EAP can receive services from either their agency or union EAP. Since not all EAPs offer the same services, we encourage you to call your agency or union EAP for further details.

**List of Agency and Union Employee Assistance Programs**View the List

Close

**Agency EAPs**

**Department of Sanitation**
Employee Assistance Unit
212.437.4867

**NYC Fire Department**
Counseling Services Unit
212.570.1693

**NYC Health + Hospitals**
NYC Employee Assistance Program
(NYC EAP)
212.306.7660 or email eap@olr.nyc.gov

**NYC Agencies (Non-Uniform)**
NYC Employee Assistance Program
(NYC EAP)
212.306.7660 or email eap@olr.nyc.gov

**NYC Housing Authority**
NYC Employee Assistance Program
(NYC EAP)
212.306.7660 or email eap@olr.nyc.gov

**NYC Police Department**
Counseling Unit
718.834.8816

 **Corrections Department**

Care Unit (Peer Counselors)
718.546.CARE (2273)

**Union EAPs**

**DC 37 Health & Security**
Personal Services Unit
212.815.1250

**NYC Police Organization Providing Peer Assistance (POPPA)**
212.298.9111

**United Federation of Teachers**
Member Assistance Program
212.701.9620
mapinfo@uft.org

# Keisha Hogans

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Friday, October 27, 2023 2:49 PM
**To:** Keisha Hogans
**Subject:** FW: Contact person for BCA

**From:** Hogans, Keisha
**Sent:** Monday, July 10, 2023 4:39 PM
**To:** Villari, Erin <evillar@comptroller.nyc.gov>
**Cc:** Jones, Jean <jjones1@comptroller.nyc.gov>
**Subject:** RE: Contact person for BCA

I think the only thing that maybe missing is the email conversation that Sonia Feliciano and I had. I told Sonia that this woman from a city agency was adamant that Sonia and Ana Rodriguez worked inside CIF and not on the 7th floor. This woman said, "she worked on the 7th floor and OCA is not there." I am not sure what agency she is from, but Sonia said, " I know who she is." I know OCA is on the 7th floor and you must be buzzed inside their office, but this woman refused to listen. When agencies act like this, someone listening maybe think CIF is incompetent. This is not the case. Some agencies refuse to listen to CIF staff informing them that they need to contact OCA directly to discuss their contract questions with with a reviewer or supervisor.

You are welcome.

**From:** Villari, Erin <evillar@comptroller.nyc.gov>
**Sent:** Monday, July 10, 2023 4:17 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Cc:** Jones, Jean <jjones1@comptroller.nyc.gov>
**Subject:** RE: Contact person for BCA

Ok. Thank you for confirming.

Erin N. Villari (she/hers)
Deputy Comptroller, Administration
Office of New York City Comptroller Brad S. Lander
1 Centre Street, 7th Floor, Room 722, New York, NY 10007
P: (212)669-2223 I evillar@comptroller.nyc.gov

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Monday, July 10, 2023 4:16 PM
**To:** Villari, Erin <evillar@comptroller.nyc.gov>
**Cc:** Jones, Jean <jjones1@comptroller.nyc.gov>
**Subject:** RE: Contact person for BCA

Good afternoon,

You are welcome.



1

No, I don't think I left any emails out. I just did not include personal quick email chats that I was having with Sonia and Ana. I haven't seen them in a while, and I know some of their family. We just caught up briefly and those the only emails that did not include because they were irrelevant to agencies coming to CIF with their OCA questions. Everything else was submitted to Jean Corbett and Ron Katz. I know this has been a problem for years. I read the email where Jean told me that she would contact people from now on, but I was stopped in the hallway while coming back from the bathroom. I could not ignore those women and they work for the city, so they are basically colleagues.

I forward it again to Ron, so he could possibility discuss it with the Bureau Chief of OCA. Bobby told Ron and Jean about this years ago. I am sure I included everything in this email. I sent it to Ron a month ago, so I wanted to make sure that HR was aware of this ongoing CIF front window problem.

No problem, I enjoy helping people and if there are ongoing issues; I have to speak up.

**From:** Villari, Erin <evillar@comptroller.nyc.gov>
**Sent:** Monday, July 10, 2023 3:51 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Cc:** Jones, Jean <jjones1@comptroller.nyc.gov>
**Subject:** RE: Contact person for BCA

Hi Keisha,
Thank you for sharing.  Are there emails missing from this chain?

Erin N. Villari (she/hers)
Deputy Comptroller, Administration
Office of New York City Comptroller Brad S. Lander
1 Centre Street, 7th Floor, Room 722, New York, NY 10007
P: (212)669-2223 I evillar@comptroller.nyc.gov

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Monday, July 10, 2023 3:24 PM
**To:** Villari, Erin <evillar@comptroller.nyc.gov>
**Cc:** Jones, Jean <jjones1@comptroller.nyc.gov>
**Subject:** FW: Contact person for BCA

Good afternoon,

FYI- OCA situation that started before the pandemic.

There was another issue with contact information for OCA. I know that supervisor Robert Calo has been complaining for year to management about other city agencies coming to CIF thinking that the contract reviewers work here. I brought this to Ron's attention to see if he could speak to management in OCA to make sure they are informing city agencies about the function of CIF. Also, so Ron would know what is taking place at the front window in CIF. Two different agencies had two different questions and their contracts that only OCA can answer. This has been going on years before the pandemic.

I was in the hallway and these situations fell into my lap. I have no problem helping the public, but they need to go to the right bureau for information and not CIF; especially after CIF staff informs them that they are in the wrong place. Some people think CIF is not trying to help, but they are not trying to listen. CIF is apart of BIST, so these two women needed to contact OCA.

2

**From:** Hogans, Keisha
**Sent:** Thursday, June 8, 2023 10:34 AM
**To:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Subject:** FW: Contact person for BCA

Good morning,

I did not explain this correctly to Jean. This is the scenario from Wednesday, June 7th in the morning. I was not over stepping management's authority.

I was coming back from the bathroom. I was in the hallway talking to one of the amazing security guards. A woman ran the bell that is close to our IDs and no one answered. I told her to go to the other bell at the window. She rang that and again no one came to the window. The woman asked me if I could help her. I started walking towards CIF and said, "ok." The woman said, "She wanted to speak to Sonia Feliciano or Ana Rodriquez." I started off in contracts as an intern and have known both of these women for over 20 years. I know where contracts is located and I still have a relationship with their former Bureau Chief, Lois Johnson. I know some of the staff in OCA.

I tried to explain to this woman that contracts is on the 7th floor. She told me, "No, it is not. I work on the 7th floor." I repeated Sonia Feliciano and Ana Rodriguez, both work on the 7th floor. You can see us in the camera having a conversation. Another woman walked up to us and said, "She had a question about contracts." Charlie was at the window by now and he tried to help the first woman while I turned my attention to the 2nd woman. I still was in the hallway. I was NOT in CIF. I could not walk inside without trying to help the 2nd woman. The 2nd woman told me she was an ACCO from an agency and she had quick question about the paperwork with contracts. She said, "The person who used to submit contracts recently left and that she wanted to know the process for submitting a CTI because her contracts keep getting rejected." I told her let me ask who is the contact person for OCA, so she can talk to them directly.

I called Sonia because the 1st woman told me that Sonia did not work on the 7th floor, which I knew was incorrect. The 2nd woman was an ACCO who did not know how to get information on contracts. Bobby was out, so I asked Jean, Tim was asked and I am not sure about Yomaira or Terrell. No one gave Jean an answer and Jean went to find the contact email address for contracts. The women were still at the window. I emailed Sonia and Ana to get information since NO ONE had contact information. Jean found the information after Sonia and Ana had emailed me.

I took the initiative to get accurate information since both women stopped me to ask for my help in the hallway. I was not at the window, but outside of CIF in the hallway. I guess I have a friendly face. Lol Since, we are all public servants and I love helping people; it wasn't a big deal for me to try to get them accurate information. I did not fully read this email until this morning. I was not trying over step Jean's authority. Because of my analytic skills and typing speed, management prefers for me to index claims. I steer clear away from contracts. I was helping the two women who stopped me in the hallway before I could swipe my card to get back inside CIF. Jean found out the information, typed up an email address and left it at the window.

Maybe OCA needs let agencies know to use that email address and that CIF is only for dropping off paperwork, but not for speaking to examiners or asking questions about their contracts.

**From:** Hogans, Keisha
**Sent:** Wednesday, June 7, 2023 10:42 AM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** RE: Contact person for BCA

Good morning,

3

Okay, I knew who to contact in OCA to ask questions. I did not give out their email addresses. I could not believe one would told me that Sonia and Ana worked here as opposed to the 7th floor. The other woman was an ACCO who had a question about her contract. I just wanted contact information to give to her. Now I have this address, so that is the contact information. Smile

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Wednesday, June 7, 2023 10:32 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Contact person for BCA

Keisha,

Thank you so much for the information, going forward let me request info. We were instructed to give agencies the generic email address -*OCAmailbox@comptroller.nyc.gov*. *If this has changed, I will let everyone know.*

**Jean C. Corbett**

**Central Imaging Facility, Administrative Manager**

**Office of the New York City Comptroller, Brad Lander**

**Municipal Building, Room 1225**

**New York, NY 10007-2341**

**Tel: 212-669-3159**

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Wednesday, June 7, 2023 10:27 AM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** FW: Contact person for BCA

FYI-I hate not have information to help people.

**From:** Feliciano, Sonia <sfelici@comptroller.nyc.gov>
**Sent:** Wednesday, June 7, 2023 10:15 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Cc:** Rodriguez, Ana <arodrig@comptroller.nyc.gov>
**Subject:** RE: Contact person for BCA

Hi Keisha,

4

Thank you for the information.   Hope all is well.

For inquiries on how to enter/create a  CT1/CTR etc.... into FMS. agency should contact the FISA helpdesk. callcntr@fisa-opa.nyc.gov
Non Mayoral agencies with contract related questions can reach out to:
Sonia Feliciano – sfelici@comptroller.nyc.gov
Teija Sudol  -   tsudol@comptrolller.nyc.gov

Mayoral agencies should contact MOC's for guidance.

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Wednesday, June 7, 2023 9:56 AM
**To:** Feliciano, Sonia <sfelici@comptroller.nyc.gov>
**Cc:** Rodriguez, Ana <arodrig@comptroller.nyc.gov>
**Subject:** Contact person for OCA

Good morning,

An ACCO from a small agency had come here to ask questions about her contract. She received a lot of rejection letters because the person who used to fill out the contracts left. She wanted to talk to someone about filling out a CT1. I think that is the form or what she had said.  I called you. I was going to give her your information, but she was too busy listening to another woman who had a contract from anyone agency that she ignored me. One woman came to CIF and thought that you and Ana worked in room 1225. Smh I kept telling that woman, OCA is on the 7th floor and she would not listen. She said, "No, it isn't. I work on the 7th floor." I realized that she did not want to listen because I know OCA is on 7 now.  Anyway, who is the contact person so if I have this question again; I can tell agencies were to go.

Bobby is not in, but these women were two different agencies. I like to give people the right information as opposed to sending them all over the place. I could not believe one woman told me that you and Ana worked here. WOW!!! Some folks just do not like to listen.

5

*N.Y.S.A.G. ignored whistleblower + public integrity Act*

## Keisha Hogans

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Tuesday, May 2, 2023 8:33 PM
**To:** 'Fannie Ip'
**Cc:** 'Kanielle Hernandez'; 'Samantha Day'
**Subject:** RE: NYAG Submission #1-439934438

Good evening,

I appreciate you all responding and trying. I wanted to give paperwork and to meet everyone, so you will know that my case was as crazy as it sound, especially since the Comptroller's office general counsel own investigator admitted on Tuesday, January 19th that she did not investigate anyone. The judge ignored this because my case should have been dismissed once she admitted that. I am glad that it is on the court record. NYC corruption at its finest.

Thank you and enjoy the reading proving my racial discrimination and sexual harassment complaint that NYS failed to investigate for years.

-----Original Message-----
From: Fannie Ip [mailto:ipf@nyassembly.gov]
Sent: Tuesday, May 2, 2023 5:26 PM
To: khogans1@nyc.rr.com
Cc: Kanielle Hernandez <hernandezk@nyassembly.gov>; Samantha Day <days@nyassembly.gov>
Subject: Re: NYAG Submission #1-439934438

Dear Ms. Hogans,

I am the Community Liaison for the Office of State Assemblymember Grace Lee and we are in receipt of your email below. I am sorry to hear about what had happened and hopefully we can assist you. I have already reached out to the Attorney General's office and am waiting to hear back about the referenced complaint you submitted last year in November. I will let you know as soon as I have any updates.

Thank you for reaching out to us, please feel free to contact me with anything else.

Best regards,
Fannie

Fannie Ip (she/her)
Community Liaison
Grace Lee, Assemblymember for New York State District 65
212-312-1420
ipf@nyassembly.gov

---------- Forwarded message ---------
From: Keisha Hogans <khogans1@nyc.rr.com>
Date: Tue, Apr 25, 2023 at 12:09 PM
Subject: FW: FW: NYAG Submission #1-439934438
To: <leeg@nyassembly.gov>

1

Good afternoon,

I would like to know if I can have an appointment to go over the fraudulent charges that the NYC Comptroller's office brought against me for filing racial discrimination as well as sexual harassment while they suppressed evidence. I have a copy of my evidence, which will help with speaking to AG James as to why her office hasn't contacted me about the NYS Whistleblower Act. I have been fighting this case on my own.

NYC Comptroller's office claimed that I lied, but why did the general counsel's office leave out evidence and not investigate? There is a lot of corruption within NYC agencies and no one if following up on the NYS level.

Thank you

*From:* Keisha Hogans [mailto:khogans1@nyc.rr.com <khogans1@nyc.rr.com>]
*Sent:* Monday, February 27, 2023 9:27 PM
*To:* 'Office of Assemblymember Grace Lee' <hi@nysad65.com>
*Subject:* RE: FW: NYAG Submission #1-439934438

Good evening,

Thank you so much for responding. I was not sure if the Assemblywoman or you would remember me. Yes, we did. I am trying to clear my name and reputation, as well as get my money back. I am not asking any politician to side with me. I am asking for real unbiased investigations and for someone to look at the facts. The fact that I was on trial for filing a sexual harassment complaint should raise eyebrows, but it is even worse when the key piece of evidence was omitted on purpose.

When I spoke with the Assemblywoman, she agreed that women of color have a hard time with submitting sexual harassment complaints. I agreed. She mentioned she may have me speak one day at an event on this subject. It is sad that in this day and age that attorneys and judges are still doing this crap. (excuse my language) Since it is bad for women of color, it is even worse for Black women because there isn't any support. I cannot tell you how many politicians and reporters I begged to have my story investigated and was meet with silence. If there was an investigation, then I would not have been suspended. The investigation began in 2019 and I guess that is when Stringer was getting ready to run for NYC mayor because I refuse to believe that these educated attorneys did not notice that the video was never subpoena into evidence .

2

I am going to share something with you so you know that I was telling the truth about my case. This is just to show that I was telling the truth and there was not an investigation. I do not want the Assemblywoman to contact DC37. I know they endorsed her and I want her to keep that relationship. I did research and will follow the advice I was given. I had found a digital forensic investigator who would have found everything digital and list those involved, but the Comptroller's office general counsel and my former employment attorney refused to follow the code of ethics for attorneys. The exculpatory evidence was omitted which is also illegal.

This is my evidence which should have been submitted in 2020, 2021, and researched in 2022 prior to my fraudulent suspension in February of 2022.

*From:* Keisha Hogans [mailto:khogans1@nyc.rr.com <khogans1@nyc.rr.com>]
*Sent:* Tuesday, January 25, 2022 12:34 PM
*To:* 'Richard Washington' <Richard@washington-at-law.com>
*Subject:* FW: T-Mobile

Good afternoon,

Any update on getting that subpoena to clear my name?

*From:* Keisha Hogans [mailto:khogans1@nyc.rr.com <khogans1@nyc.rr.com>]
*Sent:* Monday, January 24, 2022 9:21 AM
*To:* 'Richard Washington' <Richard@washington-at-law.com>
*Subject:* FW: T-Mobile

*From:* Keisha Hogans [mailto:khogans1@nyc.rr.com <khogans1@nyc.rr.com>]
*Sent:* Tuesday, January 11, 2022 1:33 PM
*To:* 'Richard Washington' <Richard@washington-at-law.com>; 'Ussery, Justin' <Justin.Ussery@EnvistaForensics.com>
*Subject:* FW: T-Mobile

3

Good afternoon,

I need would need you on the phone call, so I can clear my name.

*From:* Keisha Hogans [mailto:khogans1@nyc.rr.com <khogans1@nyc.rr.com>]
*Sent:* Friday, January 7, 2022 12:34 PM
*To:* 'Richard Washington' <Richard@washington-at-law.com>
*Subject:* FW: T-Mobile

Good afternoon,

I need my reputation and name to be cleared. It was brutally attacked
during this trial and I have evidence to support, all of my complaints,
even the racism came out during my trial. I did some research and found
this company. I need to know your availability, so I can have them do some
research on my behalf. I should not be punished for defending my civil
rights, especially when there is more evidence to support everything that I
said.

Thank you and stay safe.

*From:* Ussery, Justin [mailto:Justin.Ussery@EnvistaForensics.com
<Justin.Ussery@EnvistaForensics.com>]
*Sent:* Friday, January 7, 2022 11:23 AM
*To:* Keisha Hogans <khogans1@nyc.rr.com>
*Subject:* RE: T-Mobile

Keisha,

Please let me know your availability for a matter consultation. Also due to
the fact that there will be legal process involved, we would like to have
your attorney on the call as well.

4

I am currently traveling but have availability next week.


Justin


*Justin Ussery*

*Digital Forensic Examiner*

Envista Forensics

D: +1 469 638 0636
M: +1 469 992 9446

www.envistaforensics.com


Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.


*From:* Keisha Hogans <khogans1@nyc.rr.com>
*Sent:* Friday, January 7, 2022 9:25 AM
*To:* Daniel, Lars <lars.daniel@envistaforensics.com>; Digital Forensics Assignments <DFassign@EnvistaForensics.com>; Ussery, Justin < Justin.Ussery@EnvistaForensics.com>
*Subject:* RE: T-Mobile


Good morning


I do have a work attorney. I am interested in this line of services because my job is on the line based off of lies and no investigation.


*From:* Daniel, Lars [mailto:lars.daniel@envistaforensics.com

5

<lars.daniel@envistaforensics.com>]
*Sent:* Friday, January 7, 2022 9:33 AM
*To:* Keisha Hogans <khogans1@nyc.rr.com>; Digital Forensics Assignments <
DFassign@EnvistaForensics.com>; Ussery, Justin <
Justin.Ussery@EnvistaForensics.com>
*Subject:* Re: T-Mobile


Keisha,


From this email chain it does appear that you have an attorney, which we
require in order to work with you.


Our expert Justin Ussery is copied on this email and will be in touch.


Best,


Lars E. Daniel

EnCE, CCPA, CCO, CTNS, CTA, CWA, CIPTS

Practice Leader: Digital Forensics

Envista Forensics

Cell: 919-621-9335

Email: lars.daniel@envistaforensics.com


------------------------------

*From:* Keisha Hogans <khogans1@nyc.rr.com>
*Sent:* Thursday, January 6, 2022 1:07 PM
*To:* Daniel, Lars
*Subject:* FW: T-Mobile


** Be aware, this is an external email and sender may not be genuine. If
you are an Envista, AREPA or Inspexx employee and this email seems
suspicious, please forward it (as attachment) to IT helpdesk! * *

6

Good afternoon,

I read an article that you wrote. I live in NYC. I was brought up on charges to be terminated because I reported sexual harassment against my White female manager. I asked T-Mobile they could pull a video that was on my colleague's phone to show that a pornographic video was sent. My work attorney and the NYC Comptroller's office who was bringing me up on charges never asked for this information.

I wanted to prove that a video was sent on 2/1/2018 around 9 pm because it was discussed on 2/2/2018 and shown at work.

Thank you and stay safe

*From:* Lopez, Christopher (Albuquerque) [
mailto:Christopher.Lopez25@T-Mobile.com <Christopher.Lopez25@T-Mobile.com>]
*Sent:* Thursday, August 6, 2020 12:26 PM
*To:* Keisha Hogans <khogans1@nyc.rr.com>
*Subject:* RE: T-Mobile

Hi Ms. Hogans,

I appreciate your email and yes, this is correct.

Thank you,

Chris Lopez

Sr. Specialist, Executive Response
Office of the President

Desk: (425) 689-3458
Email: Christopher.Lopez25@T-Mobile.com

7

[image: Sig Logo]

T-Mobile.com
<https://nam02.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.t-
mobile.com%2F&data=02%7C01%7CChristopher.Lopez25%40T-
Mobile.com%7C5180786fba3841338faa08d813a3820b%7Cbe0f980bdd994b19bd7bbc71a09b026c%7C0%7C0%7C63728
0940264642979&sdata=i1LxWgbVJn%2BAGv1BiNTsYelxi9znS1urUfulSjbXB2k%3D&reserved=0>
| Follow T-Mobile on Twitter
<https://nam02.safelinks.protection.outlook.com/?url=https%3A%2F%2Ftwitter.com%2Ftmobile&data=02%7C01%7CChr
istopher.Lopez25%40T-
Mobile.com%7C5180786fba3841338faa08d813a3820b%7Cbe0f980bdd994b19bd7bbc71a09b026c%7C0%7C0%7C63728
0940264642979&sdata=KMENBzidPEUImawyJTO0869OWhOFHjKfpdRSETnAUyE%3D&reserved=0>,
Facebook
<https://nam02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.facebook.com%2FTMobile&data=02%7C0
1%7CChristopher.Lopez25%40T-
Mobile.com%7C5180786fba3841338faa08d813a3820b%7Cbe0f980bdd994b19bd7bbc71a09b026c%7C0%7C0%7C63728
0940264652972&sdata=OaRiS1zs9D5aD8ZCQ0804pB%2BH1zk%2Bysjtct3NnJ%2BQE4%3D&reserved=0>
and Instagram
<https://nam02.safelinks.protection.outlook.com/?url=http%3A%2F%2Finstagram.com%2Ftmobile&data=02%7C01%7C
Christopher.Lopez25%40T-
Mobile.com%7C5180786fba3841338faa08d813a3820b%7Cbe0f980bdd994b19bd7bbc71a09b026c%7C0%7C0%7C63728
0940264652972&sdata=P6Vp2MRBQuCz%2BzNnEHOgdpGqq2yrX0WtGblYzBB3mjg%3D&reserved=0>

NOTICE: This communication may contain privileged or other confidential
information. If you have received it in error, please advise the sender by
reply email and immediately delete the message and any attachments without
copying or disclosing the contents. Thank you.

*From:* Keisha Hogans <khogans1@nyc.rr.com>
*Sent:* Wednesday, August 5, 2020 12:00 PM
*To:* Lopez, Christopher (Albuquerque) <Christopher.Lopez25@T-Mobile.com>
*Subject:* FW: T-Mobile

*[External]*

Good morning,

8

I know you are busy, but I wanted to confirm that I am right about the conversation we had. I need to give the telephone numbers to my attorney, so she can work on those subpoenas to help my case.

I hope all is well with you and your family.

*From:* Keisha Hogans [mailto:khogans1@nyc.rr.com <khogans1@nyc.rr.com>]
*Sent:* Thursday, July 2, 2020 11:03 AM
*To:* 'Lopez, Christopher (Albuquerque)' <Christopher.Lopez25@T-Mobile.com>
*Subject:* RE: T-Mobile

Good morning,

Thank you for contacting, I really appreciate it. I am so glad that you called me again and that we spoke. I am dealing with a situation at work and needed to know that I can have a text message retrieved that was sent from July-September of 2019. I have the person's number and what was sent, as well as the telephone number of a T-Mobile customer who sent a video out on Thursday evening 2/1/18 between 7-9:30 pm. I know my attorney would have to provide a subpoena for them, but I wanted to know what else I needed to do.

I was so discouraged when I spoke to another representative who told me since T-Mobile has billions of customers this can't be done. I need it for a sexual harassment case. I will ask in the future how to store text messages. I hope you have a safe and relaxing 4th of July and again, thank you for following up with me.

*From:* Lopez, Christopher (Albuquerque) [
mailto:Christopher.Lopez25@T-Mobile.com <Christopher.Lopez25@T-Mobile.com>]
*Sent:* Thursday, June 25, 2020 9:43 PM
*To:* khogans1@nyc.rr.com
*Subject:* T-Mobile

Hi Ms. Hogans,

9

I am in receipt of your correspondence recently submitted and regret any
inconvenience this has caused you.  I will be in contact with you soon, as
I am currently investigating this matter. You are welcome to respond to
this email with the best time to contact you at to discuss this matter. I
am in the office Monday, Tuesday, Thursday and Friday from 9:00 AM until
7:30PM Pacific Time.  I look forward to speaking with you. Have a great
night!

Thank you,

Chris Lopez

Sr. Specialist, Executive Response
Office of the President

Desk: (425) 689-3458
Email: Christopher.Lopez25@T-Mobile.com

[image: Sig Logo]

T-Mobile.com <http://www.t-mobile.com/> | Follow T-Mobile on Twitter
<https://twitter.com/tmobile>, Facebook <https://www.facebook.com/TMobile>
and Instagram <http://instagram.com/tmobile>

NOTICE: This communication may contain privileged or other confidential
information. If you have received it in error, please advise the sender by
reply email and immediately delete the message and any attachments without
copying or disclosing the contents. Thank you.

*From:* Office of Assemblymember Grace Lee [mailto:hi@nysad65.com
<hi@nysad65.com>]
*Sent:* Monday, February 27, 2023 4:19 PM
*To:* Keisha Hogans <khogans1@nyc.rr.com>; Kanielle Hernandez <
khernandez@nysad65.com>

*Subject:* Re: FW: NYAG Submission #1-439934438

Hi Keisha,

I hope you are doing well. This is Samantha from Assemblymember Lee's team. I do remember you and we connected during the campaign.

Yes, we'd be happy to reach out to the AG's office and look into this for you.

I'm cccing our District Director Kanielle, who can get more information from you and see how our office can assist you.

Best,

Samantha

On Sat, Feb 25, 2023 at 8:26 PM Keisha Hogans <khogans1@nyc.rr.com> wrote:

Good evening,

Do you remember meeting me? I live in Knickerbocker Village. We spoke about how bad sexual harassment is in NYS. Well, after my research I found out that NYS Attorney General James office is supposed to follow up on Whistleblowers. I filed 2 complaints and no one followed up. I followed up with the Public Integrity complaint because this was covered up since I work for the NYC Comptroller's office. I was falsely suspended and the video was never entered into court.

Is it possible that you can speak to someone at the NYS AG's office to find out why they have no followed up on this investigation?

Thank you and stay safe.

*From:* Andrade, Nicole
*Sent:* Friday, February 2, 2018 3:48 PM
*To:* Hogans, Keisha <khogans@comptroller.nyc.gov>
*Cc:* EEO Officer <EEO@comptroller.nyc.gov>
*Subject:* RE: Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

Good Afternoon Ms. Hogans,

I see from the thread below that you have addressed your questions to the appropriate person, our EEO Officer Ms. Jones Randall.  I am certain she will reach out to you (if she hasn't already) to discuss further.

Thank you,

Nicole

*From:* Hogans, Keisha
*Sent:* Friday, February 2, 2018 2:36 PM
*To:* Andrade, Nicole <nandrad@comptroller.nyc.gov>
*Subject:* FW: Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

Quick question

*From:* Hogans, Keisha
*Sent:* Friday, February 2, 2018 2:31 PM
*To:* EEO Officer <EEO@comptroller.nyc.gov>
*Subject:* Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

12

ᄅ

I am asking because I witnessed a manager watching it and discussing. I am curious.

Keisha Hogans

Computer Aide II

Bureau of Information Systems & Technology

Office of the New York City Comptroller Scott M. Stringer

1 Centre Street, 12th floor South, New York, NY 10007

(212)-669-8444

[image: Office Seal (002)]

*From:* public.integrity@ag.ny.gov [mailto:public.integrity@ag.ny.gov]
*Sent:* Monday, November 14, 2022 9:36 AM
*To:* khogans1@nyc.rr.com
*Subject:* NYAG Submission #1-439934438

Thank you for submitting your complaint to the Public Integrity Bureau. Attached please find a copy for your records. Your assistance is vital to our efforts to serve the people of the State of New York.

The Attorney General takes seriously the legal issues of all New Yorkers,



13

and every complaint to this office is carefully considered. Please be assured that we will thoroughly evaluate each of the issues you have raised, and determine if we, or any bureau within our office, can provide assistance. We may also share your submission with other local, state, or federal agencies, as appropriate.

We will contact you if we require any additional information. *Please do not submit follow-up inquiries through the complaint form, *which is for new submissions only. If contacting our office regarding this submission, please refer to *Intake #1-439934438.* Inquiries may be made by phone at (800) 771-7755, or by email.

*IMPORTANT NOTICE: *This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete the e-mail from your system.

14

# The New York City Police Department
# Police Academy

On recommendation of its faculty and by virtue of the authority
vested in it by the Police Commissioner, has awarded to

## Keisha D. Hogans

this certificate as evidence of satisfactory completion of the

## Citizens Police Academy

Given in the City and State of New York
in the month of June, Two Thousand & Sixteen

Case 1:23-cv-10514-VSB    Document 1    Filed 11/29/23    Page 57 of 223

*In Appreciation this Certificate is Presented by*

# New York Theological Seminary

*To*

## Kiesha Hogans

*In recognition of your significant contribution as a member of the Site Team of*

## Pamela Chisholm



*On the occasion of the awarding of the degree of*

*Doctor of Ministry*

*May 21, 2016*

_____    _____    _____
*President*                  *Academic Dean*              *Program Director*

## Hogans, Keisha

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Friday, October 7, 2016 4:27 PM |
| **To:** | Calo, Robert |
| **Subject:** | FW: To avoid complaining in the future, as long as it is not a Wednesday and I have about 2 hours to adjust my schedule |

FYI

**From:** Hogans, Keisha
**Sent:** Friday, October 7, 2016 4:26 PM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** To avoid complaining in the future, as long as it is not a Wednesday and I have about 2 hours to adjust my schedule

I can stay late when Charles leaves and Tyrell may not be in or they are both out. However, I do need at least a couple of hours to adjust my schedule and I can get the time back at a later date. I do not mind. Enjoy weekend

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



1

# Exhibit B

## Hogans, Keisha

**From:**       Hogans, Keisha
**Sent:**       Tuesday, April 11, 2023 11:22 AM
**To:**         Katz, Ron
**Cc:**         Corbett, Jean
**Subject:**    RE: DCAS Class

Good morning,

I am confused. I applied for these classes months ago and HR had to review the training. I asked for 4 classes, then Jean Jones sent the agency an email stating that employees can only take one. I changed my request to one, even though I knew other employees would not take advantage of receiving extra training classes. I resubmitted my paperwork with only one course, which is supposed to start on Monday. I am assuming from your email that HR did not approve this training either.

I thought there was a budget for training. I never asked for a class before because this benefit is not advertised. I would assume that an employee with seniority who never took one of these courses would be given this opportunity. If these courses are not available to all employees, then why have it listed on the Intranet making employees believe we can advance in our civil service careers with agency paid training?

I guess I will have to apply again next year and see what happens.

**From:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Sent:** Tuesday, April 11, 2023 10:37 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Cc:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** Re: DCAS Class

Keisha,

There is a review of overall training for the Comptroller's office in place. Once completed we will be able to process new training requests.

Thank you,
Ron

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Date:** Wednesday, March 8, 2023 at 12:21 PM
**To:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Subject:** DCAS Class

Good afternoon,

Attached is a request from Keisha Hogan's to attend a DCAS class.

Jean

1

**NYC Department of Citywide Administrative Services | Citywide Training Center (CTC)**

# Application

| DCAS CTC Office Use Only | |
|---|---|
| **Input Date** | **Initials** |

## Training Applicant Information

Please complete all fields. The employee reference number can be found on your paystub. It is not your social security number. First-time non-City applicants can leave this blank and will be assigned a DCAS CTC ID number after registration. If you need help obtaining any information in this section, please contact your training liaison for assistance.

Employee Reference Number (See Paystub) `0 2 7 5 9 0 7`
Employee Affiliation: (Check One) ☑City ☐State ☐Federal ☐Non-Gov.
Today's Date 2/3/23

Last Name Hogans    First Name Keisha    Middle Initial D

Civil Service Title Computer Associate Ope    Office Title Computer Associate Operations

Agency Name N.Y.C. Comptroller's Office    Agency Code `0 1 5`    I have changed agencies within the last two years ☑Yes ☐No

Division/Work Unit B.I.S.T. Central Imaging Facility    Work Address (full) C.I.F. room 1225 New York, N.Y. 10007

Work Phone (212)-669-8444    Work Fax

Work Email KHogans@comptroller.nyc.gov    Personal Email KHogans1@nyc.rr.com

## Optional Applicant Information

Gender
☑ Female or Woman    ☐ Non-binary (not female/woman or male/man)    ☐ Unknown/I choose not to disclose
☐ Male or Man    ☐ Other (a gender not listed)

| Are you Hispanic? | What is your race? | |
|---|---|---|
| ☑ Yes | ☐ Asian | ☐ I do not want to disclose |
| ☑ No | ☑ Black | ☐ Two or more races |
| | ☐ White | |
| ☐ I do not want to disclose | ☐ American Indian or Alaskan Native | |

## Selected Course Information

Please complete all fields. Courses selected should be from the current DCAS Citywide Training Center Class Schedule. Contact your agency training liaison for additional course information.

| | Course Code | Course Title | Course Dates | Days | Cost |
|---|---|---|---|---|---|
| 1 | T3084 | Excel for Office 365, Part 1 | march 15 | 1 | $150. |
| 2 | C7833 | Writing in Plain language and Elim | April 17 and may 15 | 1 1/2 | $485. |
| 3 | C8176 | Enhancing Emotional Intelligence | April 28 | 1 | $250. |
| 4 | C1240 | Getting Results when You're not in chge | June 14 | 1 | $250. |

## DCAS Citywide Training Center Confirmation/Cancellation Policy

1. Your agency training liaison will notify you of your confirmation to attend the class(es) for which you have registered. You should not attend a class for which you have not received a confirmation. If you have not received a confirmation, check with your liaison. No food or beverages are permitted in classrooms.
2. Requests for cancellations or scheduling must be received in writing at least 7 business days prior to the start of a confirmed class. Requests received without the required notice will result in a full-course fee charge. Agencies may designate a qualified participant for substitution up to the commencement of the class without penalty.

## Applicant Signature

_____          _____
Applicant Signature                                      2/3/23
                                                                 Date

## After Completing Application

1) Forward this completed application to your immediate supervisor for signature and authorization.

2) Your supervisor must then forward this completed application to the appropriate agency training liaison for processing.

3) If the training is at a cost, the agency training liaison must then forward the application to the agency fiscal officer or designee for fiscal authorization.

4) The agency training liaison must then sign and forward the completed and authorized application to the DCAS CTC.

*Note: The DCAS CTC will process applications under the assumption that Training Liaisons have obtained all necessary permissions.

## Supervisor's Authorization

Supervisor's Name (Print)  Jean Corbett          Title  Manager

Work Phone  212-669-3159          Work Fax          Work Email  jcorbet@Comptroller.Ny.go

By my signature, I certify that this employee is authorized for training in the course(s) requested and confirm that this employee has taken, where applicable, the prerequisite basic courses and/or has demonstrated the skill necessary to participate successfully in advanced-level coursework. Additionally, I understand that this employee is excused from normal work assignments during the hours of training and is required to attend the training course(s), as scheduled, once DCAS CTC registration confirmation is received by the Agency Training Liaison.

_____          _____
Supervisor Signature                                      2/3/23
                                                                 Date

## Hogans, Keisha

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Thursday, November 17, 2022 3:31 PM |
| **To:** | Randall, Diane Jones |
| **Subject:** | RE: [EXTERNAL] |

**Categories:**         Red Category

Good afternoon,

Yes, I do. I cannot believe that Michael Bott who is the Comptroller's office Chief Information Officer and the Director of room 1225 gave me a written warning because I was locked out of the network and could not communicate. Cheryl gave me a password and Christine gave me a different password, which locked me out of the network. No one looked this up and we are in BIST. Since they were still emailing me even though I was locked out of the network, Ron felt I was being insubordinate and ignoring him; despite the fact that I showed him and Jean all the emails of communication. This is abusive behavior. I make sure I keep accurate records because I know how management in BIST behaves, but NO ONE read the time log of the emails. Nor did anyone check to see if I was locked out of the network or that I received 2 different passwords from 2 different people.

Michael Bott and Ron Katz have a problem with me and it is not about me going AWOL. I was locked out of the network and given a written warning because of it. This is ridiculous.

**From:** Randall, Diane Jones <drandal@comptroller.nyc.gov>
**Sent:** Thursday, November 3, 2022 12:27 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: [EXTERNAL]

Hi Keisha,

If you believe the Agency's EEO policy has been violated, please let me know.

-Diane



**Diane Jones Randall**
EEO Officer
Office of New York City Comptroller Brad Lander
1 Centre Street, Room 639, New York, NY 10007
P: (212) 669-2173 | drandal@comptroller.nyc.gov
P: (212) 669-3692 | eeo@comptroller.nyc.gov

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Friday, October 28, 2022 3:27 PM
**To:** Randall, Diane Jones <drandal@comptroller.nyc.gov>
**Subject:** FW: [EXTERNAL]

Good afternoon,

1

## Hogans, Keisha

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Wednesday, November 16, 2022 2:06 PM |
| **To:** | Hogans, Keisha |
| **Subject:** | Automatic reply: I want to cancel my AL 3 hours for 11/17. |

I am currently out of the office and will return on November 21, 2022  Please contact the following people for assistance:

New Claim Request -  Tim Carrero tcarrer@comptroller.nyc.gov
Contracts  Robert Calo@ 212-669-3741 or Ron Katz @ 212-669-4704.
Labor Law -Terrell Cley at tcley@comptroller.nyc.gov
Add/ Edit/update Attorney/s- Johnny Thomas at jthomas@comptroller.nyc.gov, Yomaria Malave at  Ymalave@comptroller.nyc.gov.


Thank you!

1

## Hogans, Keisha

| | |
|---|---|
| **From:** | EEO Officer |
| **Sent:** | Tuesday, October 4, 2022 12:52 PM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: Reasonable Accommodation |

Hi Keisha,

You can request a Reasonable Accommodation for:
- disability
- religion
- status as a victim of domestic violence, sex offenses, or stalking
- pregnancy, childbirth, or related medical conditions

If you don't fall into one of these four categories, please talk to Human Resources about your current concerns.

Thanks,
Diane



**Diane Jones Randall**
EEO Officer
Office of New York City Comptroller Brad Lander
1 Centre Street, Room 639, New York, NY 10007
P: (212) 669-2173 | drandal@comptroller.nyc.gov
P: (212) 669-3692 | eeo@comptroller.nyc.gov

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Tuesday, October 4, 2022 12:27 PM
**To:** EEO Officer <EEO@comptroller.nyc.gov>
**Subject:** RE: Reasonable Accommodation

Good afternoon,

I already have an EEOC complaint being investigated. EEOC already knows that I was not given a fair trial because evidence was missing. I asked about the reasonable accommodation. I wanted to know what she needed to write. I do not have a disability, but I do work in a hostile work environment since there was 2 incidents of sexual harassment. The trial caused me emotional distress.

**From:** EEO Officer <EEO@comptroller.nyc.gov>
**Sent:** Tuesday, October 4, 2022 11:59 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Reasonable Accommodation

Hi Keisha,

If you are filing an EEO discrimination claim, I do not need anything from your doctor.

1

## Hogans, Keisha

**From:** Hogans, Keisha
**Sent:** Friday, December 17, 2021 9:30 AM
**To:** EEO Officer
**Subject:** RE: EEO manual

Good morning,

This is just an FYI email.

First, I owe you an apology. I have been so angry over the conditions of my unit and the violations of my civil rights that a lot of times, my emails were harsh because I was hurt. I am working on my communication skills.

I am sure you are aware that I was on trial. I am not sure if OGC shared information with you, but a lot evidence was uncovered. Every civil rights complaint that I filed in good faith was proven to be true and civil rights laws were violated. OGC admitted there were  hiccups made with the internal investigation. Since the judge did not render his decision yet, I will go in to too many specifics. I am happy that my name and character have been vindicated, during my trial due to evidence that was overlooked, but it came out when people were sworn under oath. I am happy that is on the court transcript as well.

Years ago, a Hispanic female colleague text me calling me a female dog, during working hours. I emailed management, but  management did not reprimand this employee. During my trial, this Hispanic female under 40 years old testified that in 2017, she stepped down from being the supervisor of claims. She said, "Management had written document of her stepping down, due to the workload being too much for her." This Hispanic female colleague sworn testimony is on the court transcript as well. This position was not posted. No one else in my unit was offered this position or made aware of it. Her testimony proved that my NYS Human Rights and EEOC complaint made in 2017, if a field investigation was conducted, this would have been discovered.

My director testified that he has heard a colleague, the same Hispanic female under 40 who was given a supervisory position, refers to me as a "dark cloud.' My director did not reprimand her, but hearing that I am allowed to be called a "dark cloud," is offensive. My director gave me a written warning for calling this same colleague lazy, but he allows her to call me a "dark cloud." I could not believe my director allowed this colleague give me this nickname and he repeated it continuously during this testimony. According, to EEO laws this is a violation, yet again it was allowed for this colleague to call me out of my name a 2nd time. First, this younger Hispanic female colleague text me during working hours calling me a female dog and nothing happened, then the "dark cloud, " comment.

There were two witnesses whose audio testimonies were left out regarding the video that was shown that I found offensive. Plus, either 2018 or 2019 an office title of Claims document specialist was Hispanic male under 40. Management gave this younger Hispanic male opportunities to advance that were not given to more experienced employees and it is for a task that is done primarily by Black women, who could have done this. Management wrote and testified that, "Hispanic young staff are not given preferential treatment." However, if anyone was to ask those Hispanic employees, then they would have explained their tasks and the extra training they received. Again, these examples proved that I was telling the truth.

As stressful and horrible as it was for me to be on trial, during the pandemic, I am glad that my name and character have been vindicated. I never lied and evidence came out that was overlooked, so I guess that is why the judge has not rushed to given his judgement since the evidence cleared my name at the beginning.  It was an stressful experience especially since I have never been in trouble, but the good news is that the truth came out and since it in the court transcripts, it can't be changed.

1

## Hogans, Keisha

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Friday, December 10, 2021 3:53 PM |
| **To:** | EEO Officer |
| **Subject:** | RE: EEO manual |

Good afternoon,

Okay, I thought that is what it meant. I figured that, but I was not sure. So, if there is evidence and it was rejected is that a violation too?

So , it is okay for management to have some staff members to receive CT or OT for a task and exclude one who does the same task? I wasn't aware of that.

Thank you

**From:** EEO Officer
**Sent:** Friday, December 10, 2021 3:49 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: EEO manual

Hi Keisha,

The policy states that no employee will suffer retaliation for "raising good faith complaints of discrimination, opposing discrimination, participating in any way in an employment discrimination investigation or lawsuit, or engaging in any other protected activity."

If there is evidence that anyone has been denied anything because of their color, that is a violation.

Comp time and overtime is approved or denied at the discretion of an employee's supervisor.

-Diane

Diane Jones Randall
EEO Officer
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, Room 639, New York, NY 10007
P: (212) 669-3692  | eeo@comptroller.nyc.gov

**From:** Hogans, Keisha
**Sent:** Friday, December 10, 2021 1:39 PM
**To:** Randall, Diane Jones <drandal@comptroller.nyc.gov>
**Subject:** EEO manual

Good afternoon,

1

2

• This Policy applies to *all* aspects of employment with the Comptroller's Office, including recruitment and hiring practices, promotions, discipline, termination, performance evaluations, work assignments, compensation, benefits and all other personnel actions that affect the terms, conditions, and privileges of an individual's employment or potential employment with this agency

## C. Prohibited Employment Practices

### 1. Discriminatory Employment Decisions

This Policy prohibits making employment decisions based on a person's protected status.

This Policy applies to *all* aspects of employment with this Office, including recruitment and hirin  practices, promotions, discipline, termination, performance evaluations, work assignments,  compensation, benefits and all other personnel actions that affect the terms, conditions, and  privileges of an individual's employment or potential employment with this Office. This means   employees may not discriminate when it comes making decisions about granting breaks, approvin  leave, assigning work stations, or setting any other term or condition of employment, no matter  how small.

### 2. Retaliation

This Policy prohibits retaliating against (or punishing) any employee of the Comptroller's Office  job applicant for asserting his or her rights to be free from employment discrimination. Asserting  these EEO rights is called "protected activity," and it can take many forms. Examples of activities  that are protected against retaliation include the following:

- opposing discriminatory practices in the workplace
- raising good faith complaints of discrimination

.....................A complaint made in good faith, even if found to be unsubstantiated, will not be considered a false accusation.

Is it an EEO violation if management offers CT or OT to everyone in a section, but excludes a Black woman who filed an EEO complaint?

Management has given CT/OT for the task that I perfom, but I have been excluded. I think this is the 3rd week my colleagues are allowed to earning CT/OT.

3

**Hogans, Keisha**

**From:**       EEO Officer
**Sent:**       Friday, December 10, 2021 3:49 PM
**To:**         Hogans, Keisha
**Subject:**    RE: EEO manual

Hi Keisha,

The policy states that no employee will suffer retaliation for "raising good faith complaints of discrimination, opposing discrimination, participating in any way in an employment discrimination investigation or lawsuit, or engaging in any other protected activity."

If there is evidence that anyone has been denied anything because of their color, that is a violation.

Comp time and overtime is approved or denied at the discretion of an employee's supervisor.


-Diane


Diane Jones Randall
EEO Officer
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, Room 639, New York, NY 10007
P: (212) 669-3692  | eeo@comptroller.nyc.gov

**From:** Hogans, Keisha
**Sent:** Friday, December 10, 2021 1:39 PM
**To:** Randall, Diane Jones <drandal@comptroller.nyc.gov>
**Subject:** EEO manual

Good afternoon,

I pray you and your family are doing well. I have a couple of questions that I am confused about regarding EEO's manual.


The manual states The Comptroller's Office is an equal employment opportunity employer that will not tolerate  discrimination or harassment of any kind against employees and applicants for employment on the basis of actual or perceived age, race, color, national origin, immigration status, religion/creed,  gender (including sexual harassment, gender identity or expression), disability, pregnancy, status as  a current or former military service member, arrest or conviction record, marital or partnership  status, caregiver status, genetic information or predisposing genetic characteristic, sexual  orientation, unemployment status, consumer credit history, familial status, salary history (effective  as of October 31, 2017), sexual and reproductive health decisions (effective as of May 20, 2019),  status as a victim/survivor of domestic violence, sex offenses, or

1

• This Policy applies to *all* aspects of employment with the Comptroller's Office, including recruitment and hiring practices, promotions, discipline, termination, performance evaluations, work assignments, compensation, benefits and all other personnel actions that affect the terms, conditions, and privileges of an individual's employment or potential employment with this agency

## C. Prohibited Employment Practices

### 1. Discriminatory Employment Decisions

This Policy prohibits making employment decisions based on a person's protected status.

This Policy applies to *all* aspects of employment with this Office, including recruitment and hirin practices, promotions, discipline, termination, performance evaluations, work assignments, compensation, benefits and all other personnel actions that affect the terms, conditions, and privileges of an individual's employment or potential employment with this Office. This means employees may not discriminate when it comes making decisions about granting breaks, approvin leave, assigning work stations, or setting any other term or condition of employment, no matter how small.

### 2. Retaliation

This Policy prohibits retaliating against (or punishing) any employee of the Comptroller's Office job applicant for asserting his or her rights to be free from employment discrimination. Asserting these EEO rights is called "protected activity," and it can take many forms. Examples of activities that are protected against retaliation include the following:

- opposing discriminatory practices in the workplace
- raising good faith complaints of discrimination

.....................A complaint made in good faith, even if found to be unsubstantiated, will not be considered a false accusation.

Is it an EEO violation if management offers CT or OT to everyone in a section, but excludes a Black woman who filed an EEO complaint?

Management has given CT/OT for the task that I perfom, but I have been excluded. I think this is the 3rd week my colleagues are allowed to earning CT/OT.

3

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Carrero, Timothy |
| **Sent:** | Tuesday, June 15, 2021 9:32 AM |
| **To:** | Corbett, Jean; Kilgore, Arthurene; Walker, Lisa; Hogans, Keisha; Malave, Yomaira; Branch, Gladys; Hope, Deborah; Decker, Douglas |
| **Subject:** | Re: Change in coding Police chase claims. |

Manual has been updated.

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Tuesday, June 15, 2021 9:01 AM
**To:** Kilgore, Arthurene <akilgor@comptroller.nyc.gov>; Walker, Lisa <lwalker@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Malave, Yomaira <ymalave@comptroller.nyc.gov>; Branch, Gladys <gbranch@comptroller.nyc.gov>; Hope, Deborah <dhope@comptroller.nyc.gov>; Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: Change in coding Police chase claims.

Will let you know. Good question!

Jean

**From:** Kilgore, Arthurene <akilgor@comptroller.nyc.gov>
**Sent:** Tuesday, June 15, 2021 8:59 AM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>; Walker, Lisa <lwalker@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Malave, Yomaira <ymalave@comptroller.nyc.gov>; Branch, Gladys <gbranch@comptroller.nyc.gov>; Hope, Deborah <dhope@comptroller.nyc.gov>; Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: Change in coding Police chase claims.

Is this pertaining to vehicles only?  Or does it apply to a police chase on foot?

**From:** Corbett, Jean
**Sent:** Tuesday, June 15, 2021 8:55 AM
**To:** Walker, Lisa <lwalker@comptroller.nyc.gov>; Kilgore, Arthurene <akilgor@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Malave, Yomaira <ymalave@comptroller.nyc.gov>; Branch, Gladys <gbranch@comptroller.nyc.gov>; Hope, Deborah <dhope@comptroller.nyc.gov>; Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** FW: Change in coding Police chase claims.

Good morning,

Please see change below. Let me know if you have any questions.

Tim, please update manual.

Jean

**From:** Courtney, Mary Ellen <mcourtn@comptroller.nyc.gov>
**Sent:** Monday, June 14, 2021 12:13 PM

1

*Dep't of Sanitation v. Green*, OATH Index No. 1329/02 (Aug. 20, 2002), aff'd, NYC Civ. Serv. Comm'n Item No. CD03-35-SA (Apr. 16, 2003).

Respondent has worked for the Office of the Comptroller for nearly thirty years, has no prior discipline, receives excellent performance evaluations, and is among the hardest working employees in her unit. Report at 2, 25. Despite this, she has not received any promotions or merit raises at work, while she has watched less experienced coworkers be promoted. *Id.* at 2-3.

Several additional facts noted in the Report bear repeating. ALJ Casey found that the Appellant testified in good faith as to events as she recalled them. *Id.* at 7. ALJ Casey also found that the Appellant's complaints to the various City and States agencies were all consistent with one another. *Id.* at 6. The record reflects the Appellant did not file complaints in an attempt to get her coworkers in trouble, but rather because she experienced disparate treatment. *Id.* at 7. Finally, the EEO interview of the Appellant was flawed because it presented an obvious conflict of interest, as the Appellant's representative also represented the subjects of many of the Appellant's complaints. *Id.* at 9.

Based on the evidence presented at trial, and the facts in the record, the Appellant did not intentionally or recklessly commit any misconduct, and the employer did not make a good faith effort to investigate her complaints. Instead, the Appellant engaged in protected activity by making complaints about retaliation and discrimination in good faith based on her observations and experiences, even though there is no requirement under the NYCHRL for complaints to be made in good faith in order to gain protection from retaliation under the statute. Additionally, the

4

Appellant deserves the protection of anti-retaliation statues because it is clear that the misconduct charges stemmed directly from her protected activity under the NYCHRL and other civil rights laws. Therefore, the Appellant's conduct did not rise to the level of misconduct and she should not be subjected to discipline based on the facts established at the trial in this matter.

ALJ Casey concluded that the Appellant did engage in one charge of misconduct, namely the allegation that the Appellant made false or misleading statements in her DOI complaint regarding the discussion and display of pornography in the workplace. However, this finding is contradicted by the record in this case. ALJ Casey believed that the Appellant's complaint to DOI did not merit the same protection as under the NYCHRL because the Administrative Code which protects those individuals who make reports to DOI only applies to claims that an employee "reasonably believes" involve corruption and similar misconduct. Admin. Code §12-113(b)(1).

This finding was made in error because the record does establish that the Appellant had a reasonable basis in her DOI complaint. The Appellant credibly testified about the lewd comments and commotion she observed when others viewed the pornographic video at work. ALJ Casey found that the Appellant had a reasonable basis for her other complaints which were made under very similar circumstances and had a similar good faith basis. It would therefore be arbitrary and capricious, and unsupported by rational evidence, to find that this one complaint was not made in good faith.

5

had a reasonable basis to make her complaints, and acted with good faith at all times. Thus, Appellant maintains that the penalty of a twenty-day suspension is so disproportionate to the offenses charged to be shocking to one's sense of fairness.

Based on the above, Appellant respectfully requests the Commission to (1) Reverse the Comptroller's Determination to sustain the charge and suspend Appellant; (2) Restore Appellant's salary for the twenty day period she was suspended; (3) Order that disciplinary charge at issue be expunged from Appellant's personnel file; and, (4) Order any relief that may be deemed just and proper. In the event the Commission upholds the charge, it is Appellant's contention that a twenty day penalty is unreasonably excessive and shocking to ones sense of fairness, and should be reduced in accordance with the particular facts and circumstances of this case.

Respectfully submitted,

Michael Coviello
Assistant General Counsel
District Council 37
AFSCME, AFL-CIO
125 Barclay St. 5th Floor
New York, NY 10007

7

urthermore, as ALJ Casey noted, all of the complaints the Appellant made

s agencies were consistent and essentially the same. It is illogical and unfair

plaint to lack protection because it was made to one City agency when the very same complaint has protection when made to another City agency. Under the totality of the circumstances, it would be unjust to penalize the Appellant for this charge, and the ALJ's Report and the agency's determination were both made in error and disregard of the facts.

The Appellant's procedural due process rights were not adequately protected at the hearing. The only charge sustained against the Appellant was based on a video that was displayed in the workplace, that she did not have in her possession. However, the Petitioner at trial never entered the video into evidence. It was therefore irrational of ALJ Casey to find that the employer sustained its burden of proof when it failed to submit such a critical piece of evidence into the record. The Appellant requested that the employer investigate the video during the investigation into her complaints, but her employer ignored her complaints and requests. The Appellant entered credible testimony and email evidence into the record reflecting the circumstances of her complaint about this issue, but this evidence was ignored in the Report.

On a final note, under the facts of this case, a penalty of a twenty day suspension is excessive and unreasonable. Such a long period of unpaid suspension presents a serious economic harm to the Appellant. The Appellant has worked for the Comptroller for nearly thirty years. The record reflects that she is an extremely capable employee with no prior discipline. As explained above, Appellant's behavior did not rise to the level of misconduct as her complaints were protected activity, she

6

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Monday, November 29, 2021 9:19 AM |
| **To:** | Katz, Ron |
| **Subject:** | Fw: Is there CT/OT available? |

Good morning,

I am confused. I asked Jean a question and she said, "reach out to you." I noticed that the eclaims que was going down. I am sure that there is OT, but I wasn't made aware of it and Jean told me to reach out to you.

---

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Monday, November 29, 2021 9:17 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Is there CT/OT available?

You asked me about OT. I said to reach out to Ron.



*Jean C. Corbett*
Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159, Email: jcorbet@comptroller.nyc.gov

**From:** Hogans, Keisha
**Sent:** Monday, November 29, 2021 9:16 AM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** Re: Is there CT/OT available?

Huh?

---

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Monday, November 29, 2021 9:15 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Is there CT/OT available?

Reach out to Ron.

1

Thank you for responding. I figured I was right, but I wanted to verify it with you because I was confused.

I pray you and your family stay safe.

**From:** EEO Officer
**Sent:** Friday, December 10, 2021 3:49 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: EEO manual

Hi Keisha,

The policy states that no employee will suffer retaliation for "raising good faith complaints of discrimination, opposing discrimination, participating in any way in an employment discrimination investigation or lawsuit, or engaging in any other protected activity."

If there is evidence that anyone has been denied anything because of their color, that is a violation.

Comp time and overtime is approved or denied at the discretion of an employee's supervisor.

-Diane

Diane Jones Randall
EEO Officer
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, Room 639, New York, NY 10007
P: (212) 669-3692 | eeo@comptroller.nyc.gov

**From:** Hogans, Keisha
**Sent:** Friday, December 10, 2021 1:39 PM
**To:** Randall, Diane Jones <drandal@comptroller.nyc.gov>
**Subject:** EEO manual

Good afternoon,

I pray you and your family are doing well. I have a couple of questions that I am confused about regarding EEO's manual.

The manual states The Comptroller's Office is an equal employment opportunity employer that will not tolerate   discrimination or harassment of any kind against employees and applicants for employment on the basis of actual or perceived age, race, color, national origin, immigration status, religion/creed,  gender (including sexual harassment, gender identity or expression), disability, pregnancy, status as  a current or former military service member, arrest or conviction record, marital or partnership  status, caregiver status, genetic information or predisposing genetic characteristic, sexual  orientation, unemployment status, consumer credit history, familial status, salary history (effective  as of October 31, 2017), sexual and reproductive health

2

decisions (effective as of May 20, 2019),  status as a victim/survivor of domestic violence, sex offenses, or stalking, or other non-merit based  factors (collectively "protected status"). This Policy is intended to implement this commitment.

It is also Comptroller's Office policy that none of its employees or job applicants will suffer  retaliation or harassment for raising good faith complaints of discrimination, opposing  discrimination, participating in any way in an employment discrimination investigation or lawsuit,  or engaging in any other protected activity.

It is an EEO violation for management to retaliation against an employee for filing a civil rights complaint?

1 The Comptroller appoints an EEO Officer to assist with the implementation of this Policy, standards, and procedures. The agency EEO Officer and other personnel, including EEO counselors, investigators, liaisons, etc., are referred to in this Policy as "EEO office" or "EEO representatives."

**B. Application of this Policy**

3

• This Policy applies to *all* aspects of employment with the Comptroller's Office, including recruitment and hiring practices, promotions, discipline, termination, performance evaluations, work assignments, compensation, benefits and all other personnel actions that affect the terms, conditions, and privileges of an individual's employment or potential employment with this agency

## C. Prohibited Employment Practices

### 1. Discriminatory Employment Decisions

This Policy prohibits making employment decisions based on a person's protected status.

This Policy applies to *all* aspects of employment with this Office, including recruitment and hirin practices, promotions, discipline, termination, performance evaluations, work assignments, compensation, benefits and all other personnel actions that affect the terms, conditions, and privileges of an individual's employment or potential employment with this Office. This means employees may not discriminate when it comes making decisions about granting breaks, approvin leave, assigning work stations, or setting any other term or condition of employment, no matter how small.

### 2. Retaliation

This Policy prohibits retaliating against (or punishing) any employee of the Comptroller's Office job applicant for asserting his or her rights to be free from employment discrimination. Asserting these EEO rights is called "protected activity," and it can take many forms. Examples of activities that are protected against retaliation include the following:

- opposing discriminatory practices in the workplace
- raising good faith complaints of discrimination

....................A complaint made in good faith, even if found to be unsubstantiated, will not be considered a false accusation.

Is it an EEO violation if management offers CT or OT to everyone in a section, but excludes a Black woman who filed an EEO complaint?

Management has given CT/OT for the task that I perfom, but I have been excluded. I think this is the 3rd week my colleagues are allowed to earning CT/OT.

4

## Keisha Hogans

| | |
|---|---|
| **From:** | Hamilton, Karen (OATH) <khamilton@oath.nyc.gov> |
| **Sent:** | Tuesday, January 25, 2022 2:12 PM |
| **To:** | Keisha Hogans |
| **Cc:** | OATH Calunit |
| **Subject:** | RE: [EXTERNAL] RE: City of New York - Correspondence #1-1-6151022 OATH Contact Clerk's Office  Case Index 210203 Office of the Comptroller v. Hogans, Keisha |

Forms are also on our website
www.nyc.gov/oath. Select Trials Division then select Overview  then ( Trial Related Forms)

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Tuesday, January 25, 2022 11:43 AM
**To:** Hamilton, Karen (OATH) <khamilton@oath.nyc.gov>
**Cc:** OATH Calunit <OATHCalunit@oath.nyc.gov>
**Subject:** RE: [EXTERNAL] RE: City of New York - Correspondence #1-1-6151022 OATH Contact Clerk's Office Case Index 210203 Office of the Comptroller v. Hogans, Keisha

Good morning,

I was told that I can directly contact OATH to request this information. Okay, I did not know. I did ask Mr. Washington for this subpoena. Okay, thanks.

**From:** Hamilton, Karen (OATH) [mailto:khamilton@oath.nyc.gov]
**Sent:** Tuesday, January 25, 2022 11:34 AM
**To:** Keisha Hogans <khogans1@nyc.rr.com>
**Cc:** OATH Calunit <OATHCalunit@oath.nyc.gov>
**Subject:** RE: [EXTERNAL] RE: City of New York - Correspondence #1-1-6151022 OATH Contact Clerk's Office Case Index 210203 Office of the Comptroller v. Hogans, Keisha

Good Morning,

A recommended decision was already issued, You must make a request to the agency to reopen case.  Our record shows  that Mr. Washington is your attorney please contact him regarding your inquiry .   OATH's Rules of Practice on our Website at www.nyc.gov/oath. Select Trials division.

This is based on OATH Trials rule 1-52:

# §1-52 Post-Trial Motions.

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Monday, January 24, 2022 4:38 PM
**To:** Goldstein, Jon (OATH) <JGoldstein2@oath.nyc.gov>

1

**Cc:** OATH Calunit <OATHCalunit@oath.nyc.gov>
**Subject:** [EXTERNAL] RE: City of New York - Correspondence #1-1-6151022 OATH Contact Clerk's Office

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Good evening,

Thank you. I do not know the process. I just found out that I could have asked for cellphone records to be subpoena, which would help my case.

**From:** Goldstein, Jon (OATH) [mailto:JGoldstein2@oath.nyc.gov]
**Sent:** Monday, January 24, 2022 4:28 PM
**To:** 'khogans1@nyc.rr.com' <khogans1@nyc.rr.com>
**Cc:** OATH Calunit <OATHCalunit@oath.nyc.gov>
**Subject:** FW: City of New York - Correspondence #1-1-6151022 OATH Contact Clerk's Office

Thank you for contacting the Clerk's Office.  This is the Hearing Division, and it appears your inquiry is a matter before the Trials Division.  If you have questions about any cases heard before the Trials Division please contact them at  OATHCalUnit@OATH.nyc.gov

We have copied them here for your convenience.

**Responses must be sent to clerksoffice@oath.nyc.gov for a reply.**

Respectfully,

Jon Goldstein, Esq.
Agency Counsel, Clerk's Office
Office of Administrative Trials and Hearings



**From:** agencymail <agencymail@customercare.nyc.gov>
**Sent:** Monday, January 24, 2022 4:18 PM
**To:** ClerksOffice <ClerksOffice@oath.nyc.gov>
**Subject:** City of New York - Correspondence #1-1-6151022 OATH Contact Clerk's Office

Below is the result of your feedback form.  It was submitted by
Keisha Hogans () on Monday 24th of January 2022 04:14:27 PM
------------------------------------------------------------------------

This form resides at
https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww1.nyc.gov%2Fsite%2Foath%2Fclerks-office%2Femail-the-clerks-

office.page&amp;data=04%7C01%7Cagencyincoming%40customercare.nyc.gov%7Cf7d99fbe2a6747e7c0ff08d9df7e834
8%7C73d61799c28440228d4154cc4f1929ef%7C0%7C0%7C637786556722257099%7CUnknown%7CTWFpbGZsb3d8eyJ
WIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000&amp;sdata=1V8Dj%2BxwqPBXcGzv
O1%2FlxQfynVgytgAbey3Sd04BXFU%3D&amp;reserved=0

------------------------------------------------------------------------

Message Topic: Other

First Name: Keisha

Last Name: Hogans

Summons Number: OATH Index No. 203/21

textfield:

Address: 38 Monroe Street

City: apt EC12

State: NY

ZIP Code: 10002

Place of Occurrence on Summons: New York

Phone: 212 6698444

Email: khogans1@nyc.rr.com

Message: Good afternoon,
I was told that I can ask the court for a subpoena for evidence in my case. I am not sure of the process. I witnessed inappropriate actions that offended me. I am sure this evidence would prove my innocence, but it was not brought up in my case. I need a subpoena for digital evidence that my cellphone provider can give the court. I have information, but not sure of the process. What do I need to provide to get a subpoena for this digital evidence on a personal cellphone? Thank you very much and please stay safe.

------------------------------------------------------------------------

REMOTE_HOST: 23.215.131.95
HTTP_ADDR: www1.nyc.gov
HTTP_USER_AGENT: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/97.0.4692.99 Safari/537.36

This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete the e-mail from your system.

## Keisha Hogans

| | |
|---|---|
| **From:** | Keisha Hogans <khogans1@nyc.rr.com> |
| **Sent:** | Friday, June 3, 2022 4:07 PM |
| **To:** | 'Coviello, Michael' |
| **Subject:** | FW: T-Mobile |

**From:** Keisha Hogans [mailto:khogans1@nyc.rr.com]
**Sent:** Tuesday, January 25, 2022 12:34 PM
**To:** 'Richard Washington' <Richard@washington-at-law.com>
**Subject:** FW: T-Mobile

Good afternoon,

Any update on getting that subpoena to clear my name?

**From:** Keisha Hogans [mailto:khogans1@nyc.rr.com]
**Sent:** Monday, January 24, 2022 9:21 AM
**To:** 'Richard Washington' <Richard@washington-at-law.com>
**Subject:** FW: T-Mobile

**From:** Keisha Hogans [mailto:khogans1@nyc.rr.com]
**Sent:** Tuesday, January 11, 2022 1:33 PM
**To:** 'Richard Washington' <Richard@washington-at-law.com>; 'Ussery, Justin' <Justin.Ussery@EnvistaForensics.com>
**Subject:** FW: T-Mobile

Good afternoon,

I need would need you on the phone call, so I can clear my name.

**From:** Keisha Hogans [mailto:khogans1@nyc.rr.com]
**Sent:** Friday, January 7, 2022 12:34 PM
**To:** 'Richard Washington' <Richard@washington-at-law.com>
**Subject:** FW: T-Mobile

Good afternoon,

I need my reputation and name to be cleared. It was brutally attacked during this trial and I have evidence to support, all of my complaints, even the racism came out during my trial. I did some research and found this company. I need to know your availability, so I can have them do some research on my behalf. I should not be punished for defending my civil rights, especially when there is more evidence to support everything that I said.

Thank you and stay safe.

**From:** Ussery, Justin [mailto:Justin.Ussery@EnvistaForensics.com]
**Sent:** Friday, January 7, 2022 11:23 AM
**To:** Keisha Hogans <khogans1@nyc.rr.com>
**Subject:** RE: T-Mobile

Keisha,

Please let me know your availability for a matter consultation. Also due to the fact that there will be legal process involved, we would like to have your attorney on the call as well.

I am currently traveling but have availability next week.

Justin

**Justin Ussery**
*Digital Forensic Examiner*
Envista Forensics
D: +1 469 638 0636
M: +1 469 992 9446
www.envistaforensics.com

Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Friday, January 7, 2022 9:25 AM
**To:** Daniel, Lars <lars.daniel@envistaforensics.com>; Digital Forensics Assignments <DFassign@EnvistaForensics.com>; Ussery, Justin <Justin.Ussery@EnvistaForensics.com>
**Subject:** RE: T-Mobile

Good morning

I do have a work attorney. I am interested in this line of services because my job is on the line based off of lies and no investigation.

**From:** Daniel, Lars [mailto:lars.daniel@envistaforensics.com]
**Sent:** Friday, January 7, 2022 9:33 AM
**To:** Keisha Hogans <khogans1@nyc.rr.com>; Digital Forensics Assignments <DFassign@EnvistaForensics.com>; Ussery, Justin <Justin.Ussery@EnvistaForensics.com>
**Subject:** Re: T-Mobile

Keisha,

From this email chain it does appear that you have an attorney, which we require in order to work with you.

Our expert Justin Ussery is copied on this email and will be in touch.

Best,

Lars E. Daniel

2

rating should reflect this outstanding performance and it does not. This is a huge c.
metrics numbers. Someone else needs to investigate the metrics.

**From:** SILVIA DENG-BATISTA [mailto:SILVIA.DENG-BATISTA@EEOC.GOV]
**Sent:** Friday, July 19, 2019 2:38 PM
**To:** Keisha Hogans <khogans1@nyc.rr.com>
**Subject:** RE: New fields added in the metrics from 2009 until now

Ms. Hogans,

Based on all the information that you have provided, I have drafted the cha
'Edit", the charge. This means that you could review and edit your charge
Once you do that, the charge could be reviewed by the Commission and i
Commission receives a charge to review, they only need a summary of your allegations not to ....
two pages. The Commission encourages all possible charging parties to provide additional information in the
form of a letter, including any information that you might feel that could help. I cannot advise you on what
decision to make since, I am inquiring about the pending sign charge since the system notated the date that it
was submitted.

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Friday, July 19, 2019 1:29 PM
**To:** SILVIA DENG-BATISTA <SILVIA.DENG-BATISTA@EEOC.GOV>
**Subject:** RE: New fields added in the metrics from 2009 until now

Good afternoon,

I do need want to the Commission to file my charge and I am sure there is information missing, but I am working on
getting ready for surgery. Is there a way to extend it or can I edit it at a later date, if I sign it today?

**From:** SILVIA DENG-BATISTA [mailto:SILVIA.DENG-BATISTA@EEOC.GOV]
**Sent:** Friday, July 19, 2019 1:14 PM
**To:** Keisha Hogans <khogans1@nyc.rr.com>
**Subject:** RE: New fields added in the metrics from 2009 until now

Good afternoon Ms. Hogans,

I do not need any additional information however, since you wanted the Commission to file your charge, I
drafted it and sent it to you via the portal. The only issue is that the charge needs to be signed, submitted and
filed otherwise it will be closed by the Commission if you fail to complete the process. I hope that you recover
well from your surgery, have a great day.

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Friday, July 19, 2019 1:09 PM
**To:** SILVIA DENG-BATISTA <SILVIA.DENG-BATISTA@EEOC.GOV>
**Subject:** RE: New fields added in the metrics from 2009 until now

Good afternoon,

I just received your message. I did not realize there was a time deadline for the portal. I am having surgery on Monday, July 22nd, so I will be out of for a week. My mind was not on this case for the past month because I was prepping for surgery. I know I cannot focus on it today or this weekend, so I may have to re-file after the 29th. I am not sure how this works. I have to take care of my health. This discrimination stressed me out, caused my hair to fall out and other health challenges. I know it is more information than you need, but this is my dilemma. I have to address my health and surgery is Monday at Lenox Hill.

**From:** SILVIA DENG-BATISTA [mailto:SILVIA.DENG-BATISTA@EEOC.GOV]
**Sent:** Friday, July 19, 2019 9:33 AM
**To:** Keisha Hogans <khogans1@nyc.rr.com>
**Subject:** FW: New fields added in the metrics from 2009 until now

Good morning Ms. Hogan,

I just left you a message at 212-964-2840 regarding the sent charge. I submitted you drafted charge for your review and signature on 06/21/19 and as per the EEOC portal, you have not signed or submit the charge back. If the charge does not get signed or submitted the Commission would not be able to proceed and the system will automatically close it. Please reply to this e-mail and let me know when you have completed the submission of your charge.

Thank you

**From:** SILVIA DENG-BATISTA
**Sent:** Friday, June 21, 2019 10:09 AM
**To:** Keisha Hogans <khogans1@nyc.rr.com>
**Subject:** RE: New fields added in the metrics from 2009 until now

Good morning Ms. Hogans,

I drafted your charge and included all the information that you have provided in the past weeks. Please verify that all that information is correct, if not you can add, edit or delete it and once you have done so please sign(digitally) then, file and submit via the portal. Once you file your charge the Commission will review it and will make a decision. Thank you in adavance.

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Thursday, June 20, 2019 7:14 AM
**To:** SILVIA DENG-BATISTA <SILVIA.DENG-BATISTA@EEOC.GOV>
**Subject:** New fields added in the metrics from 2009 until now

Good morning,

I know that you are not at work, but I wanted you to receive this before I forget again. I have emails from Doug Decker, Deborah Hope and Lisa Walker stating that the metrics system is wrong because Jean Corbett and Rob Katz refused to update the metrics to reflect the new additions. We have more fields to fill out in additional reading the claim to figure out why someone is suing NYC. If they really have a lawsuit against NYC. The more fields we have to fill out, then the more time it takes to complete one new notice of claims. Indexing new notice of claims is the most complicated task with Central Imaging Facility unit. I did not include Arthurene Kilgore because she is the employee that management uses to test how the changes will work, but Arthruene is never timed.

All five of us have complained to Jean and she has ignored it. We are all over 40 and we perform the hardest task within my unit, but if the younger staff in contracts complains, Jean and Ron will solve it. Contracts involves memorizing paperwork. I worked in CIF for about 22 years. Before I came to CIF, I worked within the Contracts Bureau, so I am

3

## Hogans, Keisha

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Thursday, January 3, 2019 2:46 PM |
| **To:** | White, Juliet |
| **Cc:** | Askew, Carolyn |
| **Subject:** | Sexual harassment on the 12th floor of claimants towards Comptroller's female employees. |

Good afternoon,

I mentioned this issue to my former local president Robert Ajaye and nothing ever happened. However, the last incident was on Friday, December 21st of 2018. I was walking from CIF room 1225 to the bathroom and some claimant walked out of room 1220 to make a comment and stare at me walk down the hall. When I came back from the bathroom and I walked pass room 1220, he jumped up again and came to the hallway to stare at me going in to CIF. There are no signs anywhere on this floor to talk about sexual harassment to stop the public from making comments or advances at the women on this floor.

I did contact someone from my local, but they have been quiet. I had to bring this up because I felt so uncomfortable and I almost told the man off. I was talking about it in the bathroom one day and a few women from PD room 1217 said, "they noticed the same thing. Men will make comments before they basically undress you with their eyes." It is very uncomfortable. They are here to talk about their claims, while we are here to work and some men are rude, loud, disrespectful and harass women.

It has happened to me a lot. I would think a man is stopping me for information, but then he starts trying to get to know me on a personal manner. It is annoying. I had to write this before one guy go too far, gets too out of hand and I have to come out character to put him in his place. Something needs to be posted so this professional misconduct can stop. This harassment is beyond annoying.

Thank you.

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



1

## Keisha Hogans

**From:** Civil Rights <Civil.Rights@ag.ny.gov>
**Sent:** Monday, April 8, 2019 1:04 PM
**To:** khogans1@nyc.rr.com
**Subject:** RE: Form submission from: Questions & Comments to Attorney General Letitia James

Thank you for contacting the Civil Rights Bureau at the New York Attorney General's Office. Based on the information you provided, we are unable to investigate this matter because it does not appear to allege a pattern or practice of discrimination. Individual complaints such as yours fall outside the jurisdiction of the Civil Rights Bureau.

You may, however, wish to contact the New York State Division of Human Rights, which has the authority to investigation individual complaints of discrimination. Complaints can be filed online at this address: http://www.dhr.ny.gov/how-file-complaint#howto. Should you wish to contact a private attorney, you may obtain attorney referrals from your local bar association.

Please note that your complaint with the Attorney General's office does not have any impact on applicable statutes of limitations. By filing a complaint with the OAG, you have not initiated a lawsuit or a proceeding, nor has the OAG initiated a lawsuit or proceeding on your behalf.

Kind regards,

Civil Rights Bureau

**From:** Keisha <khogans1@nyc.rr.com>
**Sent:** Saturday, April 6, 2019 11:45 AM
**To:** NYSAG EMAIL FOR INTRANET <nysag@ag.ny.gov>
**Subject:** Form submission from: Questions & Comments to Attorney General Letitia James

Submitted on Saturday, April 6, 2019 – 11:45 Submitted by user: Anonymous Submitted values are:

```
==Personal Information==
  Salutation: Ms.
  First Name: Keisha
  Last Name: Hogans
  Address 1: 38 Monroe Street
  Address 2: apt EC-12
  City: New York
  State/Province: New York
  Zip/Postal Code: 10002
  Phone: 2129642840
  Email Address: khogans1@nyc.rr.com
```

Comments: Good morning Honorable Attorney General, I sent your office a certified letter about the discrimination practices within Comptroller Stringer's office. Comptroller Stringer is so busy with trying to get support for his mayoral nomination that he is failing as a Comptroller. NYC contracts were approved from his office for Thrive and a few other projects that are wasting NYC's money, yet Comptroller Stringer has been

1

quiet and no one stopped Mayor DiBlasio. There are hundreds of thousands if not millions on NYer's in need of mental health, but where is the assistance? On February 2, 2018, around 2 pm, I witnessed a colleague, Arthurene Kilgore show our manager, Jean Corbett and another colleague, Yomaira Malave a pornographic video of a large Black male's penis. I heard my manager ask Arthurene, "What is that an umbrella? Oh, I will do that with my husband tonight." The general counsel's office is investigating, but they do not have all the people who were talking about this video. Plus, general counsel has been cover

ing for

management within the Bureau of Information System and Technology for years when NYS Human Rights commission send mail. There is a metrics system that is used to rate how much work we in Central Imaging Facility unit produce per hour. Some employees work produce lower than the average, but on their evaluation, they receive a satisfactory or above and for those of us who are hard workers, we receive above satisfactory, as opposed to outstanding because if we rated an outstanding, then we can ask for a merit increase and take this to DC37 to file a grievance. Management purposely keeps us all at the same level. Since these inaccurate evaluations have been evaluated by management, investigations of the Comptroller's office should be turned over to NYS or request a federal agency. Comptroller Stringer does not report to any other politician, which is why his agency has been allowed to get away with discrimination. BIST advertises promotional computer exams, but once minorities pa

ss,

management has told minority men that the computer specialist title is too much money to give them. Why advertise computer exams? I am not trying to get my colleagues or manager, Jean Corbett in trouble. Ron Katz, the director of CIF, is also Comptroller Stringer's best friend. He has been going to meetings for the Comptroller throughout Brooklyn as opposed to paying attention to his office and doing what the city is paying Ron to do, which is be a director. Everyone is talking about President Trump, but NYC is a mess. NYC politicians need to be accountable and do the job that New Yorkers paid them to do.

■

**IMPORTANT NOTICE:** This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete the e-mail from your system.

## Hogans, Keisha

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Thursday, January 3, 2019 2:46 PM |
| **To:** | White, Juliet |
| **Cc:** | Askew, Carolyn |
| **Subject:** | Sexual harassment on the 12th floor of claimants towards Comptroller's female employees. |

Good afternoon,

I mentioned this issue to my former local president Robert Ajaye and nothing ever happened. However, the last incident was on Friday, December 21st of 2018. I was walking from CIF room 1225 to the bathroom and some claimant walked out of room 1220 to make a comment and stare at me walk down the hall. When I came back from the bathroom and I walked pass room 1220, he jumped up again and came to the hallway to stare at me going in to CIF. There are no signs anywhere on this floor to talk about sexual harassment to stop the public from making comments or advances at the women on this floor.

I did contact someone from my local, but they have been quiet. I had to bring this up because I felt so uncomfortable and I almost told the man off. I was talking about it in the bathroom one day and a few women from PD room 1217 said, "they noticed the same thing. Men will make comments before they basically undress you with their eyes." It is very uncomfortable. They are here to talk about their claims, while we are here to work and some men are rude, loud, disrespectful and harass women.

It has happened to me a lot. I would think a man is stopping me for information, but then he starts trying to get to know me on a personal manner. It is annoying. I had to write this before one guy go too far, gets too out of hand and I have to come out character to put him in his place. Something needs to be posted so this professional misconduct can stop. This harassment is beyond annoying.

Thank you.

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



1

**Hogans, Keisha**

# Carrero, Timothy
Claims Document Associate • Information Systems

# Malave, Yomaira
Computer Associate Tech Support • Information Systems



**Division of Human Rights**



**ANDREW M. CUOMO**
Governor

**JOHNATHAN J. SMITH**
Interim Commissioner

January 6, 2021

Matthew Marks, Esq.
Ricotta & Marks, P.C.
31-10 37th Avenue, Suite 401
Long Island City, New York 11101

  Re: Keisha D. Hogans v. City of New York, Office of the Comptroller
    Case No. 10199862

Dear Mr. Marks:

  We are in receipt of your reopening request with respect to the above case.

  Your client is advised that, pursuant to Section 298 of the Executive Law (Human Rights Law), a no probable cause determination is a final order of the Division which is subject exclusively to judicial review. Judicial review is commenced by the filing of a Notice of Petition and Petition directly with the New York State Supreme Court in the county where the unlawful discriminatory practice took place. Your client was informed of her right to judicial review in the determination.

  Where an appeal is not taken and the time to appeal has expired, a reopening may be predicated only upon actions occurring subsequent to the investigation, or an allegation of newly discovered evidence of wrongdoing, fraud or irregularity which could not, with due diligence, have been discovered before the dismissal of the complaint (9 NYCRR §465.20(c)). A review of your client's does not support a reopening under this section. The evidence fails to indicate that a violation of the Human Rights Law occurred and there is no indication that additional investigation will result in a finding of a violation.

          Very truly yours,

          Caroline J. Downey
          General Counsel

*N.Y.C. Comptroller's EEO manual* (handwritten)

- This Policy applies to *all* aspects of employment with the Comptroller's Office, including recruitment and hiring practices, promotions, discipline, termination, performance evaluations, work assignments, compensation, benefits and all other personnel actions that affect the terms, conditions, and privileges of an individual's employment or potential employment with this agency.

- The protections of this Policy apply to conduct that occurs at any location that could be reasonably regarded as an extension of the workplace, such as any field location, off-site meeting, off-site office social function, City vehicle, or facility where official business is being conducted on behalf of the Comptroller's Office.

- The protections of this Policy apply to conduct motivated by the protected characteristic of other persons with whom an employee is associated. For example, this Policy applies to individuals who are subjected to adverse actions because of their marriage to, or domestic partnership or association with, persons of a particular racial, religious, or national origin group, or persons who have a disability.

- This Policy applies to *all* employees of the Comptroller's Office, including supervisors and other management personnel, interns, and job applicants.

- Any employee who violates this Policy is subject to discipline, up to and including termination.

## C. Prohibited Employment Practices

### 1. Discriminatory Employment Decisions

This Policy prohibits making employment decisions based on a person's protected status.

This Policy applies to *all* aspects of employment with this Office, including recruitment and hiring practices, promotions, discipline, termination, performance evaluations, work assignments, compensation, benefits and all other personnel actions that affect the terms, conditions, and privileges of an individual's employment or potential employment with this Office. This means employees may not discriminate when it comes making decisions about granting breaks, approving leave, assigning work stations, or setting any other term or condition of employment, no matter how small.

### 2. Retaliation

This Policy prohibits retaliating against (or punishing) any employee of the Comptroller's Office or job applicant for asserting his or her rights to be free from employment discrimination. Asserting these EEO rights is called "protected activity," and it can take many forms. Examples of activities that are protected against retaliation include the following:

- opposing discriminatory practices in the workplace
- raising good faith complaints of discrimination
- being a witness in an EEO complaint, investigation, or lawsuit
- cooperating in an EEO investigation

2

- refusing to follow orders where there is a good faith belief that doing so would result in discrimination
- resisting sexual advances or intervening to protect others
- requesting a reasonable accommodation

It is also a violation of this policy to retaliate against or harass someone because of his or her association with individual who engages in protected activity.

Engaging in protected activity does not automatically shield an employee from all discipline and adverse employment action. Employees may be disciplined for misconduct based on non-retaliatory and non-discriminatory reasons that would otherwise result in such consequences. In addition, knowingly making a false accusation of discrimination or knowingly providing false information in the course of an investigation of a complaint, is conduct that may be grounds for discipline. A complaint made in good faith, even if found to be unsubstantiated, will not be considered a false accusation.

### 3. Harassment

Harassment based on any protected characteristic will not be tolerated under this Policy. This Policy also prohibits harassing someone because they have complained about discrimination, filed a charge of discrimination, or testified or participated in any way in an employment discrimination investigation, proceeding, or lawsuit. Sexual harassment (unwelcome sexual advances, requests for sexual favors, and other conduct of a sexual nature) is also unlawful and prohibited by the Policy (see below).

Harassment is unwelcome conduct based on a person's race, color, religion, sex, national origin, age, disability, genetic information, or any other protected characteristic that creates an intimidating, hostile, or abusive working environment or unreasonably interferes with an employee's job performance. Harassment can take the form of threats, intimidation, coercion, violence, or other offensive conduct, such as slurs, derogatory comments, offensive jokes, epithets or name calling, physical assaults or threats, and interference with work performance.

Harassment can occur in a variety of circumstances. The complainant does not have to be the person harassed, but can be anyone affected by the offensive conduct. Unlawful harassment may occur without economic injury to, or discharge of, the complainant. The harasser can be the complainant's supervisor, a supervisor in another area, a co-worker, or someone who is not a Comptroller's Office employee, such as a vendor or client.

Harassment outside of the workplace may also violate this policy if there is a link with the workplace. For example, if a supervisor harasses an employee during an out-of-office meeting or while on a work-related trip.

Employees are urged to report acts of harassment to the appropriate agency officials as outlined in the Procedures section below.

3

### 4. Sexual Harassment

This Policy prohibits sexual harassment and harassment based on gender or any other related protected status.

Sexual harassment will not be tolerated. Sexual harassment is a form of gender-based discrimination. It is predatory sexual behavior in which a person targets another person with unwelcome sexual advances, requests for sexual favors, and other verbal, written, or physical conduct of a sexual nature. Such conduct will violate this policy when (1) the conduct creates a hostile or offensive work environment or (2) granting sexual favors is either explicitly or implicitly a term or condition of employment or is used as the basis for employment decisions (such as the target being fired or demoted for refusing to acquiesce).

A broad range of behavior may be considered sexual harassment if it is unwelcome. Harassment can be verbal, physical, or pictorial/graphic and can include jokes, innuendo, pressure for dates, sexual touching, subtle or direct propositions for sexual favors, or other sexually suggestive remarks, pictures, or gestures.

The harasser can be a man or a woman, or of any gender identity, and sexual harassment may involve individuals of the same or different gender(s). The complainant does not have to be the person at whom the offensive conduct is directed, but anyone affected by the conduct.

Employees are urged to report acts of sexual harassment to the appropriate agency officials as outlined in the Procedures section below.

### 5. Sexual and Reproductive Health Decisions

New York State Labor Law Section 203-e and the New York City Human Rights Law prohibits an employer from accessing an employee's personal information regarding an employee or employee's reproductive health decision making without informed written consent. This means any information relating to a decision by an individual to receive any particular drug, device or services which are arranged for or offered or provided to individuals relating to sexual and reproductive health, including the reproductive system and its function. Such services include, but are not limited to, fertility-related medical procedures, sexually transmitted disease prevention, testing, treatment, and family planning services and counseling, such as birth control drugs and supplies, emergency contraception, sterilization procedures, pregnancy testing, and abortion. These laws also prohibit employers from retaliating against employees for exercising the rights secured by these laws.

Any employee who believes their rights under these laws have been violated may, amongst other things, bring a civil action against the employer. Remedies in such an action could include, where applicable, front and/or back pay, attorney's fees and costs, reinstatement, liquidated damages and other injunctive relief.

4



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

KEISHA D. HOGANS,

Complainant,

v.

CITY OF NEW YORK, OFFICE OF THE
COMPTROLLER,

Respondent.

*[Handwritten margin note:]* N.Y.S. H.R.D. never asked was the video from A.H. personal cellphone submitted during e Discovery - N.Y.S. H.R.D. never investigate - video never request

DETERMINATION AND
ORDER AFTER
INVESTIGATION

Case No.
10199862

On 1/31/2019, Keisha D. Hogans filed a verified complaint with the New York State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of age, race/color, opposed discrimination/retaliation, sex in violation of N.Y. Exec. Law, art. 15 (Human Rights Law).

After investigation, and following opportunity for review of related information and evidence by the named parties, the Division has determined that there is NO PROBABLE CAUSE to believe that the respondent has engaged in or is engaging in the unlawful discriminatory practice complained of. This determination is based on the following:

There is insufficient evidence to support the allegations of unlawful discrimination as contained in the complaint. The investigation has not revealed a nexus between any adverse employment action and protected classes under the New York State Human Rights Law. Complainant has filed multiple discrimination complaints in the past where she maintained that she was subjected to discrimination for bases such as race/color, age, sex, and opposition to discrimination. Complainant's most recent complaint was filed with the New York State Division of Human Rights on or around May 30, 2017. First, the record does not support the contention that Complainant was subjected to adverse employment action when she was given a written warning and/or a single "Needs Improvement" rating in one category on her performance review. It is undisputed that Complainant was issued the written warning and the "Needs Improvement" rating in one category for conduct that was reported to management by a peer, and so the record indicates that Respondent's actions were based on legitimate, non-

discriminatory reasons. In addition, Complainant has peers that share some of the same protected characteristics that did not receive a "Needs Improvement" in either category, including Complainant receiving performance evaluation that did not have "Needs Improvement" ratings in the past, including ratings that occurred subsequent to the complainant engaging in protected activity. Furthermore, there were others who did not engage in protected activity that are similarly situated to Complainant that did receive "Needs Improvement" on their performance evaluation so there is no indication that Complainant was singled out in this regard. Complainant alleges that Respondent retaliates against her by scrutinizing her and/or "watching" her more than her peers; but there was no evidence to substantiate the allegation absent speculation. Specifically, Complainant's misconduct that led up to her written warning came to Respondent's attention through one of her peers; thus, Respondent acted on information it received. There is no evidence that it sought the information out.

Furthermore, Complainant alleged that she was subjected to sexual harassment in the workplace when her peers and supervisor were viewing and discussing pornographic video in the workplace. The record shows that when Complainant reported the conducted an internal investigation ensued, and there was no corroboration for Complainant's allegation after multiple interviews were conducted. Although Complainant insists that the interviewees were untruthful and that the interviewees met prior to their interviews to discuss Complainant's internal complaint, the record shows that even if the allegations were true, there is no evidence that the conduct persisted after Complainant made Respondent aware of the conduct; therefore, Respondent's actions were enough to cure the environment of the alleged sexual offensive conduct. Lastly, Complainant does question Respondent's utilization of its metrics system and its effectiveness, but this, in and of itself, is not considered discriminatory since the system is applied evenly amongst all whom are comparably situated as far as job title and job tasks nor is there any indication that Complainant was treated adversely under the metrics system. There is insufficient evidence that the complainant was subjected to adverse employment actions based on her protected categories under the New York State Human Rights Law. Based on the above, there is no probable cause to support the allegations of discrimination as contained in the complaint.

The complaint is therefore ordered dismissed and the file is closed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

- 2 -

Dated:          **JUL 1 9 2019**

          Syracuse, New York

STATE DIVISION OF HUMAN RIGHTS

By:  *Julia B Day*

          Julia B. Day
          Regional Director

## Hogans, Keisha

| | |
|---|---|
| **From:** | EEO Officer |
| **Sent:** | Monday, February 5, 2018 3:15 PM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: Is it in validation of sexual harassment policy for employees to show a text of a male's body part? |

We'll meet you at 10 am in Room 639, OK?

 **Diane Jones Randall**
EEO Officer
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, Room 639, New York, NY 10007
P: (212) 669-3692 | eeo@comptroller.nyc.gov

**From:** Hogans, Keisha
**Sent:** Monday, February 5, 2018 1:52 PM
**To:** EEO Officer <EEO@comptroller.nyc.gov>
**Subject:** RE: Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

I go to lunch from 12-1, so anytime in the morning is fine. I am nervous because I do know from my write up last week, that my Director and manager do retaliate.

**From:** EEO Officer
**Sent:** Monday, February 5, 2018 1:14 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

Sure. I can meet you any time before 2pm.
What works for you?

**From:** Hogans, Keisha
**Sent:** Monday, February 5, 2018 1:07 PM
**To:** EEO Officer <EEO@comptroller.nyc.gov>
**Subject:** RE: Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

Good afternoon,

Is it possible that I can do it tomorrow because I am working on something right now?

**From:** EEO Officer
**Sent:** Monday, February 5, 2018 11:51 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

**To:** EEO Officer <EEO@comptroller.nyc.gov>
**Subject:** Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

I am asking because I witnessed a manager watching it and discussing. I am curious.

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



3



**Diane Jones Randall**
EEO Officer
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, Room 639, New York, NY 10007
P: (212) 669-3692 | eeo@comptroller.nyc.gov

**From:** Hogans, Keisha
**Sent:** Friday, February 2, 2018 2:31 PM
**To:** EEO Officer <EEO@comptroller.nyc.gov>
**Subject:** Is it in validation of sexual harassment policy for employees to show a text of a male's body part?

I am asking because I witnessed a manager watching it and discussing. I am curious.

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



3

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Friday, October 23, 2020 4:23 PM |
| **To:** | Branch, Gladys; Calo, Robert; Carrero, Timothy; ░amena, Obeng; Hogans, Keisha; Hope, Deborah; Kilgore░ ▓ith, Charles; Taylor, Maurice; Walker, Lisa |
| **Cc:** | Katz, Ron |
| **Subject:** | eClaims |

**Categories:**    Red Category

Good evening or morning,

Starting Monday, October 26$^{th,}$ eClaims will be filled out the same way we fill out regular claims. You can edit all fields that come in incorrectly by the person submitting the claim.  Remove all extra characters left in first and last name, such as hyphens, commas, periods..... Please be sure to go over everything, especially Subrogation claims. Pay close attention to the occurrence information, we seem to forget the borough.

Also, please stick to your assigned eClaim day. There is one exception to this, if there is no regular claims you can index eClaims.

See assigned days (Yomaira is in training, she may do an eClaim here and there).

Monday – Doug
Tuesday – Keisha
Wednesday – Tim
Thursday – Lisa
Friday – Arthurene

November's schedule is the same as October's schedule.

Please confirm you read this, depending on when you are reading this.

Have a great weekend or day.

Thank you,

Jean C Corbett
New York City Comptroller
Adminstrative Manager, BIST-CIF

1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Carrero, Timothy |
| **Sent:** | Tuesday, June 15, 2021 9:32 AM |
| **To:** | Corbett, Jean; Kilgore, Arthurene; Walker, Lisa; Hogans, Keisha; Malave, Yomaira; Branch, Gladys; Hope, Deborah; Decker, Douglas |
| **Subject:** | Re: Change in coding Police chase claims. |
| **Categories:** | Red Category |

Manual has been updated.

---

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Tuesday, June 15, 2021 9:01 AM
**To:** Kilgore, Arthurene <akilgor@comptroller.nyc.gov>; Walker, Lisa <lwalker@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Malave, Yomaira <ymalave@comptroller.nyc.gov>; Branch, Gladys <gbranch@comptroller.nyc.gov>; Hope, Deborah <dhope@comptroller.nyc.gov>; Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: Change in coding Police chase claims.

Will let you know. Good question!

Jean

**From:** Kilgore, Arthurene <akilgor@comptroller.nyc.gov>
**Sent:** Tuesday, June 15, 2021 8:59 AM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>; Walker, Lisa <lwalker@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Malave, Yomaira <ymalave@comptroller.nyc.gov>; Branch, Gladys <gbranch@comptroller.nyc.gov>; Hope, Deborah <dhope@comptroller.nyc.gov>; Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: Change in coding Police chase claims.

Is this pertaining to vehicles only?  Or does it apply to a police chase on foot?

**From:** Corbett, Jean
**Sent:** Tuesday, June 15, 2021 8:55 AM
**To:** Walker, Lisa <lwalker@comptroller.nyc.gov>; Kilgore, Arthurene <akilgor@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Malave, Yomaira <ymalave@comptroller.nyc.gov>; Branch, Gladys <gbranch@comptroller.nyc.gov>; Hope, Deborah <dhope@comptroller.nyc.gov>; Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** FW: Change in coding Police chase claims.

Good morning,

Please see change below. Let me know if you have any questions.

Tim, please update manual.

Jean

1

**From:** Courtney, Mary Ellen <mcourtn@comptroller.nyc.gov>
**Sent:** Monday, June 14, 2021 12:13 PM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Cc:** Maglio-Scotti, Maria <mmaglio@comptroller.nyc.gov>; Mallick, Rohit <rmallic@comptroller.nyc.gov>; Carragoia, Lynell <lcanaga@comptroller.nyc.gov>; Karp, Adam S. <akarp@comptroller.nyc.gov>
**Subject:** Change in coding Police chase claims.

Hi Jean – Please be advised that going forward all police chase claims should be coded as "Auto Acc", not "Police action".
Let me know if you have any questions.
Thank you,
Mary Ellen



MaryEllen Courtney
Division Chief, Affirmative Claims & Quality Review
Bureau of Law & Adjustment
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, 12th Floor, New York, NY 10007
P: 212-669-4729 | F: 212-669-2929 | mcourtn@comptroller.nyc.gov

2

```
************ -COMM. JOURNAL- ******************** DATE MAR-13-2013 ***** TIME 16:00 ********

        MODE = MEMORY TRANSMISSION                START=MAR-13 15:56    END=MAR-13 16:00

        FILE NO.=652

    STN NO.    COMM.    ABBR NO.    STATION NAME/TEL NO.    PAGES    DURATION

    001      . OK      ☎          917187418102            009/009 00:03:16
```

-OFFICE OF THE COMPTROLLER-

```
*********************************** -              - ***** -      1212 669 2310- **********
```

Attention General Counsel        3/13/13

Dear Mrs/Ms. Carolyn Downey,

My name is Keisha D. Hogans, I was told to contact you. My case # is 1015553 2. I did not open my paperwork right away, I went to file another EEO complaint because the racial and equal pay discrimination is still occurring. I realized I may have left out more proof to solidify my complaint. However, my work ethics was attached by whoever investigated me.

I am asking to re-open my case since it was not professionally investigated. I was not verbally attached. I was not contacted prior to a final decision being determined. I was not given a fair investigation. Also, is this the final part of me filing prior to me hiring an employment attorney. I am being discriminated against and it is blatant. Please advise.

Thank you,

Keisha D. Hogans

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

## EEOC REVIEW PROCEDURE

If you want the EEOC to review the New York State Division of Human Rights final determination, because you are not satisfied with their final findings, you may request that the EEOC conduct a substantial weight review.  This request must be done in writing to the EEOC and within fifteen (15) days from the date you received the New York State Division of Human Rights final determination.  Otherwise, we will adopt the state findings.

You review request must specify the reason(s) why you do not agree with the New York State Division of Human Rights final determination.

Mail your request for substantial weight review to:

Equal Employment Opportunity Commission
Attn: State and Local Unit
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

This address is for review purposes only.  Remember, if you have questions concerning the status of your case, you must contact the New York State Division of Human Rights.

Date: June 13, 2012

# Exhibit C

*O.G.C.*
*had access*
*to evidence*
*via email*

**O'Neal, Krishna**

| | |
|---|---|
| **From:** | Wilkinson, Shelly-Ann |
| **Sent:** | Wednesday, January 13, 2021 12:17 PM |
| **To:** | O'Neal, Krishna |
| **Subject:** | FW: (Follow Up  Employee ID # 275907)  Legal Hold  -  Preservation Notice OGC Investigation |

**From:** Ishman, Joseth <jishman@comptroller.nyc.gov>
**Sent:** Monday, November 25, 2019 6:01 PM
**To:** Wilkinson, Shelly-Ann <swilkin@comptroller.nyc.gov>
**Cc:** O'Neal, Krishna <koneal@comptroller.nyc.gov>
**Subject:** Re: (Follow Up Employee ID # 275907) Legal Hold - Preservation Notice OGC Investigation

Hello,

I indented on calling you today, but got tied up. What's a good time to call you tomorrow?

Sent from my iPhone

> On Nov 25, 2019, at 5:55 PM, Wilkinson, Shelly-Ann <swilkin@comptroller.nyc.gov> wrote:
>
> <image001.jpg>
> Good Evening Joseth,
>
> Per your e-mail below and as a follow-up to my voice message left for you this evening, kindly contact me regarding Employee ID # 275907's Legal Hold – Perseveration Notice OGC Investigation.
>
> Thanks,
>
> <image002.png>
> Shelly-Ann O. Wilkinson
> Confidential Investigator, Office of the General Counsel
> Office of the New York City Comptroller Scott M. Stringer
> 1 Centre Street, 6th Floor North, New York, NY 10007
> (212) 669-7776 | swilkin@comptroller.nyc.gov
>
>
>
> **From:** Ishman, Joseth
> **Sent:** Friday, November 22, 2019 8:26 PM
> **To:** Wilkinson, Shelly-Ann <swilkin@comptroller.nyc.gov>
> **Cc:** O'Neal, Krishna <koneal@comptroller.nyc.gov>
> **Subject:** RE: (Employee ID # 275907) Legal Hold - Preservation Notice OGC Investigation
>
> OK. I will reach out to you on Monday.

1

**ATTORNEY-CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

This preservation notice outlines the requirements that you must follow to preserve electronically stored information related to the above-referenced matter.

## YOUR NEXT STEPS

1. To enable us to document the measures taken by the agency to meet its discovery obligations, **please confirm that you have read this notice** and acknowledge your duty to preserve by replying to this email by **Tuesday, November 26, 2019 – Please do not reply all.**

2. Until further notice, please preserve all electronically stored information for custodians listed in Annex A and Annex B at the end of this email.

3. Please follow these steps to ensure preservation:

    a) **Enact preservation/legal hold on relevant employee mailboxes.**

        i) Activate legal hold on the mailboxes listed in the Distribution List (Current Employees) and Departed List (Former Employees) above so that incoming or outgoing emails are stored.

        ii) If there are other locations where mailboxes are stored *e.g.*, local PSTs, our IT department is responsible for preservation. If you have any questions or concerns, please contact me to discuss.

    b) **Suspend any auto-deletion, date limits, or size limits for the following:**

        i) Email

        ii) Personal Shares

        iii) Network Shares: H:\ I:\ J:\ Q:\

        iv) Mobile devices (including Blackberries, iPhones, agency-issued cell phones, tablets, etc.)

    c) **Suspend any activities** (such as major upgrades) that would risk altering or destroying relevant electronically stored information (including metadata). *Please contact me when such activities are being discussed* affecting any of the custodians listed in Annex A or Annex B so that we can agree upon a resolution that accomplishes IT's and/or Records Management's goals and upholds the duty to preserve.

    d) **Do not reformat custodian workstation drives/laptops without preserving relevant electronically stored information.**

    e) **Back-up the following databases and network shares every night:**

        i) Databases: Email; SQL DB maintenance plan (nightly backup of databases and transaction logs)

        ii) Network Shares: H:\ I:\ J:\ Q:\

3

Favorites    Browse                                                                          💬 Comments

File ⌄     View ⌄     🖳 Explore ⌄     ⟳ Refresh



Favorites    Browse    📣 Comments

File ˅     View ˅     📑 Explore ˅     ↻ Refresh



File ⌄    View ⌄    🖥 Explore ⌄    ⟳ Refresh



**31,033**
Selected FY Claims as of Today

**(Blank)**
Prior FY Claims as of Today

Fiscal Year

2017    ⌃

Area

All    ⌄

Division

All    ⌄

Agency
☐ Department of Buildings
☐ Department of Correction
☐ Department of Education
☐ Department of Environmental Protection
☐ Department of Housing Preservation and Development
☐ Department of Parks & Recreation
☐ Department of Sanitation
☐ Department of Transportation
☐ Fire Department
☐ NYC Health + Hospitals
☐ NYC Human Resources Administration
☐ Other
☐ Police Department

Claims Filed by Area

Claims Filed by Division

Claims Filed Y/Y Comparison

◌ Prior FY as of Today  ● Selected FY as of Today  ⋮ Prior FY as of End of Month

| Month | Value |
|---|---|
| July | 2,360 |
| August | 2,645 |
| September | 2,370 |
| October | 2,356 |
| November | 2,435 |
| December | 2,502 |
| January | 2,478 |
| February | 2,453 |
| March | 2,988 |
| April | 2,669 |
| May | 2,709 |
| June | 2,988 |

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Monday, November 29, 2021 9:20 AM |
| **To:** | Katz, Ron |
| **Subject:** | Re: Indexing concers |

Oh okay. I am still dealing with the shock and stress of being on tria
so I have no clue

*[handwritten note in right margin: E-mails of metrics changes. O.G.C. had a legal hold on my e-mails access to evidence]*

**From:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Sent:** Monday, November 29, 2021 9:18 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Indexing concers

In each case the information was listed in the claim.

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Monday, November 29, 2021 9:18 AM
**To:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Subject:** Re: Indexing concers

Good morning,

Was the street or borough listed in the claim? If it is not listed, then I do not add it.

**From:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Sent:** Monday, November 29, 2021 9:14 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** Indexing concers

Good morning Keisha,

Over the past several weeks we have seen a significant increase in data omissions from claims that you indexed. Given the high standard of quality typically found in your work this is highly unusual.

Is there an issue that we should be aware of?

The specific claim numbers, and the related issue, have been identified below:
- 2021NF032248 is a duplicate claim generated by you. <u>Please pay careful attention when researching existing NF claims prior to generating a new claim.</u>

- 2021PD030361 Claimant Occurrence Street and Boro wasn't entered.
- 2021PD030400 Claimant Occurrence Street and Boro wasn't entered.
- 2021PD030443 Claimant Occurrence Street wasn't entered.
- 2021PD030466 Claimant Occurrence Street wasn't entered

1

## Hogans, Keisha

**From:**       Hogans, Keisha
**Sent:**       Monday, December 21, 2020 11:45 AM
**To:**         Corbett, Jean
**Subject:**    Fw: 12/10

FYI

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Friday, December 11, 2020 12:21 PM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** Re: 12/10

Okay no problem. My feedback is the new form is hard, so it will take longer. I kept getting confused with the first name and the address. I noticed a lot of time-consuming changes, so it will take longer to index a new claim. I guess that's my feedback.

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Friday, December 11, 2020 12:10 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: 12/10

You may be back into the regular queue be sure the lab is the server. You will see the different names of the server on the drop down.

Yes, the form is going to be different at first because it's new but it will be better as you use it.

Jean

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Friday, December 11, 2020 12:08 PM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** Re: 12/10

Good afternoon,

I don't know what's happening. I did see the new style of claims yesterday. They were hard to index, but they aren't there today. Anyway, okay.

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Friday, December 11, 2020 12:03 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: 12/10

Good afternoon,

1

## Hogans, Keisha

**From:**          Corbett, Jean
**Sent:**          Tuesday, May 26, 2020 5:56 PM
**To:**            Branch, Gladys; Carrero, Timothy; Decker, Douglas; Hogans, Keisha; Hope, Deborah;
                   Kilgore, Arthurene; Malave, Yomaira; Walker, Lisa
**Subject:**       RE: Changes

Good evening all,

We are not adding the claimant's email address on the claims I transfer. Why not?

*Jean C. Corbett*
Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159, Email: jcorbet@comptroller.nyc.gov

**From:** Corbett, Jean
**Sent:** Friday, May 15, 2020 9:16 AM
**To:** Branch, Gladys <gbranch@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Decker, Douglas
<ddecker@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Hope, Deborah
<dhope@comptroller.nyc.gov>; Kilgore, Arthurene <akilgor@comptroller.nyc.gov>; Malave, Yomaira
<ymalave@comptroller.nyc.gov>; Walker, Lisa <lwalker@comptroller.nyc.gov>
**Cc:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Subject:** RE: Changes

Good morning all,

Please **do not** make any changes to the email address on the eClaim claims. The only one we should be updated is the
claims that "I" transfer.
The only thing we should be changing on the eClaim claims is the Occurrence information and the file date, ONLY if there
is a dismissal date for correction claims.
If you have any questions, please reach out to me.
Jean

**From:** Corbett, Jean
**Sent:** Wednesday, May 13, 2020 1:08 PM
**To:** Branch, Gladys <gbranch@comptroller.nyc.gov>; Carrero, Timothy <tcarrer@comptroller.nyc.gov>; Decker, Douglas
<ddecker@comptroller.nyc.gov>; Hogans, Keisha <khogans@comptroller.nyc.gov>; Hope, Deborah
<dhope@comptroller.nyc.gov>; Kilgore, Arthurene <akilgor@comptroller.nyc.gov>; Malave, Yomaira
<ymalave@comptroller.nyc.gov>; Walker, Lisa <lwalker@comptroller.nyc.gov>
**Cc:** Katz, Ron <rkatz@comptroller.nyc.gov>
**Subject:** Changes

1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Monday, October 5, 2020 10:22 AM |
| **To:** | Branch, Gladys; Carrero, Timothy; Decker, Douglas; Hogans, Keisha; Hope, Deborah; Kilgore, Arthurene; Malave, Yomaira; Walker, Lisa |
| **Cc:** | Calo, Robert |
| **Subject:** | Claim Queues |

Good morning all,

We are working hard and the claim's index queues look really good. Let's try to finish up all the batches today including the old claims. The sooner the better!

Have a GREAT Monday!

Thank you,

Jean C Corbett
New York City Comptroller
Adminstrative Manager, BIST-CIF

1

## Hogans, Keisha

**From:** Corbett, Jean
**Sent:** Thursday, June 18, 2020 10:47 AM
**To:** Kilgore, Arthurene; Hogans, Keisha; Decker, Douglas; Branch, Gladys; Carrero, Timothy; Hope, Deborah
**Subject:** FW: New Risk Management Code

See below. They added a new risk management code for protesting. It is in the same spot as the COVID-19.



*Jean C. Corbett*
Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159, Email: jcorbet@comptroller.nyc.gov

**From:** Jacobson, Lauren
**Sent:** Thursday, June 18, 2020 9:34 AM
**To:** Katz, Ron <rkatz@comptroller.nyc.gov>; Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Cc:** Canagata, Lynell <lcanaga@comptroller.nyc.gov>; Karp, Adam S. <akarp@comptroller.nyc.gov>; Reilly, Katherine <kreilly@comptroller.nyc.gov>; Mallick, Rohit <rmallic@comptroller.nyc.gov>
**Subject:** New Risk Management Code

Hi Ron and Jean,

A new risk management code named 2020 Protest has been created in the risk management code disaster field (same location as the risk management code for COVID-19)?

Starting today, can you please use the risk management code for all NOCs that mention the recent protests?

Please let us know if you have any questions.

Thank you,
Lauren

1

# Hogans, Keisha

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Wednesday, May 13, 2020 1:08 PM |
| **To:** | Branch, Gladys; Carrero, Timothy; Decker, Douglas; Hogans, Keisha; Hope, Deborah; Kilgore, Arthurene; Malave, Yomaira; Walker, Lisa |
| **Cc:** | Katz, Ron |
| **Subject:** | Changes |

Good afternoon,

As of this morning May 13, 2020 there has been a change in the index form(if you haven't noticed). I was not aware they were going to release it already, so this email comes post release. There are two new fields(see below); Email(claimant) and claimant attorney email(attorney) that will need to be field out, if they are given. These email addresses should only be entered for claims that "I"(normally labeled – ATTACHED BY JEAN CORBETT) transfer over to the eClaim que or claims faxed over to the regular que. Also, there is a new tab(see below) for Risk Management called DR(Disaster) for COVID-19. If there are any claims that use the words; disease, virus or infected and do not mention the word COVID-19 but are insinuating it is the virus label it COVID-19.

Let me know if you have any questions.

Thank you,

Jean

1

## Hogans, Keisha

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Wednesday, February 5, 2020 12:41 PM |
| **To:** | Branch, Gladys; Carrero, Timothy; Clay, Terrell; Decker, Douglas; Dwamena, Obeng; Hogans, Keisha; Hope, Deborah; Kilgore, Arthurene; Malave, Yomaira; Partlow, Genovia; Qaisar, Raza; Smith, Charles; Taylor, Maurice; Walker, Lisa |
| **Cc:** | Katz, Ron; Calo, Robert |
| **Subject:** | Time lists |
| **Categories:** | Red Category |

Good afternoon,

Below is a list of tasks we perform on a daily basis. For formality purposes, use the list of descriptions below that fits the task you are doing, and include the hours or time worked on each task.  When sending your daily tasks to me, include Ron Katz. Most of you will only need to change the way you describe your task/s.

If you have any questions, feel free to ask.

Claims New Receive – (outside OAISIS application)
Claims New Prep
Claims Scan
Claims New Index

Claims Additional Index

Claims Library Prep
Claims Library Scan
Claims Library Index

Contracts New Receive(DOC-PREP)
Contracts New Prep
Contracts New Scan
Contracts New Index

Contracts Additional Receive
Contracts Additional Prep
Contracts Additional Index

Contracts Library Receive(creating new cases)
Contracts Library Prep
Contracts Library Scan
Contracts Library Index

Labor Law New Received(creating new cases)
Labor Law Prepped
Labor Law Indexed

1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Thursday, November 7, 2019 8:12 AM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: 11/6 |

Good morning,

Wow- Good Day yesterday 152 claims indexed.

Great Job!



*Jean C. Corbett*
Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159, Email: jcorbet@comptroller.nyc.gov

**From:** Hogans, Keisha
**Sent:** Wednesday, November 6, 2019 3:32 PM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** 11/6

| | | |
|---|---|---|
| Noc's | 8:00-12:00 | 4 hours |
| Noc's | 1:00-4:00 | 3 hours |

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



1

## Hogans, Keisha

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Tuesday, June 11, 2019 3:10 PM |
| **To:** | Branch, Gladys; Calo, Robert; Carrero, Timothy; Clay, Terrell; Corbett, Jean; Decker, Douglas; Dwamena, Obeng; Hogans, Keisha; Hope, Deborah; Kilgore, Arthurene; Malave, Yomaira; Partlow, Genovia; Shaw, Kristin; Smith, Charles; Taylor, Maurice; Walker, Lisa |
| **Cc:** | Katz, Ron |
| **Subject:** | Thank you |

Good afternoon,

We are approaching the middle of June and almost the start of summer. What a way to start the summer by being on top in all areas of work and services we provide.  All of your hard work and dedication doesn't go unnoticed and I wanted to say, Thank You.

If you ever have any questions or want to cross train on any area, please don't hesitate to ask.

Thank you again!

Jean



*Jean C. Corbett*
Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159, Email: jcorbet@comptroller.nyc.gov

i

## Hogans, Keisha

| | |
|---|---|
| **From:** | Walker, Lisa |
| **Sent:** | Tuesday, February 12, 2019 11:25 AM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: New fields added in the metrics from 2009 until now |

Yes, there is a lot more information that now has to be added then before to do new notice of claims.

**From:** Hogans, Keisha
**Sent:** Tuesday, February 12, 2019 10:16 AM
**To:** Walker, Lisa <lwalker@comptroller.nyc.gov>
**Subject:** FW: New fields added in the metrics from 2009 until now

I know 5 of us had added the list of changes from 2009 until for indexing new notice of claims. I forgot which ones you added. So, you agree that it takes longer to index new notice of claims?

**From:** Branch, Gladys
**Sent:** Monday, October 15, 2018 11:43 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: New fields added in the metrics from 2009 until now

Hello Keisha
As I said before the only other thing I can remember is in the field called Project under LW/ Special Education we have to fill in the IHO # .

**From:** Hogans, Keisha
**Sent:** Friday, October 12, 2018 3:28 PM
**To:** Branch, Gladys <gbranch@comptroller.nyc.gov>
**Subject:** FW: New fields added in the metrics from 2009 until now

See if you can remember anymore because the metrics needs to reflect these changes, so we can be rated fairly.

**From:** Hogans, Keisha
**Sent:** Friday, October 12, 2018 10:00 AM
**To:** Walker, Lisa <lwalker@comptroller.nyc.gov>
**Subject:** New fields added in the metrics from 2009 until now

1. Site drop down Occupation
2.
3. SSN-it was Tax ID for Law claims only before 2009
4.
5. Date of Birth
6.
7. Time
8.
9. Attorney list is out of order and plenty of duplicates
10.
11. Defendants

1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Decker, Douglas |
| **Sent:** | Tuesday, February 12, 2019 11:40 AM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: New fields added in the metrics from 2009 until now |

Yes I agree. Many more fields added with expectations of meeting 2009 metrics.

**From:** Hogans, Keisha
**Sent:** Tuesday, February 12, 2019 9:23 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** FW: New fields added in the metrics from 2009 until now

Do you agree that these are the changes to indexing new notice of claims take longer?

**From:** Branch, Gladys
**Sent:** Monday, October 15, 2018 11:43 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: New fields added in the metrics from 2009 until now

Hello Keisha
As I said before the only other thing I can remember is in the field called Project under LW/ Special Education we have to fill in the IHO # .

**From:** Hogans, Keisha
**Sent:** Friday, October 12, 2018 3:28 PM
**To:** Branch, Gladys <gbranch@comptroller.nyc.gov>
**Subject:** FW: New fields added in the metrics from 2009 until now

See if you can remember anymore because the metrics needs to reflect these changes, so we can be rated fairly.

**From:** Hogans, Keisha
**Sent:** Friday, October 12, 2018 10:00 AM
**To:** Walker, Lisa <lwalker@comptroller.nyc.gov>
**Subject:** New fields added in the metrics from 2009 until now

1. Site drop down Occupation
2.
3. SSN-it was Tax ID for Law claims only before 2009
4.
5. Date of Birth
6.
7. Time
8.
9. Attorney list is out of order and plenty of duplicates
10.
11. Defendants
12.

1

## Hogans, Keisha

**From:**      Fairley, Debra
**Sent:**      Thursday, November 29, 2018 5:04 PM
**To:**        #No Internet Access
**Subject:**   You now have limited Internet Access

Good Evening,

You have been granted limited Internet access so you can access employee resources including Send Word Now update requests. In order to be sure this service is working, please click the link when you receive a request from SWNAlert@comptroller.nyc.gov.

Thanks!



**Debra Fairley**
Computer Specialist, Business Continuity & Disaster Recovery
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, RM 1225, New York, NY 10007
P: 212-669-4705| dfairle@comptroller.nyc.gov

1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Decker, Douglas |
| **Sent:** | Friday, October 5, 2018 11:01 AM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: if I had to type 2 or more defendants, I will go hard with this complaint. |

**Categories:**       Red Category

Metrics audited or just Eliminated. A real Mgr and whatever PT is ... can just do the daily eye test. Not brain surgery. They just have to be aware of what is going on under THEIR watch. THEY are responsible.

**From:** Hogans, Keisha
**Sent:** Friday, October 5, 2018 10:59 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: if I had to type 2 or more defendants, I will go hard with this complaint.

Yup. This is how I know Ron is watching my work more closely now. ALL OF SUDDEN, now I will report this. There is no way I can add 20 defendants and still reach my quota. It is common sense and the metrics needs to be audited.

**From:** Decker, Douglas
**Sent:** Friday, October 5, 2018 10:57 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: if I had to type 2 or more defendants, I will go hard with this complaint.

Same for me, never do it anymore. Wasting too much time.

**From:** Hogans, Keisha
**Sent:** Friday, October 5, 2018 10:53 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: if I had to type 2 or more defendants, I will go hard with this complaint.

Do you add it? I have not done this in about a year.

**From:** Decker, Douglas
**Sent:** Friday, October 5, 2018 10:50 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: if I had to type 2 or more defendants, I will go hard with this complaint.

Yes they make mistakes .. but rarely if ever admit it. They just RE-Started this Defendant stuff?

**From:** Hogans, Keisha
**Sent:** Friday, October 5, 2018 10:48 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** if I had to type 2 or more defendants, I will go hard with this complaint.

1

J and R are not ready, so Jean should not have sent that email. Metrics needs to be audited and management should not be the ones in control of it. If management is always right, then why do we have a union. They are not GOD. They make mistakes.

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



## Hogans, Keisha

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Friday, September 2, 2016 10:21 AM |
| **To:** | Branch, Gladys; Calo, Robert; Decker, Douglas; Hogans, Keisha; Hope, Deborah; Kilgore, Arthurene; Walker, Lisa |
| **Subject:** | Certified NOC |

Good morning,

We all have access to the internet. When you come across a claim that has been certified and stamped by Pitney Bowes be sure to check the drop off date at the post office. You can use USPS.com to check on this. If you have any questions come see me.

*Jean C. Corbett*

Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159

1

## Hogans, Keisha

**From:** Corbett, Jean
**Sent:** Monday, December 1, 2014 1:25 PM
**To:** Branch, Gladys; Calo, Robert; Carrero, Timothy; Corbett, Jean; Decker, Douglas; Dwamena, Obeng; Estrada, Josefa; Hogans, Keisha; Hope, Deborah; Kilgore, Arthurene; Malave, Yomaira; Partlow, Genovia; Perry, Marilyn; Taylor, Maurice; Walker, Lisa
**Subject:** Indexing Real Property

There are 5 fields that need to be filled out when indexing Real Property  and make sure we uncheck ack letter.

1) Select Division – RP
2) Select Type – Indicated on cover sheet – Certiorari, Condemnation or Tax Cancellation
3) Last Name – is  Property name on cover sheet
4) Occurrence Borough – is Borough on cover sheet
5) File Date – is file date on cover sheet
6) Be sure to uncheck ack letters before releasing into production

Let me know if you have any questions.

1

*Jean C. Corbett*
Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159

3

## Hogans, Keisha

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Thursday, November 20, 2014 10:32 AM |
| **To:** | Branch, Gladys; Calo, Robert; Carrero, Timothy; Corbett, Jean; Decker, Douglas; Dwamena, Obeng; Estrada, Josefa; Hogans, Keisha; Hope, Deborah; Katz, Ron; Kilgore, Arthurene; Malave, Yomaira; Partlow, Genovia; Perry, Marilyn; Taylor, Maurice; Thomas, Johnny; Walker, Lisa |
| **Subject:** | FW: Special Ed claims - Risk Management Info |

Please take notice of the change below for Law – Special Ed. If you have any questions please come see me.

*Jean C. Corbett*

Central Imaging Facility, Manager
Office of the New York City Comptroller - Scott Stringer
Municipal Building, Room 1225
New York, NY 10007-2341
Tel: 212-669-3159

**From:** Lyte, Pamela
**Sent:** Thursday, November 20, 2014 10:27 AM
**To:** Corbett, Jean
**Subject:** Special Ed claims - Risk Management Info

Hi Jean,

As per our conversation this morning, on future Special Ed,  DOE Claims (Law) in the Risk Management Info,  please list as follows:

        Classification – **CHILD**
        Location – **SCHOOL**
        Agent – **EXPENSES**
        Interaction – **TUITION REIMBURSEMENT**

Thank you,

*Pamela Lyte*
Administrative Manager
Law & Adjusment/ Law Div
1 Centre St.
New York, NY 10007
(212) 669-4736 (p)
(212)669-4844 (f)

1

Last Name                           Insurance Claim No.

First Name                          Occupation

Fed Biz                             FB Type

Street 1                            Tax ID

Street 2                            Date of Birth

City                    State       Date of Death

Zip Code          Phone             □ Employee?  □ City Employee?

Email

Insurance

**Occurrence Information**

Borough                    Date          Time

Street 1                   S/W

Street 2                   Weather

City            State

Photo Number Carrier (With NYC)   Electronic Record No.      Acknowledgment Letter

Photo No.                          Receipt No.               ☑ Print

**Window Control**
○ None  ● Attorney  ○ Risk Management  ○ Filing  ○ CE

Attorney of Record Information

Record

                                        ▼  □ Pro Se?

Last Name

First Name                    Tax ID

Street 1                      Phone

Street 2                      Fax

City            State         Zip Code

Email

Claimant Attorney Email

# Risk Management Information

| Class. | Specific Location | Accident Agent | Interaction | Injury | Target | Alleged Injury | Identifier | DR |
|--------|-------------------|----------------|-------------|--------|--------|----------------|-----------|-----|
| | | | | | | | | ▼ |

Disaster:

Generate          Clear

3

# Exhibit D

**From:** O'Neal, Krishna <koneal@comptroller.nyc.gov>
**Sent:** Saturday, September 12, 2020 9:09 PM
**To:** 'Richard Washington' <RJWLaw@outlook.com>
**Subject:** OOC v. K Hogans Prelim Discovery Production

Richard,

Attached are documents related to the Hogans matter per our discussion last month.

They include the following:

1) A timeline created by Investigator Wilkinson.
2) KH Complaint to SDHR.
3) OOC's response to the Complaint.
4) SDHR Decision and Order.
5) EEOC Dismissal.
6) Investigator Wilkinson Interview Summaries.
7) Transcripts of KH 2-7-2019, 9-16-2019 and 10-29-2019 interviews. 4th and final interview is missing, 11/19

I am working on getting you audio recordings of the interviews. Additional items will be turned over to you in advance of trial.

Please let me know if you have any questions.

KNO

2

# Keisha Hogans

**From:** Keisha Hogans <khogans1@nyc.rr.com>
**Sent:** Wednesday, October 23, 2019 7:39 AM
**To:** 'Jones, Shayvonne'
**Subject:** This is list I sent to DOI, but you have the names w█

Good morning,

This is just the FYI since you wanted to know

Since you told me on either 2/7 or 2/9, not to give out too much information and have Shelly Ann make her conduct her own investigation, I acted like I did not know the names to that matched the behavior. I work within a small unit. We have low cubicles and we sit within close proximity of each other. We sit so close that can hear each other's phone conversations and can see what our colleagues are doing. I was beyond annoyed when Shelly Ann Wilkinson was wavering her fingers around as if she was reprimanding a child, then she asked me, "If I had a mental problem." Shelly Ann Wilkinson is a very condescending investigator and should not be allowed to abuse her authority by disrespecting her colleagues just to get information. These are the names to match what takes place within my dysfunctional unit in room 1225.

I had a colleague that used to go into the men's bathroom, go inside the stalls and videotape what he saw. I don't think I need to be any more graphic. He would come into the office and play the video within the scan area which is in front of me. His name is Charlie Smith, computer associate. After Obeng D.., Yomaira Malave and Timothy Carrero told him for the 3rd time to stop, he finally did. Charlie would play these videos for them. Now, he talks about his bowel movement until one of them tells him to stop.

A clerical associate member sings sexual explicit songs at work, her supervisor, Robert Calo, has told her to stop about different 5xs. She continues to do it. I heard Jean Corbett, my manager, call her, "a singing bird." She was transferred from the department of contracts. Kristin Shaw still sings whatever lyrics, songs and as loud as she wants. Kristin sang Carbi B's lyrics to "No Limit." She ang, "F, then I get some money." Robert Calo, her supervisor told her to stop singing that. Kristin Shaw transferred to Dept. of Health in LIC. However, Jean Corbett, my manager thought Kristin's singing was funny because everyone's I do not like distractions while I am trying to read lawsuits.

The colleague who takes lunch at 1pm, then goes out again around 3 pm to get food for another lunch break, plays Instagram videos out loud twice a day and watching movies while some of us are waiting for him to scan work is Obeng Dw.. Obeng is a clerical associate. He scans claims and those of us who index have to wait for him to finish his breaks before we can index, if no work is in the que. This is done in front of our manager, Jean Corbett and she does not say a word to him about the 2 lunch breaks or watching movies or vides using the Comptroller's internet or the Comptroller's pc using and external hard drive.

A computer associate would write Arthurene Kilgore and Jean Corbett were b.tch when they pissed him off. He would write he had to go into Jean's office and bend her over or put her on her knees to straighten her out. He, also would write he had a set a ma.......... Ms. Jones, when disrespectful Shelly Ann Wilkinson asked about those emails, I was quiet for a reason. I didn't want my colleague to get in trouble. I can quote them verbatim because he sent them to my comptroller's email. I remember Shelly Ann hinting general counsel was going to check my work pc to find out if I drafted letters about my work civil rights complaint or emails. Shelly Ann paused while asking those questions. I am sure NYC Comptroller's office already check my work pc. I may have drafted my work discrimination case. However, the reason Shelly Ann Wilkinson paused was for two reasons she did check my pc already and I am sure they checked my emails. I know the male Computer Associate who would call Arthurene and Jean b., hint Jean should be on her knees or he bend Jean over to set her straight because Doug Decker would send me these emails. I just don't want him to get in

1

trouble. General Counsel found out and more than likely since Doug Decker is White, they wanted to protect his reputation. We all know emails are stored on the servers, so Doug's emails can still be retrieved.


Timothy Carrero plays video games and keeps boxes stacked up on his desk so no one can see his pc monitor. Terrell Clay watches CNN most of the day. Timothy, Terrell and I are on probation for the computer associate title. I am not trying to hurt their civil servant careers. Gladys Branch who is an 1180 member uses the Comptroller's email address as if it is her personal address. Shelly Ann Wilkinson had to suppress my colleagues internet and computer usage if she wants to target me. We have large screens and again it is a small unit. We all can see each other computers.

On Wednesday, January 30, 2018, I was giving a written warning by my director, Ron Katz and Jean Corbett was his witness. Apparently, Arthurene Kilgore and someone else made a complaint against me, I think it was Jean Corbett. Arthurene and Jean went to Ron to complain about me.  Ron used the employee manual to state, "I gossip, use the comptroller's computer, disruptive and a liar. On Friday, February 2, 2018 around 10 am, Arthurene Kilgore came into work and talked about a video she sent to other female colleagues. Arthurene, Lisa Walker, Genovia Partlow (who Wilkinson failed to investigate) and Yomaira Malave talked about how Arthurene sent this a pornographic video of a large Black man's penis, the night before, 2/1 around 9 pm. Yomaira Malave said, "She was in class and could not open the video right away." Arthurene told Deborah Hope, "I will sent it to you." Deborah Hope said, "Don't send me that sh.t." Arthurene told Jean Corbett twice that morning, "Jean, I have to show you this video." These women talked about this video about 90 minutes right behind me. Arthurene and I can reach around and touch each other, our cubicles are so close. It is easy to hear her conversations and for her to hear mine.

2/2/18 around 2 pm, Jean Corbett was talking to Yomaira Malave at her desk in the scan area. A couple of us watch when Jean walks around talking to our colleagues because we want to know what she is putting on their metrics while she gossips for about 30-90 minutes while some of us, she bugs to work faster. Arthurene walked up to Jean and Yomaira with her cellphone and played the video. I stood up to watch them. I could not believe Jean was watching that video with her staff 2 days after signing off on my written warning. Jean said, "What is that an umbrella?" Arthurene or Yomaira answered her. Jean replied, "I will do that with my husband tonight." Obeng Dw.. said, "What kind of woman's meeting are you all having? " Obeng yelled it. Doug Decker who sits across from me took off his headphones. I walked up to Doug Decker and told him what those 3 women were watching. Doug said, " I wondered why Obeng yelled." I wrote down the date and time, then emailed the Director of personnel. She forward my email to our EEO, Ms. Randall. I meet with Ms. Randall about a week later and I warned her, " What if they lie and say it is not true? Ms. Randall said, "Someone will slip up."

Arthurene Kilgore, Lisa Walker, Deborah Hope, Yomaira Malave and Obeng Dw.. meet inside Jean Corbett's office and discussed what story they would tell general counsel. At first they said, "It was just a picture." Doug Decker was not in that meeting, but the following day he meet with Jean Corbett for about 60 minutes. He told me, "Jean told him what to expect when he goes to general counsel and what to say to Shelly Ann Wilkson. The plan is everyone's word against mine. I was walking to the kitchen and I heard Jean Corbett tell Debra Fairley, my shop steward, " I wouldn't do something like this. I am not this type of person. " Debra Fairley motioned to her to stop talking. Jean Corbett is with local 1180 and Debra Fairley is with DC37, as well as my shop steward. Debra should not be giving any assistance to a 1180 member over talking to me. No one can tell Debra who to be friends with, but her priority should be to give advice/assistance to local 2627 and not to 1549 or 1180 members. I think she is confused about the local she is representing.


On 9/16  Shelly Ann Wilkinson told me and Ms. Jones, my colleagues said, "Nothing happened. And one was offended by the complaint." It is hard to talk to Shelly Ann Wilkinson because she rolls her eyes and uses her body language to make gestures as if I am ignorant. She cuts me off when I am talking.  Shelly Ann Wilkinson gave me enough clues that my agency is looking to bring charges against me. Shelly Ann keeps saying the video was played behind me, but I corrected on her on the tape. Shelly Ann cannot follow the events of 2/2/19, so I will have to file an appeal. I refuse to let have my civil rights violated because of an investigator who cannot follow the chain of events, colleagues who lie and a White

2

female manager who felt it was okay to watch a pornographic video of a Black man. My story will not change because I know what happened on Friday, February 2,2018.

There is a huge mess within my unit that started with Robert Ajaye and Michael Lanni once they gave management power to give local 2627, local 1548 and local 1180 members quotas. I remember going to White collar division and was told, "CIF does not have quotas." Yet, this year, you found out the truth about our hourly quotas and the deal made by local 2627 former board members,  Robert Ajaye and Michael Lanni made behind the backs of local 2627 members. Robert and Michael started attacking my character, kept lying about it and aided in petitioning me out as shop steward because I would not be quiet about this deal. In 2019, the truth finally came out. The same will happen with this pornographic video.

The reason other members won't file civil rights complaints is because they see the hell management puts me through, so they afraid. If I am quiet, management will harass me and pressure me to do more work if I slow down. When I file a complaint, management still harasses me. So, I might as well stick to using my voice until the racism with my unit stops.

3

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Thursday, April 22, 2021 12:12 PM |
| **To:** | Corbett, Jean |
| **Subject:** | Re: Eclaim marked 9 |

I do not have access to a lot of applications. Anyway, thanks. I will release it after I finish this batch.

---

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Thursday, April 22, 2021 12:10 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Eclaim marked 9

You can view the claim. It is the same access look as BLA application.

In the body of the claim it has a claim number attach it to that one. I already attached it, you can release it.

Jean

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Thursday, April 22, 2021 12:07 PM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** Re: Eclaim marked 9

I saw it in the search which is why I split it, so I wouldn't make a duplicate. I was saying my search is limited.

---

**From:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Sent:** Thursday, April 22, 2021 11:52 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: Eclaim marked 9

Keisha,

You can view all the claims once you select it on your search results in the CIF application.

Jean

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Thursday, April 22, 2021 11:51 AM
**To:** Corbett, Jean <jcorbet@comptroller.nyc.gov>
**Subject:** Eclaim marked 9

Good morning,

1

A:    Yes.

Q:    And you have to pay attention to detail.

A:    Yes.

Q:    Okay.  You also mentioned that sometimes, even in your office, you can hear people talking.

A:    Yes.

Q:    Okay.  And, as the supervisor, do you understand how hearing people talking could be difficult for an employee who's working on a detail-oriented task?

A:    Yes.

Q:    Okay.  You also mentioned on the last day that you had a good rapport with Ms. Hogans at some point.  Correct?

A:    Yes.

Q:    And that you all spoke frequently and talked about church.

A:    Yes, sure.

Q:    Alright.  Do you remember inviting Keisha to your home to go swimming?

A:    No.

Q:    But you say your relationship with Ms. Hogans started to change when she complained.

A:    Complains about what?

Q:    I don't know.

A:    I'm not sure what you mean by complained.

Q:    Well, you said that, I believe that you said, and I can

## Hogans, Keisha

| | |
|---|---|
| **From:** | Decker, Douglas |
| **Sent:** | Thursday, October 1, 2020 2:29 PM |
| **To:** | Hogans, Keisha |
| **Subject:** | Re: Keep track of your 9's. 2 of mine we done in the eclaim que. |

Yes I was noticing how nobody is working lol Only us

Get Outlook for iOS

**From:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Sent:** Thursday, October 1, 2020 12:50:05 PM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** Keep track of your 9's. 2 of mine we done in the eclaim que.

I know JC will cover for the ones do it because it was one of her friends. smh

## Hogans, Keisha

**From:** Decker, Douglas
**Sent:** Thursday, October 18, 2018 2:43 PM
**To:** Hogans, Keisha

Wow, There are 12-14 batches of eclaims in que! What does this B do all day!!! Amazing or pitiful.

*Douglas Decker*
Computer Associate-Operations BIS
Office of New York City Comptroller Scott M. Stringer
1 Centre Street, 12th Floor South, New York, NY 10007
P: (212) 669-4137



1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Decker, Douglas |
| **Sent:** | Thursday, July 5, 2018 10:08 AM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: I will keep writing no work because it is up to management to assign work. lol |

Yes and keep cool Tootsie

**From:** Hogans, Keisha
**Sent:** Thursday, July 5, 2018 10:06 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

Please I need to do 2 more batches before I can take a break. I will do the stairs though. I was soooo scared when I had that mild heat stroke. I learned a lesson. I will load up on electrolytes prior to being in 90 degree weather.

**From:** Decker, Douglas
**Sent:** Thursday, July 5, 2018 10:03 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

Good Job! Now, break time!!!!!!!!!!!!!!!!!!

**From:** Hogans, Keisha
**Sent:** Thursday, July 5, 2018 10:02 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

I took out the words FA and just put my full initials on it

**From:** Decker, Douglas
**Sent:** Thursday, July 5, 2018 10:01 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

Fantastic!!!!!!!!!!!!!!!!!!!!!!!

**From:** Hogans, Keisha
**Sent:** Thursday, July 5, 2018 10:00 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

I did.

**From:** Decker, Douglas
**Sent:** Thursday, July 5, 2018 9:53 AM

1

**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

## Well put your name on it before AK snatches it up

**From:** Hogans, Keisha
**Sent:** Thursday, July 5, 2018 9:52 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

I will later on. I wanted to do some regular work to get myself back in the swing of things. Is that ok supervisor?  Ha ha ha

**From:** Decker, Douglas
**Sent:** Thursday, July 5, 2018 9:52 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: I will keep writing no work because it is up to management to assign work. lol

## Are you doing the Fed Act?

**From:** Hogans, Keisha
**Sent:** Thursday, July 5, 2018 9:28 AM
**To:** Decker, Douglas <ddecker@comptroller.nyc.gov>
**Subject:** I will keep writing no work because it is up to management to assign work. lol

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



2

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Thursday, September 21, 2017 8:48 AM |
| **To:** | Decker, Douglas |
| **Subject:** | RE: well Lisa has no eclaims yet lol |

Jean will defend them because she is NOT A MANAGER, but their friend. Like she needs to protect them to show alliance. So, if he does it too, then he cannot say he was not made aware of the problem.    I love speaking up against injustice. You know that. I would not want that job, if I had to act like Robert. He agrees with management, lies, takes dues and trips, but does not represent all his members. Nah, I rather be an honest fighter.


**From:** Decker, Douglas
**Sent:** Thursday, September 21, 2017 8:41 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

## Very good. You hit all the topics. You are NEW UNION President.


**From:** Hogans, Keisha
**Sent:** Thursday, September 21, 2017 8:40 AM
**To:** Decker, Douglas <ddeckerf@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

Lol you are funny. I will do eclaims in the morning and when the 2 lazy jerks complain, I will go to Ron.. It is not fair that we have to the hard claims while after 330 the priorities come, 2 people get a bunch easy ones & high stats, as well as do eclaims at night. Are they exempt from working hard?


**From:** Decker, Douglas
**Sent:** Thursday, September 21, 2017 8:37 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

## I have other things to say WooHoooooooooooo LOL


**From:** Hogans, Keisha
**Sent:** Thursday, September 21, 2017 8:36 AM
**To:** Decker, Douglas <ddeckerf@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

I did about 4 that is enough. I am over it. I will do them in Thursday and Friday morning like you said.


**From:** Decker, Douglas
**Sent:** Thursday, September 21, 2017 8:35 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

## Yes. Then hurry and do eclaims until she leaves.

1

**From:** Hogans, Keisha
**Sent:** Thursday, September 21, 2017 8:34 AM
**To:** Decker, Douglas <ddeckerf@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

That is true..... I forgot she does not work until 130 or 2. What was I thinking!!

**From:** Decker, Douglas
**Sent:** Thursday, September 21, 2017 8:33 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

Two big Ifs. Coming in AND working.

**From:** Hogans, Keisha
**Sent:** Thursday, September 21, 2017 8:32 AM
**To:** Decker, Douglas <ddeckerf@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

Good morning, they are done lol woo hoo she can do some real work, if she comes in.

**From:** Decker, Douglas
**Sent:** Thursday, September 21, 2017 8:32 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: well Lisa has no eclaims yet lol

Good Morning! Eclaims, Woo Hoooooooo!

**From:** Hogans, Keisha
**Sent:** Thursday, September 21, 2017 8:16 AM
**To:** Decker, Douglas <ddeckerf@comptroller.nyc.gov>
**Subject:** well Lisa has no eclaims yet lol

I did them all. I know last night, she was working on them and the other day after 4

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



2

## Hogans, Keisha

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Tuesday, January 16, 2018 11:33 AM |
| **To:** | Decker, Douglas |
| **Subject:** | RE: she is asking Tim now to scan. She is giving Rene one of the claims about the Bronx fire. smh |

You are right, but it is silly bc she is not getting extra pay. Lol Rene will regret allowing them to use her ONE DAY.

**From:** Decker, Douglas
**Sent:** Tuesday, January 16, 2018 11:29 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: she is asking Tim now to scan. She is giving Rene one of the claims about the Bronx fire. smh

Renee probably likes that they ask her to do a "few special" things. Than they let her slide the rest of the time.

**From:** Hogans, Keisha
**Sent:** Tuesday, January 16, 2018 11:27 AM
**To:** Decker, Douglas <ddeckerf@comptroller.nyc.gov>
**Subject:** RE: she is asking Tim now to scan. She is giving Rene one of the claims about the Bronx fire. smh

They use us all in their own way. We are the ones who get the work out, NOT RENE & LISA.

**From:** Decker, Douglas
**Sent:** Tuesday, January 16, 2018 11:27 AM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>
**Subject:** RE: she is asking Tim now to scan. She is giving Rene one of the claims about the Bronx fire. smh

Better them than us

**From:** Hogans, Keisha
**Sent:** Tuesday, January 16, 2018 11:25 AM
**To:** Decker, Douglas <ddeckerf@comptroller.nyc.gov>
**Subject:** she is asking Tim now to scan. She is giving Rene one of the claims about the Bronx fire. smh

Rene is soooo stupid for letting them use her and she will not ask for more money. Smh

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*

1

**Hogans, Keisha**

**From:** Hogans, Keisha
**Sent:** Tuesday, June 13, 2017 11:20 AM
**To:** Decker, Douglas
**Subject:** I am quiet with you for a reason. however, Rene blasted a video on purpose.

There is no way Jean did not hear it. Plus, Rene said, "I showed a video so what." I wanted to show it. This place is a joke.

*Keisha Hogans*
*Computer Aide II*
*Bureau of Information Systems & Technology*
*Office of the New York City Comptroller Scott M. Stringer*
*1 Centre Street, 12th floor South, New York, NY 10007*
*(212)-669-8444*



1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Monday, December 14, 2015 2:10 PM |
| **To:** | Decker, Douglas |
| **Subject:** | RE: Wake Rene up lol |

She is asleep lol

**From:** Decker, Douglas
**Sent:** Monday, December 14, 2015 2:09 PM
**To:** Hogans, Keisha
**Subject:** RE: Wake Rene up lol

What? You mean ... NO!!!

**From:** Hogans, Keisha
**Sent:** Monday, December 14, 2015 2:08 PM
**To:** Decker, Douglas
**Subject:** Wake Rene up lol

1

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Hogans, Keisha |
| **Sent:** | Thursday, January 21, 2021 9:21 AM |
| **To:** | Keisha Hogans |
| **Subject:** | Fw: Health and safety meeting yesterday |

**From:** Hogans, Keisha
**Sent:** Wednesday, April 24, 2019 3:10 PM
**To:** khogans1@nyc.rr.com <khogans1@nyc.rr.com>
**Subject:** FW: Health and safety meeting yesterday

**From:** Frazier-Martin, Renae
**Sent:** Thursday, January 22, 2015 12:13 PM
**To:** Hogans, Keisha <khogans@comptroller.nyc.gov>; Tindall, Susan <STindall@dc37.net>; Brunson, Tamika <tbrunso@comptroller.nyc.gov>; Askew, Carolyn <caskew@comptroller.nyc.gov>; Gutierrez, Debbie <dgutier@comptroller.nyc.gov>; Boston, Kim <kboston@comptroller.nyc.gov>
**Cc:** White, Juliet <jwhite@comptroller.nyc.gov>; rajaye@gmail.com; Galanter, Igor <igalant@comptroller.nyc.gov>; Hibbert-Taylor, Yvette <yhibber@comptroller.nyc.gov>; Ramos, Vivian <vramos@comptroller.nyc.gov>; rajaye@gmail.com; dawlocal371@aol.com; thatcher@sseu371.org
**Subject:** RE: Health and safety meeting yesterday

Wonderful!!!!

**From:** Hogans, Keisha
**Sent:** Thursday, January 22, 2015 9:03 AM
**To:** Tindall, Susan; Brunson, Tamika; Askew, Carolyn; Frazier-Martin, Renae; Gutierrez, Debbie; Boston, Kim
**Cc:** White, Juliet; rajaye@gmail.com; Galanter, Igor; Hibbert-Taylor, Yvette; Ramos, Vivian; rajaye@gmail.com
**Subject:** RE: Health and safety meeting yesterday

Good morning,

I am pleased to report that Susan Tinsdale, Michael Lannai the vice-president of my local and Regina did a walk through yesterday evening. I am normally out of work by 4, but it was good think I did stay late. They observed the fans, the sign posted by management and it was questioned; as well as how the scan area does get warm due to the high volume scanners. Ron Katz, my director greeted them before they walked out to discuss a resolution. DCAS was just in here with Ron to figure out the temperature. Management is looking for amicable solution, which is all I asked for without my health being at risk.

Thank you

**From:** Hogans, Keisha
**Sent:** Tuesday, January 20, 2015 7:53 AM
**To:** 'Tindall, Susan'; Brunson, Tamika; Askew, Carolyn; Frazier-Martin, Renae; Gutierrez, Debbie; Boston, Kim

1

**Cc:** White, Juliet; 'rajaye@gmail.com'; Galanter, Igor; Hibbert-Taylor, Yvette; Ramos, Vivian; 'rajaye@gmail.com'
**Subject:** RE: Health and safety meeting yesterday

Good morning,

One overhead fan and been turned off, but the second one is on full blast. It was left on all weekend because no one is really in and the air conditioner is on. Now it is January, the air conditioner provides enough air to cool off that area especially in January. There is no need to have an overhead fan on and an air conditioner.

I send Amedeo and e-mail and he never responded, so this agency doesn't have health and safety procedures and that's something else that needs to be discussed with him after the walk through. Management needs to be held accountable because this is foolishness.


**From:** Hogans, Keisha
**Sent:** Thursday, January 15, 2015 1:56 PM
**To:** 'Tindall, Susan'; Brunson, Tamika; Askew, Carolyn; Frazier-Martin, Renae; Gutierrez, Debbie; Boston, Kim
**Cc:** White, Juliet; rajaye@gmail.com; Galanter, Igor; Hibbert-Taylor, Yvette; Ramos, Vivian; 'rajaye@gmail.com'
**Subject:** RE: Health and safety meeting yesterday

Good morning,

Okay, hopefully I won't have to take off again before the walk through and resolution is reached.  So in the interim, what am I supposed to do about the air being on neck and shoulders?


**From:** Tindall, Susan [mailto:STindall@dc37.net]
**Sent:** Thursday, January 15, 2015 11:18 AM
**To:** Hogans, Keisha; Brunson, Tamika; Askew, Carolyn; Frazier-Martin, Renae; Gutierrez, Debbie; Boston, Kim
**Cc:** White, Juliet; rajaye@gmail.com; Galanter, Igor
**Subject:** RE: Health and safety meeting yesterday

I spoke with President Ajaye yesterday and requested that the local request to schedule a walkthrough. We agreed upon two dates when we're both available. I'm waiting for a confirmation. We will hopefully have a confirmation soon. I will, as always, get back to you as soon as I have something.


**From:** Hogans, Keisha [mailto:khogans@comptroller.nyc.gov]
**Sent:** Thursday, January 15, 2015 10:46 AM
**To:** Brunson, Tamika; Askew, Carolyn; Frazier-Martin, Renae; Gutierrez, Debbie; Boston, Kim
**Cc:** White, Juliet; Tindall, Susan; rajaye@gmail.com; Galanter, Igor
**Subject:** Health and safety meeting yesterday

Good morning,

We were told in our meeting on Tuesday that there would be a walk through to expedite the resolution of the temperature and ongoing overhead fan issue within CIF. This is now going on the 3rd week of me dealing with this and nothing. I am going to my doctor on Friday. I feel myself getting sick. My neck is sore. My shoulders are tense. I will probably have to get muscle relaxers. I have to take off a day to see a doctor and the union is MIA.  The scanners may get hot, but I sit in between two windows and I should not have to get sick because my colleagues are hot.

I am forced to take a day off because now I need to see my doctor. I can't sit at my desk all day with this fan blowing on me, so I get and take walks. We know CIF have quotas/benchmarks in my unit. I am degrading e-mails from my manager asking what I was doing all day. Now I am getting sick from the overhead fans and unnecessary stress from my manager

about my work. Is the union going to rectify this issue? Maybe those who scan can be moved by the windows and close to the air conditioner.

There is a sign posted one of the overhead fan with a chair in front of one of the overhead fans. The signs states, "DCAS reviewed the ambient temperature and has concluded its evaluation. Please get prior approval from Jean Corbett to adjusting the fan." If the room is up to code, then why is management allowing the overhead fans to be on in the winter? What is going to happen in the spring/summer? There are only four employees who sit by windows and two of them prefer the cold most of the time. Why can't those who scan sit by the windows and air conditioners since they are warm/hot?

This is an ongoing health and safety concern, yet it is not being addressed or resolved. I found my e-mail from 2013, which I have enclosed. Overhead fans circulate stale air with allergens, dust and more germs. Is the union okay with members getting sick because of working conditions? How long will I have to deal with this?

Amedeo is over facilities and personnel. His number is (212)-669-2223


**From:** Hogans, Keisha
**Sent:** Wednesday, December 24, 2014 11:28 AM
**To:** Tindall, Susan
**Cc:** rajaye@gmail.com
**Subject:** Last year's e-mail regarding the fans in CIF.


Good morning,,
Last week there was a situation where the heat was full blast in CIF room 1225 and facilities was called, so no one complained about the air conditioner or fans being on. However, this week seems like DCAS controlled the situation. Yet, my colleagues are still putting overheard fans on full blast. This wasn't even done, during the summer. It is winter and it may not be freezing outside, but the air being blown on someone's neck or throat can and does cause irritation. Unfortunately, I can't ask for it to be turned down because the last time I tried to be profession with a colleague, she was so rude and disrespectful, I avoid her. Yesterday, another colleague experienced the same scenario with this same individual.
Today, I had to speak to my manager, Jean to inform her about the fans. She said, "She would turn them down to medium. She didn't want to cause waves, so she would do it cautiously." It hasn't been done yet. I cannot understand why it is so hard for my colleagues to compromise and their unprofessional behavior is condoned. Do we need to have labor management meeting about work office protocol and/or consideration of others health and well-being.
There should be a level of balance without having to report all these petty situations. I enclosed the incident that happened last year. This is crazy.
**From:** Hogans, Keisha
**Sent:** Wednesday, October 16, 2013 9:28 AM
**To:** Bott, Michael
**Subject:** FYI
Good morning,
 I was out sick two weeks ago with a sore throat. I understand that it gets hot in the scan area. I am a team player and believe in compromising. I let Yomaira know the fan is blowing right on my neck, so it needs to be circulating and on medium. I did not argue with her. I did not turn the fan off. I lowered it. I hate calling out sick. She kept putting the fan on high. This was happening all last week. On Friday, October 11th around 11:15 the fan was put on high I came over to lower it because it blows on my neck. Yomaira told me, " if I was cold to put a jacket on." I did not respond. I made another alternative suggestion that she keeps in on high for short period of time. When Romy and Bobby had the ac on high, they wouldn't complain if anyone lowered it after

3

## Hogans, Keisha

| | |
|---|---|
| **From:** | Decker, Douglas |
| **Sent:** | Thursday, November 20, 2014 11:12 AM |
| **To:** | Hogans, Keisha |
| **Subject:** | RE: Now you are being gross |
| | |
| **Categories:** | Red Category |

Yes. It seems J is in a way like u, we've had enough. J accepts EVERYTHING to keep job and we take our time because that is what they ARE telling us by their actions.

**From:** Hogans, Keisha
**Sent:** Thursday, November 20, 2014 11:10 AM
**To:** Decker, Douglas
**Subject:** RE: Now you are being gross

I FULLY AGREE WITH YOU. I hear ya. I don't see how she doesn't notice that. I truly believe, she just doesn't care. Smh

**From:** Decker, Douglas
**Sent:** Thursday, November 20, 2014 11:08 AM
**To:** Hogans, Keisha
**Subject:** RE: Now you are being gross

Well, They have forced us to do more of their work and no wiggle room for missing things that they can easily add in. I AM going to be thorough. If it ends with 20 claims for the day fine. Not going to worry in the least.

**From:** Hogans, Keisha
**Sent:** Thursday, November 20, 2014 11:06 AM
**To:** Decker, Douglas
**Subject:** RE: Now you are being gross

I agree. I do need to address this to the union because we are doing more than indexing, but we are not being compensated for it.

**From:** Decker, Douglas
**Sent:** Thursday, November 20, 2014 11:04 AM
**To:** Hogans, Keisha
**Subject:** RE: Now you are being gross

That's pretty simple. We ARE doing theirs, they can edit ours. Is that fair?

**From:** Hogans, Keisha
**Sent:** Thursday, November 20, 2014 11:03 AM
**To:** Decker, Douglas
**Subject:** RE: Now you are being gross

1

I hear ya. Go on Doug. lol

**From:** Decker, Douglas
**Sent:** Thursday, November 20, 2014 11:02 AM
**To:** Hogans, Keisha
**Subject:** RE: Now you are being gross

And now, if we forget ... another ERROR message. As far as I'm concerned nothing is an error ..
LET THEM FIX IT!!!!!!!!!!!!! We can do their jobs, they can do ours.

**From:** Hogans, Keisha
**Sent:** Thursday, November 20, 2014 11:01 AM
**To:** Decker, Douglas
**Subject:** RE: Now you are being gross

You mean bla is getting lazier and lazier. She is just saying YES to everything. Uuggghhhh, we need a manager. Exactly, she needs managerial training for real. They don't push her around. She is just being a yes woman.

**From:** Decker, Douglas
**Sent:** Thursday, November 20, 2014 10:59 AM
**To:** Hogans, Keisha
**Subject:** RE: Now you are being gross

Great MORE WORK to do. WE must fill out risk mgmt. for special ed claims. Boy, BIS is getting lazier and lazier and pushing J ALL AROUND ... AND LAUGHING about it. Well, with all these extra little things 30 claims a day is more than enough.

**From:** Hogans, Keisha
**Sent:** Thursday, November 20, 2014 10:56 AM
**To:** Decker, Douglas
**Subject:** Now you are being gross

2

## Hogans, Keisha

| | |
|---|---|
| **From:** | Corbett, Jean |
| **Sent:** | Thursday, March 13, 2014 8:07 AM |
| **To:** | Branch, Gladys; Calo, Robert; Carrero, Timothy; Decker, Douglas; Dwamena, Obeng; Estrada, Josefa; Hogans, Keisha; Hope, Deborah; Kilgore, Arthurene; Malave, Yomaira; Partlow, Genovia; Perry, Marilyn; Taylor, Maurice; Walker, Lisa |
| **Subject:** | Noise in the work area |

Good morning,

A while back Mike Bott sent out an email about playing music in the work area, please restrain from doing so.  Keep in mind that this is a common area that we all use and we need to have consideration for each other. Excessive talking and fooling around distracts the people around you and can hinder their work performance.  Please be courteous of your surroundings and keep it to a minimum.

Your cooperation to this matter is very much appreciated.

Jean C. Corbett

1

**Hogans, Keisha**

**From:** Hogans, Keisha
**Sent:** Friday, February 21, 2014 10:41 AM
**To:** Decker, Douglas
**Subject:** RE: wake up

Yes, it's not productive and it is causing low morale. She doesn't see it because she doesn't want to.

**From:** Decker, Douglas
**Sent:** Friday, February 21, 2014 10:36 AM
**To:** Hogans, Keisha
**Subject:** RE: wake up

Yes, it is VERY HARD to pray for those who cause you trouble. But we MUST always do that. These errors are like someone following you around all day saying oh, you drop that .. oh you left your pen on your desk instead of putting it away. All petty little nonsensical stuff.

**From:** Hogans, Keisha
**Sent:** Friday, February 21, 2014 10:34 AM
**To:** Decker, Douglas
**Subject:** RE: wake up

She is so ridiculous with these mistakes and it's so annoying. I will keep deleing them until she decides to be a manager. No one wants to always receive anything negative without any support. It's like we are jerks, but she can't index. She just annoys me. I have her on my prayer list and I will keep her there too. I AM SERIOUS ABOUT THAT.

**From:** Decker, Douglas
**Sent:** Friday, February 21, 2014 10:30 AM
**To:** Hogans, Keisha
**Subject:** RE: wake up

Yes it's one thing to point out every LITTLE mistake but making you sound like an A-Hole something else.

**From:** Hogans, Keisha
**Sent:** Friday, February 21, 2014 10:18 AM
**To:** Decker, Douglas
**Subject:** RE: wake up

I saw in the subject line. I'm not sure how you made a PD out of a PI. LOL

**From:** Decker, Douglas
**Sent:** Friday, February 21, 2014 10:17 AM
**To:** Hogans, Keisha
**Subject:** RE: wake up

Yessssssssssss!!!!!!! The fun begins!!! I am jealous .. I need her attentionLOL

1

**Hogans, Keisha**

---

**From:** Hogans, Keisha
**Sent:** Friday, February 7, 2014 2:12 PM
**To:** Decker, Douglas
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

I just sent Jean an e-mail about the noisy scanner. She was running her mouth for about 15 minutes after lunch, she can work now. LOL She's taking the computer aide test.

**From:** Decker, Douglas
**Sent:** Friday, February 07, 2014 2:10 PM
**To:** Hogans, Keisha
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

What a place. Between Her coughing, snoring and GP's bed bugs ...

**From:** Hogans, Keisha
**Sent:** Friday, February 07, 2014 2:09 PM
**To:** Decker, Douglas
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

Lol she's on the phone now. She woke up. LOL Watch, she will cough in about 15 minutes lol

**From:** Decker, Douglas
**Sent:** Friday, February 07, 2014 2:04 PM
**To:** Hogans, Keisha
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

Good .. now back to your buddy the snorer!!!

**From:** Hogans, Keisha
**Sent:** Friday, February 07, 2014 2:03 PM
**To:** Decker, Douglas
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

Lol I was just trying to clarify your statement lol DUDE

**From:** Decker, Douglas
**Sent:** Friday, February 07, 2014 2:03 PM
**To:** Hogans, Keisha
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

Very funny! You know I can't think straight when we are about to be nasty ...

**From:** Hogans, Keisha
**Sent:** Friday, February 07, 2014 2:02 PM
**To:** Decker, Douglas
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

1

Lol don't you mean if you ask her? LOL

**From:** Decker, Douglas
**Sent:** Friday, February 07, 2014 2:01 PM
**To:** Hogans, Keisha
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

If ask her she will want something in return. I am not that type of man!!! How is MY sweetie Amy doing?

**From:** Hogans, Keisha
**Sent:** Friday, February 07, 2014 2:00 PM
**To:** Decker, Douglas
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

What? she needs to do some work. LOL No, Jean has them. lol

**From:** Decker, Douglas
**Sent:** Friday, February 07, 2014 2:00 PM
**To:** Hogans, Keisha
**Subject:** RE: Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

You deserve it ... do you have a paper cup for me dear friend?

**From:** Hogans, Keisha
**Sent:** Friday, February 07, 2014 1:11 PM
**To:** Decker, Douglas
**Subject:** Yr fake supervisor is snoring behind me. LOL What an office! At least, she's not coughing. lol

# Exhibit E

# Equal Employment Opportunity

# POLICY

## STANDARDS AND PROCEDURES TO BE UTILIZED BY CITY AGENCIES

## CITY OF NEW YORK

2014

# EQUAL

# EMPLOYMENT

# OPPORTUNITY

# POLICY

## STANDARDS AND PROCEDURES
## TO BE UTILIZED BY CITY AGENCIES

## CITY OF NEW YORK

BILL DE BLASIO
Mayor

STACEY CUMBERBATCH
Commissioner

# NEW YORK CITY
# EQUAL EMPLOYMENT OPPORTUNITY POLICY

## TABLE OF CONTENTS

INTRODUCTION ........ 1

**I.    EQUAL EMPLOYMENT OPPORTUNITY POLICY** ........ 2

A.    Types of Prohibited Conduct ........ 2
B.    Applicability ........ 3

**II.   SPECIFIC PROTECTIONS** ........ 4

A.    Sexual Harassment ........ 5
B.    Disabilities ........ 5
C.    Religion ........ 6
D.    Retaliation ........ 6
E.    Domestic Violence, Sexual Offenses, or Stalking ........ 7

**III.  PROCEDURES** ........ 7

A.    Reporting Violations ........ 7
B.    Contact with the EEO Office ........ 8
C.    Withdrawing Complaints ........ 9
D.    Mediation ........ 9
E.    Concluding the Complaint Investigation ........ 10
F.    Other Places Where Complaints May Be Filed ........ 10
G.    Requests for Reasonable Accommodations ........ 11
    1. Disabilities ........ 12
    2. Religious Accommodations ........ 12
    3. Victims of Domestic Violence, Sexual Offenses, or Stalking ........ 13
    4. Pregnancy ........ 13
H.    Confidentiality ........ 14
I.    Documentation ........ 14
J.    Additional Sources of Procedural Information ........ 15

IV.   AGENCY SPECIFIC DIVERSITY AND EEO PLANS                                15-19

V.    ENFORCEMENT AND ACCOUNTABILITY STANDARDS                              19

      A.    Department of Citywide Administrative Services                 19
      B.    Agency Heads                                                   20
      C.    EEO Officers                                                   22
      D.    Agency General Counsels                                        22
      E.    Managers and Supervisors                                       22
      F.    Personnel Officers                                             23

# NEW YORK CITY EQUAL EMPLOYMENT OPPORTUNITY POLICY
## (2014)

## Introduction

The New York City Charter provides that each agency head must ensure that his or her agency does not discriminate against employees or applicants for employment in any manner prohibited by federal, state, and local law.[1]  In addition, the Charter requires agency heads to establish measures, programs, and annual EEO Plans that communicate each agency's efforts to provide equal employment opportunity ("EEO") to City employees and applicants for employment within City government.[2]  The Department of Citywide Administrative Services ("DCAS") is required to establish uniform procedures and standards to assist City agencies in establishing annual EEO Plans, and other measures and programs to ensure equal employment opportunity.[3]  DCAS developed this Policy,[4] and the standards and procedures contained herein, to implement DCAS' and the City's obligations under the City Charter; federal, state, and local laws; and the City's diversity and inclusion strategy.

The *Equal Employment Opportunity Policy (2014)*, hereafter known as "Policy," supersedes the previous *Equal Employment Opportunity Policy (2005)* of the City of New York.  Detailed uniform complaint and reasonable accommodation procedures are published separately.  This Policy, any addenda to this Policy, and the EEO Policy Handbook are to be distributed to each agency head, EEO Officer,[5] General Counsel, Agency Personnel Officer (APO), manager, and supervisor.

In addition to the Policy, DCAS updated the EEO Policy Handbook, *"About EEO: What You May Not Know."*[6]  The EEO Policy Handbook was created to provide City government employees with a user-friendly summary of the relevant laws and the Policy.

---

[1] See Charter Section 815(h).
[2] See Charter Section 815(a)(19).
[3] See Charter Section 814(a)(12).
[4] This Policy was drafted in consultation with the Equal Employment Practices Commission, the New York City Law Department and EEO Officers from various City agencies.
[5] Each agency head appoints an EEO Officer to assist with the implementation of the Policy, standards, and procedures.  The agency EEO Officer and other personnel, including EEO counselors, investigators, liaisons, etc., are referred to in this Policy as 'EEO office or EEO representatives.'
[6] The Policy may be downloaded at http://www.nyc.gov/html/dcas/html/about/eeopol.  The EEO Policy Handbook, *"About EEO: What You May Not Know,"* may be downloaded at http://www.nyc.gov/html/dcas/html/about/eeo_booklet.shtml.

1

## I.    Equal Employment Opportunity Policy

The City of New York is an equal opportunity employer and prohibits discriminatory employment actions against, and treatment of, City employees and applicants for employment based on actual or perceived race, color, national origin, alienage or citizenship status, religion or creed, gender (including "gender identity" -- which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction,[7] marital status, partnership status,[8] genetic information or predisposing genetic characteristic,[9] sexual orientation, status as a victim or witness of domestic violence, sex offenses or stalking,[10] and unemployment status.[11]

### A.    Types of Prohibited Conduct[12]

Decisions and practices based on an individual's protected status (e.g., race, religion, age, and the other categories listed above) that unlawfully affect employment or the compensation, terms, conditions, or privileges of an individual's employment or potential employment with the City of New York are prohibited by this Policy. This includes unlawful decisions, actions, and practices that occur in the course of recruitment, testing, hiring, work assignments, salary and benefits, working conditions, performance evaluations, promotions, training opportunities, career development and advancement, transfers, discipline, discharge, or any other application or selection process relating to employment.

---

[7] Some employment actions motivated by the reasons listed are permitted by law, such as where an employer may deny employment on the basis of an applicant's prior record of conviction, if there is a direct relationship between one or more of the applicant's criminal offenses and the specific employment sought, or where employing the applicant poses an unreasonable risk to property or to the safety or welfare of specific individuals or the general public. (*See* Correction Law, Art. 23-A, Section 752.)

[8] "Partnership status" was added as a protected class under New York City's Human Rights Law on October 3, 2005.

[9] The term "predisposing genetic characteristic" was adopted on August 30, 2005 to streamline the terms "genetic predisposition" and "carrier status" in the previous version of the New York State Human Rights Law.

[10] "Status as victim of sex offenses or stalking" was added as a protected class under the City Human Rights Law on December 22, 2003.

[11] "Unemployment status" was added as a protected class under New York City's Human Rights Law on June 11, 2013.

[12] See also, EEO Policy Handbook: *"About EEO: What you May Not Know,"* for more examples of prohibited conduct.

2

The Policy also prohibits sexual harassment (i.e., conduct or language of a sexual nature) and harassment based on gender or any other protected characteristic (such as race, religion, disability, or sexual orientation). Forms of harassment may include, but are not limited to, the use of vulgar language, abusive acts or language, hostility, physical aggression, intimidation, or unequal treatment.

The Policy prohibits conduct which unreasonably interferes with an employee's job performance or creates an intimidating, hostile, or offensive working environment, or creates an abusive working environment based on any protected characteristic.

Harassment and/or retaliation against a person who opposes or complains about prohibited conduct or participates in any way in the complaint, investigation, or reasonable accommodation processes are strictly prohibited.

The Policy also prohibits the denial of reasonable accommodations for disabilities; pregnancy, childbirth, and related medical conditions; religious beliefs, observances, and practices; or for victims of domestic violence, sex offenses, or stalking that do not create an undue hardship.

Some offensive acts or remarks may violate this Policy even if they are not so severe that they violate federal, state, or local discrimination laws. The City and its agencies may discipline conduct that violates this Policy even if the conduct does not violate a law prohibiting discrimination.

The Policy also prohibits any City employee from aiding, abetting, inciting, compelling, or coercing any person present in a City facility, whether or not that person is an employee of the City, from engaging in any conduct prohibited by this Policy, including, but not limited to, conduct that creates a hostile work environment based on any protected characteristic.

B.    Applicability

Everyone who works within New York City government or its workplaces, or who seeks employment within City government, is covered by federal, state, and local employment laws, and this Policy. This includes all current employees, managers (including executives and senior level staff members), supervisors, co-workers, paid and unpaid interns,[13] and job applicants.

---

[13] The prohibition of discrimination against interns was added in the New York City's Human Rights Law on April 15, 2014.

This Policy not only protects individuals from prohibited conduct because of their own protected status (such as their own actual or perceived race, religion, national origin, or disability), but also protects individuals from conduct motivated by the actual or perceived race, religion, national origin, or disability, etc., of other persons with whom they are associated.   For example, this Policy applies to individuals who are subjected to adverse actions because of their marriage to, or domestic partnership or association with, persons of a particular racial, religious, or national origin group, or persons who have a disability.   Moreover, discrimination based on an individual's name(s) or spouse's or domestic partner's name(s) that is associated with a particular racial, religious, or national origin group is prohibited.

These protections apply to actions, whether or not intentionally offensive or directed at a particular person or group, which violate this Policy.

This Policy extends to conduct which occurs at any location that could be reasonably regarded as an extension of the workplace, such as any field location, off-site business-related social function, City vehicle, or facility where City government business is being conducted and discussed.

In addition, Work Experience Program ("WEP") participants have a right to a workplace that is free of discrimination, including harassment based on race, color, national origin, religion, gender, disability, or age, and any basis that could otherwise be determined to be prohibited behavior pursuant to the Policy as applied to employees or applicants for employment.

All City employees, interns, and WEP participants are expected to be respectful of everyone in the City's workplaces and members of the public, and to be sensitive to the effects of their behavior on those around them.   All employees, interns, and WEP participants must be trained in the requirements of this Policy and must receive a copy of the EEO Policy Handbook, *"About EEO: What You May Not Know."*


## II.   Specific Protections

The following sections are provided to enable individuals to understand the unique definitions, issues, rights, and responsibilities under this Policy pertaining to sexual harassment and discrimination based on disability, religion, retaliation, and status as a victim of domestic violence, sex offenses, or stalking.

personnel involved in both the discretionary and the civil service hiring pool process receive structured interviewing training and use structured interviewing in the selection process.

- A commitment to assess criteria for selecting persons for mid-level to high-level discretionary positions.

- A commitment to make career counseling about civil service jobs available for employees. Employees should be reminded of the identity of the agency's Career Counselor and the type of guidance which is available from the Career Counselor, at least once each fiscal year. Each agency should promptly notify agency employees and DCAS of any change in the identity of the agency Career Counselor.

- A commitment to ensure that all new employees are advised of this Policy, their rights and responsibilities under it, the discrimination complaint and investigation procedures, and the reasonable accommodation procedures.

- A commitment to establish a diversity, inclusion, and EEO training plan to ensure that all individuals who work within the agency, including managers and supervisors, are trained concerning diversity, inclusion, and EEO-related rights and responsibilities in a manner consistent with the minimum standards for diversity, inclusion and EEO training established by DCAS.

- A commitment to review on a regular basis and retain information about personnel actions, discretionary hiring, applicants, promotions, demotions, transfers, rates of pay, terms of compensation, and selection for training or apprenticeship as required by federal, state, and local law, and/or the City's official records retention schedule.

- A plan to meet obligations or remedies required or recommended as a result of government grants or contracts, court orders, consent decrees, or any audit/review conducted by a governmental agency.

Other measures which may be used to ensure fair employment practices include, for example:

- Advertising job vacancy notices in periodicals and websites with a diverse and inclusive readership.

- Sending job vacancy notices to professional and community organizations serving diverse and inclusive populations.

- Participating in career and job fairs.

- Whenever possible, promoting public service as a career choice at schools, colleges and universities.

- Using internships, work/study, co-op, and scholarship programs to attract interested persons and to develop and hire interested and qualified candidates.

- Sponsoring open houses (i.e., networking events, facilities tours).

- Working with appropriate DCAS personnel to review the competencies, skills and abilities required (as presented in job vacancy notices and notices of examination) for available positions to ensure that these standards are updated, job-related, and required by business necessity.

- Reviewing application forms and agency materials and products in order to ensure that they do not contain discriminatory language or images.

- Ensuring that human resources personnel, managers, supervisors, and other personnel involved in the recruitment and hiring process are trained in interviewing, selection, hiring skills, and EEO, to enable such individuals to correctly identify the most capable candidates.

- Implementing and encouraging inclusive skills and behavior standards for managers to ensure that they are able to maximize their professionalism, performance and communication skills.

- Conducting or encouraging the use of training and development programs to improve skills, performance, and career opportunities of all employees.

- Creating talent pools through employee surveys and databases, to promote cross-training, mentoring, coaching, stretch assignments, cross divisional assignments, job transfers, and rotation programs for career enhancement and development experiences.

- Planning and administering employee incentives, quality of work life and recognition programs, engagement surveys, performance evaluations, employee resource groups, and diversity councils.

- Promoting employees' awareness of opportunities for promotion and transfer within the agency, publicizing promotions and changes in the managerial ranks, and ensuring that the agency engage in succession planning for top managerial

positions. The agency considers its own employees for such opportunities by having programs that identify ready now and high potential talents.

The City of New York, through DCAS, will also:

- Provide the uniform procedures, formats, and reports required by the New York City Charter to facilitate the planning and review of the City's efforts to provide equal employment opportunity for employees and applicants for City government employment.

- Assess qualifications required for most civil service positions and ensure that civil service examinations are job-related and consistent with business necessity.

- Provide assistance to agencies to ensure that recruitment efforts fit particular human resource needs.

- Encourage agency job postings internally through City Jobs and externally through the City's website: http://www1.nyc.gov/jobs/

- Continue to conduct on-site EEO monitoring visits to agencies.

- Continue efforts to better ensure the accuracy of ethnicity and gender data.


## V.  Enforcement and Accountability Standards


A.    Department of Citywide Administrative Services

DCAS is required to: 1) establish and enforce uniform procedures and standards for use by City agencies in establishing measures, programs, and plans to ensure equal employment opportunity, including a time schedule for the development, review and adoption of EEO plans; 2) establish a uniform format for use by City agencies for the presentation of statistical information on the workforce of City agencies; and 3) develop resources regarding information on employment and educational programs.[18] DCAS is also required to publish and submit annual reports on the activities of DCAS and the other City agencies with respect to equal employment opportunity.[19]

---

[18] See Charter Sections 814(a)(12)-(15).
[19] See Charter Section 814(b)(8).

example, one study cited in the report found that 90% of individuals who say they have experienced harassment never take formal action against the harassment, such as filing a charge or a complaint.[3]

# EEOC Charge Data (FY 2018 – FY 2021)

Between FY 2018 and FY 2021, the EEOC received a total of 98,411 charges alleging harassment under any basis and 27,291 charges alleging sexual harassment.

Of significant note is the increased number of sexual harassment charges received by the EEOC in the two years following #MeToo going viral in October 2017 (see Figure 1).



**Figure 1.** *Sexual Harassment Charge Receipts, FY 2014 – FY 2021*

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2014 – FY 2021.

In FY 2018, the EEOC received 7,609 sexual harassment charges compared to 6,696 in FY 2017 – an increase of 13.6%. Additionally, sexual harassment charges as a percentage of all harassment charges began increasing in FY 2018. Between FY 2018 and FY 2021, sexual harassment charges accounted for 27.7% of all harassment charges compared to 24.7% of all harassment charges between FY 2014 and FY 2017. Sexual harassment charges also accounted for a greater percentage of the total charges under all statutes received by the EEOC between FY 2018 and FY 2021 (9.8%) compared to between FY 2014 and FY 2017 (7.7%). Also, between FY 2018 and FY 2021, harassment charges made up 35.4% of the total charges (277,872) received by the EEOC.

**Figure 2.** *Percent of Sexual Harassment Charges Filed by Women, FY 2018 – FY 2021*



78.2 % of sexual harassment charges were filed by women

**Figure 3.** *Percent of All Harassment Charges Filed by Women, FY 2018 – FY 2021*



62.2 % of all harassment charges were filed by women

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021.

Women also continue to file a disproportionate number of the charges filed with the EEOC alleging sexual harassment. Women filed 78.2% of the 27,291 sexual harassment charges received between FY 2018 and FY 2021 (see Figure 2). Additionally, women filed 62.2% of the 98,411 total harassment charges alleging any bases (e.g., race, national origin) received between FY 2018 and FY 2021 (see Figure 3).

Figure 4 provides the percent of total sexual harassment charges concurrently filed with a charge of race discrimination between FY 2018 and FY 2021. Of the 1,945 sexual harassment charges filed concurrently with a race charge, 71.2% designated Black/African American as the relevant race.

sexual harassment charges filed concurrently with a race charge, 71.2% designated Black/African American as the relevant race.



**Figure 4.** *Percent of Sexual Harassment Charges Concurrently Filed with Race Charges, FY 2018 – FY 2021*

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021.

Additionally, of the 797 sexual harassment charges filed concurrently with a national origin charge between FY 2018 and FY 2021, 37.6% of the charges designated Hispanic and 15.7% designated Mexican national origin.

Charges alleging sexual harassment and retaliation are often linked. Figure 5 provides the percent of total sexual harassment charges concurrently filed with a charge of retaliation between FY 2018 and FY 2021. Of the 27,291 sexual harassment charges filed, 43.5% were concurrently filed with a retaliation charge.



**Figure 5.** *Sexual Harassment Charges Concurrently Filed with Retaliation Charges, FY 2018 – FY 2021*

sexual harassment charges filed concurrently with a race charge, 71.2% designated Black/African American as the relevant race.



**Figure 4**. *Percent of Sexual Harassment Charges Concurrently Filed with Race Charges, FY 2018 – FY 2021*

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021.

Additionally, of the 797 sexual harassment charges filed concurrently with a national origin charge between FY 2018 and FY 2021, 37.6% of the charges designated Hispanic and 15.7% designated Mexican national origin.

Charges alleging sexual harassment and retaliation are often linked. Figure 5 provides the percent of total sexual harassment charges concurrently filed with a charge of retaliation between FY 2018 and FY 2021. Of the 27,291 sexual harassment charges filed, 43.5% were concurrently filed with a retaliation charge.



**Figure 5.** *Sexual Harassment Charges Concurrently Filed with Retaliation Charges, FY 2018 – FY 2021*

Number of Sexual Harassment Charges Concurrently Filed with Retaliation Charges

Percent of Sexual Harassment Charges Concurrently Filed with Retaliation Charges

# EEOC Data Highlight



**April 2022  No. 2**

## Sexual Harassment in Our Nation's Workplaces

April is National Sexual Assault Awareness and Prevention Month.[1] The U.S. Equal Employment Opportunity Commission (EEOC) enforces Title VII of the Civil Rights Act of 1964 (Title VII), which prohibits discrimination based on sex (including pregnancy, sexual orientation, and gender identity). Sexual harassment or sexual assault in the workplace is a form of sex discrimination that violates Title VII.

Preventing and remedying harassment in the workplace, including sexual harassment, has long been a top agency priority. This EEOC data highlight focuses on charges alleging sexual harassment under Title VII filed with the agency beginning in FY 2018, when the #MeToo movement went viral and received international attention, through FY 2021. The data profiled below also includes other allegations of discrimination, including on the bases of race, retaliation, and national origin, filed concurrently with allegations of sexual harassment between FY 2018 and FY 2021.

These data do not tell the full story of sexual harassment in our nation's workplaces. In June 2016, the EEOC released a report on the study of harassment in the workplace which noted that workplace harassment often goes unreported.[2] For example, one study cited in the report found that 90% of individuals who say they have experienced harassment never take formal action against the harassment, such as filing a charge or a complaint.[3]

## EEOC Charge Data (FY 2018 – FY 2021)

Between FY 2018 and FY 2021, the EEOC received a total of 98,411 charges alleging harassment under any basis and 27,291 charges alleging sexual harassment. Of significant note is the increased number of sexual harassment charges received by the EEOC in the two years following #MeToo going viral in October 2017 (see Figure 1).



**Figure 1.** *Sexual Harassment Charge Receipts, FY 2014 – FY 2021*

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2014 – FY 2021.

---

[1] "A Proclamation on National Sexual Assault Awareness and Prevention Month, 2022," The White House, March 31, 2022, https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/31/a-proclamation-on-national-sexual-assault-awareness-and-prevention-month-2022/.

[2] *See* Select Task Force on the Study of Harassment in the Workplace, Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic, June 2016 at https://www.eeoc.gov/select-task-force-study-harassment-workplace# Toc453686298.

[3] *Id.* citing Lilia M. Cortina and Jennifer L. Berdahl, *Sexual Harassment in Organizations: A Decade of Research in Review*, 1 The Sage Handbook of Organizational Behavior 469, 469-96 (J. Barling & C. L. Cooper eds., 2008).

by the EEOC were those involving Discharge, Harassment (non-sexual), and Terms and Conditions (see Figure 6).

As expected, the states with the most sexual harassment charges generally correspond with the states with the largest populations. Examining the number of charges per 10,000 people, ages 16 and older, provides a better comparison of the states with the most sexual harassment charges standardized by population. (See Figures 7 and 8). The top 10 states account for 24.5% of all sexual harassment charge receipts in the United States.

**Figure 6.** Five Most Common Issues, Sexual Harassment Charges, FY 2018 – FY 2021

| Issue | |
|---|---|
| Discharge | 48.3% |
| Harassment (non-sexual) | 33.2% |
| Terms/Conditions | 32.5% |
| Constructive Discharge | 20.9% |
| Discipline | 10.3% |

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 - FY 2021.

**Figure 8.** Top 10 States with the Most Sexual Harassment Charges per 10,000 Population Ages 16 Years and Older, FY 2018 – FY 2021

| Number of Charges per 10,000 Population | | | |
|---|---|---|---|
| Alabama | 1.00 | Arkansas | 0.75 |
| Mississippi | 0.93 | Missouri | 0.74 |
| Georgia | 0.83 | Nevada | 0.72 |
| Kansas | 0.80 | District of Columbia | 0.72 |
| Tennessee | 0.76 | Louisiana | 0.72 |

SOURCES: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021. 2015-2019 American Community Survey (ACS) 5-Year Estimates, 16 Years and Older, Civilian Labor Force.

**Figure 7.** Top 10 States with the Most Sexual Harassment Charges per 10,000 Population Ages 16 Years and Older, FY 2018 – FY 2021



SOURCES: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021. 2015-2019 American Community Survey (ACS) 5-Year Estimates, 16 Years and Older, Civilian Labor Force.

# Combatting Sexual Harassment in the Workplace

The EEOC will continue to use all available tools, including outreach and education, enforcement, and litigation to prevent and remedy sexual harassment in the workplace.

Between FY 2018 and FY 2021, the EEOC recovered nearly $300 million for individuals with sexual harassment claims through resolved charge receipts and in litigation. In FY 2021, EEOC resolutions that included a claim for sexual harassment increased to 10%, 1.2 percentage points higher than in FY 2018 (8.8%), and, in FY 2021, 28.6% of sexual harassment resolutions were resolved favorably to the worker. Additionally, between FY 2018 and FY 2021:

- 18.2% of total monetary benefits recovered by the EEOC included a claim for sexual harassment compared to 12.4% between FY 2014 and FY 2017.  Figure 9 provides these percentages for each fiscal year between FY 2014 and FY 2021.
- The EEOC recovered $299.8 million for individuals with sexual harassment claims through resolved charge receipts and in litigation, benefiting 8,147 people (see Figure 10).

3

Case 1:23-cv-10514-VSB   Document 1   Filed 11/29/23   Page 180 of 223
Employer's Responses to Sexual Harassment | Center for Employment Equity | UMass Amherst
11/29/23, 10:43 AM

| | Sexual Harassment Charges | All Other Non-Sexual Harassment Title VII Charges |
|---|---|---|
| Benefits | 1% | 2% |
| Constructive Discharge | 18% | 6% |
| Demotion | 3% | 3% |
| Discharge | 46% | 54% |
| Discipline | 11% | 15% |
| Harassment | 28% | 27% |
| Hiring | 1% | 6% |
| Intimidation | 8% | 4% |
| Layoff | 1% | 2% |
| Promotion | 3% | 7% |
| Suspension | 4% | 5% |
| Terms and Conditions | 26% | 29% |
| Wages | 5% | 7% |
| Other Issue | 14% | 20% |

91,503 discrimination charges filed with the EEOC and the EEOC took 114, about 0.1% of charges received, to court.

Charging parties can get a "right to sue" letter from the EEOC and bring a lawsuit to court via the private bar. One study estimates that 17% of charges of racial discrimination result in a lawsuit being filed by the charging party, but another estimates that less than 1% result in a lawsuit.[22] If sexual harassment complaints are similar, these wildly divergent estimates suggest that between 90 and 1,571 sexual harassment lawsuits were actually filed in courts in an average year. Since we estimate that there are more than 5 million incidences per year, the clear conclusion is that the vast majority of workplace sexual harassment incidences never lead to an EEOC discrimination complaint and very few of these ever make it to court. This low rate of filing also suggests that the key responders to sexual harassment in workplaces are those who are harassed and their managers

## Who Files Sexual Harassment Charges?

Table 2 describes the demographics of charging parties for charges containing a sexual harassment allegation, all other non-sexual harassment charges alleging Title VII discrimination, and for the subset of sex-based discrimination complaints that do not include sexual harassment as an issue. Sex-based charges include those Title VII charges made on the basis of one's sex, male or female, as well as charges based on one's sexual orientation or gender identity.[22]

Women filed 57% of all other (non sexual harassment) Title VII complaints, 75% of sex-based Title VII complaints, and 81% of all sexual harassment allegations. Though women are much more likely to experience sexual harassment at work and file a formal charge, men experience this issue as well: 19% of sexual harassment charges were filed by men.

**Table 2: Title VII Employment Discrimination Charges by Demographic Group**

Based on the General Social Survey estimates reported above, among those who experience sexual harassment at work, women are more likely than men to eventually file a formal charge. Women are 72% (with a confidence interval of plus or minus 1%) of those reporting experiencing sexual harassment at work on a survey, but 81% of those filing charges. We do not know if this represents differences in the seriousness of the harassment, more effective employer redress of sexual harassment complaints from men, or higher male reluctance to report.

8/19

…/employers-responses-sexual-harassment

Employer's Responses to Sexual Harassment | Center for Employment Equity | UMass Amherst

| | Percent of Not-Sexual Harassment Charges | Percent of Other Sex-Based Charges | Percent of All Sexual Harassment Charges | Percent of U.S. Labor Force |
|---|---|---|---|---|
| Women | 57% | 75% | 81% | 47% |
| Men | 43% | 25% | 19% | 53% |
| White Women | 18% | 35% | 48% | 36% |
| White Men | 11% | 10% | 11% | 43% |
| Black Women | 35% | 34% | 27% | 7% |
| Black Men | 31% | 15% | 8% | 8% |
| Other Race Women | 3% | 4% | 5% | 3% |
| Other Race Men | 3% | 2% | 1% | 4% |

Note: Analysis excludes those missing race and sex data. Missing data is more common for race than sex and much more common for charges filed with a FEPA than the EEOC. For sexual harassment charges, 8% are missing sex data (3% of EEOC and 21% of FEPA charges are missing sex data) and 40% are missing race (28% of EEOC charges and 69% of FEPA charges).

Relative to other Title VII discrimination charges, sexual harassment charges are much more common among white women, roughly equally common among white men (who file absolutely fewer discrimination complaints than other status groups), less common among black women, and much less frequent among black men.

Relative to their representation in the labor market overall, women report a disproportionate amount of workplace sexual harassment. Although they comprise 47% of the labor force, women file 81% of sexual harassment charges. Black women, in particular, report a disproportionately large percentage of workplace sexual harassment charges; they account for 7% of the labor force but file 27% of sexual harassment charges.

About half of all case processing reports are missing information on the industry of the workplace. Thus it is difficult to make precise estimates of industry variation in charge rates. Past research suggests that sexual harassment is more common in workplaces with a hyper-masculine culture and where management tolerates abusive behavior in general.[23] Given that the vast majority of sexual harassment experiences go unreported, we have no way of knowing if rates of reporting or the quality of managerial responses to internal complaints vary by industry. Given these limitations we have calculated rates by industry of sexual harassment reports to the EEOC and the state FEPAs. We calculate the rates by dividing the number of sexual harassment cases by the gender specific industry labor force.[24] Figure 3 displays these results.

Figure 3 is sorted by the female sexual harassment charge rate. Sexual harassment charges filed by women are least common in government, health care and social assistance and finance. They are most common in mining, warehousing, and transportation. In general female sexual harassment charges are higher in male dominated industries (correlation = .77). Male sexual harassment charge rates are lower than those filed by women in all industries. They are highest in educational services, followed by warehousing, accommodations and food service, and health care. Male charge rates are lowest in public administration, followed by wholesale trade, construction, and professional services. The rate of male sexual harassment charges is also associated with the sex composition of employment, with a weak tendency to be higher in industries with more women employees (correlation coefficient = .42).

## Table 3. Sex Specific Sexual Harassment Charge Rates per 100,000 employees by Industry



## What Are Employer Responses to Sexual Harassment Charges?

Past research is clear that harassment, firing and retaliation are frequent employer responses to complaints of discrimination.[25] Our analysis shows that sexual harassment is no exception to this pattern. Sixty-eight percent of sexual harassment allegations include a charge of employer retaliation in the face of a discrimination complaint. Almost two-thirds of those filing sexual harassment charges (64%) report losing their jobs as a result of their complaint.[26] High instances of job loss and retaliation are present across race and sex categories (Table 3).

Most employer responses tend to be harsh both via retaliation and firing employees who complain. The very low proportion of employees who file sexual harassment complaints is very likely to be related to employers' typically punitive responses. We do not know whether the retaliation occurred after the targeted employee reported the sexual harassment internally or after the charge was filed

with the EEOC or FEPA. However, what is clear is that complaining about sexual harassment is quite dangerous, inciting employer retaliation and firing in most instances.

White men and White women are more like to lose their jobs than are other groups. Black women, in contrast, are less likely to lose their job, although most do. Clearly filing a sexual harassment discrimination charge is no protection against job loss, and probably increased the likelihood that the charging party will lose their job.

## Table 3: Employer Response to Sexual Harassment

|  | Lost Job | Experienced Retaliation |
|---|---|---|
| All | 64% | 68% |
| Women | 65% | 69% |
| Men | 60% | 68% |
| White Women | 67% | 68% |
| White Men | 68% | 68% |
| Black Women | 59% | 70% |
| Black Men | 64% | 65% |
| Other Race Women | 63% | 68% |
| Other Race Men | 60% | 68% |

Employer retaliation is widespread, since two-thirds report it. It is highest for Black women, but almost as high for all groups. Retaliation for filing a charge of discrimination is explicitly prohibited by federal law, but is apparently normative in many workplaces. This pattern of extreme retribution fits what we have learned from past research, which finds that employers, following the advice of internal and external legal counsel, react to internal discrimination complaints with aggressive attacks on those who complain. This tactic is designed to isolate the charging party and to send a message to other workers that the cost of pursuing legal remedies to discrimination will be prohibitively high.[27]

# Does the EEOC Treat Sexual Harassment Complaints Seriously?

This section focuses on the processing of sexual harassment charges for the 33,304 Title VII sexual harassment charges filed directly with the EEOC.[28] When a charge is filed with the EEOC it is given an initial processing code indicating the likelihood that the charge has sufficient evidence to support a legal finding of employment discrimination. A code of "A" by the EEOC intake staff indicates that the complaint is likely to be able to demonstrate legal cause that discrimination occurred, and those charges are more likely to be investigated by the EEOC.[29]

## Table 4: Discrimination Processing Codes for Sex-Based Title VII Charges

The "B" code suggests legal cause may be present but additional information is needed, and they are more likely to be offered EEOC brokered mediation with the employer. The code "C" indicates that the intake staff judged that legal cause was unlikely, often because the filing deadline was missed or because the charge is not related to laws enforced by the EEOC.

In Table 4 we compare initial processing categories for Title VII sex-based charges by issue type for charges filed with the EEOC. Most discrimination charges of all types are initially assessed as either A

| Issue | A | B | C | Number of Charges |
|---|---|---|---|---|
| All Sex-Based Title VII Charges | 23% | 61% | 16% | 11,921 |
| Sex-based Title VII Charges Containing Each Issue Type | | | | |
| Sexual Harassment | 33% | 56% | 11% | 31,558 |
| Intimidation | 32% | 57% | 11% | 5,747 |
| Benefits | 30% | 59% | 11% | 1,692 |
| Constructive Discharge | 29% | 56% | 15% | 11,342 |
| Hiring | 28% | 56% | 17% | 4,800 |
| Layoffs | 28% | 61% | 11% | 1,602 |
| Other Issue | 28% | 60% | 12% | 17,394 |
| Demotion | 26% | 63% | 11% | 3,789 |
| Wages | 26% | 66% | 8% | 9,991 |
| Terms and Conditions | 25% | 62% | 13% | 32,060 |
| Harassment | 24% | 60% | 16% | 32,610 |
| Discharge | 23% | 62% | 15% | 57,795 |
| Discipline | 20% | 65% | 15% | 15,019 |
| Promotion | 19% | 73% | 9% | 8,397 |
| Suspension | 19% | 64% | 17% | 4,763 |

or B. Overall, about one quarter (23%) are coded "A" and more than half (61%) of all sex-based Title VII charges are processed as type "B". Category C charges are the smallest group of initial assessments (16%). Thus, most charges that make it to the EEOC are judged by intake staff to be potentially serious and to plausibly contain legal merit. This initial assessment of the potential merit of charges should not be surprising since very few discrimination experiences ever make it to the stage of filing formal discrimination charges.

Table 4 also compares all issues alleged in sex-based Title VII charges. Sexual harassment discrimination charges are the most likely of all sex-based Title VII charges to be processed as "A" (33%), followed closely by intimidation (32%). Both tend to have clear perpetrators and targets, making legal findings easier to establish.

EEOC initial processing tends to evaluate sexual harassment allegations as more likely to eventually demonstrate legal cause than other charges of Title VII or sex-based discrimination. While the EEOC initial charge processing assesses that the majority of all types of discrimination charges as potentially meritorious, combining A and B codes sexual harassment charges appear to present at least as much initial evidence of merit as other charges. There is no evidence here that the EEOC takes sexual harassment charges less seriously than other discrimination charges.

### Table 5: Sexual Harassment Charges Processing Codes by Demographic Groups

A charging party's race and gender may also influence the likelihood that a charge is categorized as legally actionable. Among sexual harassment charges filed with the EEOC, those filed by white women are more likely to be processed as "A" when compared to both black women and all men. Thirty-five percent of sexual harassment charges filed by white women were processed as "A" compared to 31% of those filed by black women. Cases filed by men of all races are seen as less legally actionable in initial processing.

## Do charges result in benefits for charging parties?

|  | "A" | "B" | "C" |
|---|---|---|---|
| All | 33% | 55% | 11% |
| Women | 34% | 55% | 11% |
| Men | 27% | 57% | 15% |
| White | 34% | 54% | 12% |
| Black | 29% | 57% | 14% |
| White Women | 35% | 54% | 11% |
| White Men | 28% | 57% | 15% |
| Black Women | 31% | 57% | 12% |
| Black Men | 24% | 57% | 18% |
| Other Race Women | 28% | 53% | 14% |
| Other Race Men | 23% | 59% | 19% |

This section focuses on the outcomes of sexual harassment charges filed with either the EEOC or state/local FEPA. These outcomes reflect settlements in which the charging party did not withdraw their charge and thus proceeded through mediation, negotiation/settlement, or conciliation.

**Table 6: Percent of Discrimination Charges that received Some Benefit by Issue Type**

| Issue | All Title VII Charges | | Sex-based Title VII Charges | |
|---|---|---|---|---|
|  | % Got Benefit | Total Number of Charges | % Got Benefit | Total Number of Charges |
| Sexual Harassment | 27% | 33,037 | 27% | 32,331 |
| Constructive Discharge | 21% | 20,733 | 24% | 11,415 |
| Wages | 21% | 18,507 | 23% | 7,800 |
| Demotion | 20% | 8,529 | 24% | 3,893 |
| Intimidation | 20% | 12,531 | 23% | 5,934 |
| Layoffs | 20% | 4,659 | 23% | 1,799 |
| Benefits | 19% | 4,076 | 24% | 1,689 |
| Harassment | 19% | 78,601 | 21% | 32,610 |
| Other Issue | 19% | 56,429 | 22% | 22,167 |
| Terms and Conditions | 18% | 83,856 | 21% | 33,231 |
| Discharge | 17% | 161,515 | 20% | 62,273 |
| Promotion | 17% | 19,109 | 18% | 7,218 |
| Discipline | 16% | 45,017 | 18% | 15,989 |
| Suspension | 16% | 15,435 | 17% | 5,136 |
| Hiring | 14% | 15,856 | 19% | 5,172 |

Table 6 shows the percent of charges that received any (monetary or nonmonetary) benefit by issue type. Among non-sexual harassment charges, between 14 and 21 percent of all Title VII charges and 17 to 24 percent of sex-based Title VII charges received a benefit.[30] Twenty-seven percent of sexual harassment charges received some benefit, again the highest percent of all issues.

Most people who file discrimination charges, including discrimination charges that the EEOC judges initially to be legally actionable, do not receive any benefit. At the same time sexual harassment charges stand out as more likely than other discrimination issues to secure some benefit. About a quarter of people who file sexual harassment charges, and do not withdraw their charge, receive some benefit under this process.

A complainant's race and gender are associated with the likelihood of a sexual harassment discrimination charge receiving a benefit. Sexual harassment charges filed by women, particularly White women, are more likely to receive a benefit compared to women of other races and to men. 29% of sexual harassment charges filed by White women received a benefit, compared to 23% of those filed by Black women, 21% by White men, and 18% by Black men (see Table 7).

**Table 7: Benefit Outcomes for Sexual Harassment Charges by Sex and Race**

| | Percent received some benefit |
|---|---|
| All | 27% |
| Women | 28% |
| Men | 22% |
| White | 27% |
| Black | 22% |
| White Women | 29% |
| White Men | 21% |
| Black Women | 23% |
| Black Men | 18% |
| Other Race Women | 23% |
| Other Race Men | 22% |

The charges that proceed through mediation, conciliation, or (more rarely) court processes typically result in no compensation or a modest monetary compensation for the charging party. Very few cases lead to the changes at the workplace level that many charging parties seek (see Table 8). Almost 3 out of 4 (73%) sexual harassment charges produce no benefit of either kind for the charging party.

**Table 8: Benefit Types for Sexual Harassment Charges**

| Benefit | Number | Percent |
|---|---|---|
| Monetary Benefit | 5,088 | 15% |
| Monetary and Workplace benefit | 2,701 | 8% |
| Workplace Change Only | 1,195 | 4% |
| No Benefit | 24,053 | 73% |

Twenty-three percent of sexual harassment charges produce some monetary benefit for the charging party, and 12% result in a workplace-level change of some sort. Nearly 9 out of 10 (88%) sexual harassment charges do not lead to any required change in employer behavior or managerial practices. Eight percent of sexual harassment charges lead to both a monetary benefit for the charging party and some negotiated change in workplace managerial practices.

High profile media cases often focus on large monetary settlements for the targets of sexual harassment. For example, FOX News paid former broadcaster Gretchen Carlson $20 million to settle her sexual harassment lawsuit against former FOX News CEO Roger Ailes. But outcomes for most sexual harassment charges are much smaller. Overall, charging parties who received monetary compensation for sexual harassment charges were awarded $24,700 on average. Large monetary benefits are very rare—only 1% of charges resulted in monetary compensation over $100,000 (Table 9).

# EEOC Data Highlight



**April 2022  No. 2**

## Sexual Harassment in Our Nation's Workplaces

April is National Sexual Assault Awareness and Prevention Month.[1]  The U.S. Equal Employment Opportunity Commission (EEOC) enforces Title VII of the Civil Rights Act of 1964 (Title VII), which prohibits discrimination based on sex (including pregnancy, sexual orientation, and gender identity). Sexual harassment or sexual assault in the workplace is a form of sex discrimination that violates Title VII.

Preventing and remedying harassment in the workplace, including sexual harassment, has long been a top agency priority. This EEOC data highlight focuses on charges alleging sexual harassment under Title VII filed with the agency beginning in FY 2018, when the #MeToo movement went viral and received international attention, through FY 2021. The data profiled below also includes other allegations of discrimination, including on the bases of race, retaliation, and national origin, filed concurrently with allegations of sexual harassment between FY 2018 and FY 2021.

These data do not tell the full story of sexual harassment in our nation's workplaces. In June 2016, the EEOC released a report on the study of harassment in the workplace which noted that workplace harassment often goes unreported.[2] For example, one study cited in the report found that 90% of individuals who say they have experienced harassment never take formal action against the harassment, such as filing a charge or a complaint.[3]

## EEOC Charge Data (FY 2018 – FY 2021)

Between FY 2018 and FY 2021, the EEOC received a total of 98,411 charges alleging harassment under any basis and 27,291 charges alleging sexual harassment. Of significant note is the increased number of sexual harassment charges received by the EEOC in the two years following #MeToo going viral in October 2017 (see Figure 1).



*Figure 1.  Sexual Harassment Charge Receipts, FY 2014 – FY 2021*

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2014 – FY 2021.

---

[1] "A Proclamation on National Sexual Assault Awareness and Prevention Month, 2022," The White House, March 31, 2022, https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/31/a-proclamation-on-national-sexual-assault-awareness-and-prevention-month-2022/.

[2] *See* Select Task Force on the Study of Harassment in the Workplace, Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic, June 2016 at https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686298.

[3] *Id.* citing Lilia M. Cortina and Jennifer L. Berdahl, *Sexual Harassment in Organizations: A Decade of Research in Review*, 1 The Sage Handbook of Organizational Behavior 469, 469-96 (J. Barling & C. L. Cooper eds., 2008).

In FY 2018, the EEOC received 7,609 sexual harassment charges compared to 6,696 in FY 2017 – an increase of 13.6%. Additionally, sexual harassment charges as a percentage of all harassment charges began increasing in FY 2018. Between FY 2018 and FY 2021, sexual harassment charges accounted for 27.7% of all harassment charges compared to 24.7% of all harassment charges between FY 2014 and FY 2017. Sexual harassment charges also accounted for a greater percentage of the total charges under all statutes received by the EEOC between FY 2018 and FY 2021 (9.8%) compared to between FY 2014 and FY 2017 (7.7%). Also, between FY 2018 and FY 2021, harassment charges made up 35.4% of the total charges (277,872) received by the EEOC.

Women also continue to file a disproportionate number of the charges filed with the EEOC alleging sexual harassment. Women filed 78.2% of the 27,291 sexual harassment charges received between FY 2018 and FY 2021 (see Figure 2). Additionally, women filed 62.2% of the 98,411 total harassment charges alleging any bases (e.g., race, national origin) received between FY 2018 and FY 2021 (see Figure 3).



Figure 4 provides the percent of total sexual harassment charges concurrently filed with a charge of race discrimination between FY 2018 and FY 2021. Of the 1,945 sexual harassment charges filed concurrently with a race charge, 71.2% designated Black/African American as the relevant race.

Additionally, of the 797 sexual harassment charges filed concurrently with a national origin charge between FY 2018 and FY 2021, 37.6% of the charges designated Hispanic and 15.7% designated Mexican national origin.



Charges alleging sexual harassment and retaliation are often linked. Figure 5 provides the percent of total sexual harassment charges concurrently filed with a charge of retaliation between FY 2018 and FY 2021. Of the 27,291 sexual harassment charges filed, 43.5% were concurrently filed with a retaliation charge.

Between FY 2018 and FY 2021, the most common issues alleged with sexual harassment charges received



2

by the EEOC were those involving Discharge, Harassment (non-sexual), and Terms and Conditions (see Figure 6).

As expected, the states with the most sexual harassment charges generally correspond with the states with the largest populations. Examining the number of charges per 10,000 people, ages 16 and older, provides a better comparison of the states with the most sexual harassment charges standardized by population. (See Figures 7 and 8). The top 10 states account for 24.5% of all sexual harassment charge receipts in the United States.

**Figure 6.** Five Most Common Issues, Sexual Harassment Charges, FY 2018 – FY 2021

| Issue | |
|---|---|
| Discharge | 48.3% |
| Harassment (non-sexual) | 33.2% |
| Terms/Conditions | 32.5% |
| Constructive Discharge | 20.9% |
| Discipline | 10.3% |

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 - FY 2021.

**Figure 8.** Top 10 States with the Most Sexual Harassment Charges per 10,000 Population Ages 16 Years and Older, FY 2018 – FY 2021

| Number of Charges per 10,000 Population | | | |
|---|---|---|---|
| Alabama | 1.00 | Arkansas | 0.75 |
| Mississippi | 0.93 | Missouri | 0.74 |
| Georgia | 0.83 | Nevada | 0.72 |
| Kansas | 0.80 | District of Columbia | 0.72 |
| Tennessee | 0.76 | Louisiana | 0.72 |

SOURCES: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021. 2015-2019 American Community Survey (ACS) 5-Year Estimates, 16 Years and Older, Civilian Labor Force.

**Figure 7.** Top 10 States with the Most Sexual Harassment Charges per 10,000 Population Ages 16 Years and Older, FY 2018 – FY 2021



SOURCES: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021. 2015-2019 American Community Survey (ACS) 5-Year Estimates, 16 Years and Older, Civilian Labor Force.

## Combatting Sexual Harassment in the Workplace

The EEOC will continue to use all available tools, including outreach and education, enforcement, and litigation to prevent and remedy sexual harassment in the workplace.

Between FY 2018 and FY 2021, the EEOC recovered nearly $300 million for individuals with sexual harassment claims through resolved charge receipts and in litigation. In FY 2021, EEOC resolutions that included a claim for sexual harassment increased to 10%, 1.2 percentage points higher than in FY 2018 (8.8%), and, in FY 2021, 28.6% of sexual harassment resolutions were resolved favorably to the worker. Additionally, between FY 2018 and FY 2021:

- 18.2% of total monetary benefits recovered by the EEOC included a claim for sexual harassment compared to 12.4% between FY 2014 and FY 2017. Figure 9 provides these percentages for each fiscal year between FY 2014 and FY 2021.
- The EEOC recovered $299.8 million for individuals with sexual harassment claims through resolved charge receipts and in litigation, benefiting 8,147 people (see Figure 10).

3

- The EEOC recovered nearly $104 million more for individuals with sexual harassment claims than in the period between FY 2014 and FY 2017--$83.8 million more through resolved charge receipts and an additional $20 million in litigation (see Figure 11).



**Figure 9.** *Percentage of Sexual Harassment Monetary Benefits, FY 2014 – FY 2021\**

*\*Excludes additional monetary benefits recovered by the EEOC through litigation.*

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2014 – FY 2021.



**Figure 10.** *Monetary Benefits from Resolved Sexual Harassment Charge Receipts and Litigation, FY 2018 – FY 2021*

💲 **$299.8 million recovered**

👤 **8,147 people benefited**

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2018 – FY 2021.

**Figure 11.** *Monetary Benefits from Resolved Sexual Harassment Charge Receipts and Litigation, FY 2014 -FY 2017 and FY 2018 – FY 2021*

SOURCE: U.S. EEOC, Integrated Mission System, Charge Data, FY 2014 – FY 2021.

The EEOC advances opportunity in the workplace by enforcing federal laws prohibiting employment discrimination. More information is available at www.eeoc.gov.

**Data Notes**
The charge data included in this Data Highlight include all charges filed by individuals in the private sector and state and local government workplaces. These data do not include discrimination complaints filed in the federal sector.

**Suggested Citation**
Sexual Harassment in Our Nation's Workplaces. Office of Enterprise Data and Analytics (OEDA) Data Highlight No. 2. U.S. Equal Employment Opportunity Commission (EEOC), Washington, DC, April 2022.

4

Welcome, Keisha | Log Out

- My Cases

| Case Number | Submission Date | Type | Status |
|---|---|---|---|
| 520-2022-02173 | 12-06-2021 | CHARGE | Charge Closed |
| 520-2019-03381 | 04-27-2019 | CHARGE | Charge Closed |

« ‹  1   of 1 › »                 Current Page: 1

**Please click on a case number to continue**

Technical Support                    Accessibility Statement                    Privacy Statement

1/1





**Dvyne Pleazure**
November 3, 2020 · 🌐

👍❤️ 2

Lisa Walker
Watkins
took this
picture
inside
Jean Corbett's
office

**Jean C. Sanborn Corbett**

1y

**Dvyne Pleazure**

1y

**Anissa Nelson**

1y

Dvyne Pleazure replied · 1 Reply

**Monique Denette**
Beautiful

1y

Dvyne Pleazure replied · 1 Reply

**Terence Valentine**
Yeah that's my little sister I said it right by little sister what's up sis keep blowing for my brother please



1y

**Dvyne Pleazure**

1y



**From:** +19178555714@tmomail.net
Wednesday, September 14, 2022 2:17



Our experts are certified and highly experienced in mobile device forensics. Coupled with access to state-of-the-art forensic hardware and software, our team possesses the technology and expertise to provide comprehensive consultation and analysis to help you achieve the best possible outcome in your case.

Our cell phone forensics experts can recover, analyze and report on the following common data types, among thousands of others:

- Text messaging
- Social media
- <u>Location history</u>
- Internet activity
- Search activity
- Email communication
- Photos and videos
- Voice calls
- Application data
- Biometric data
- Financial data

## Cell Phone Forensics Experts

Our cell phone forensics experts include, but are not limited to:

- XRY Certified Examiners (XRY)
- Cellebrite Certified Operators (CCO)
- Cellebrite Certified Physical Analysts (CCPA)
- Cellebrite Advanced Smartphone Analysis (CASA)
- Cellebrite Certified Mobile Examiners (CCME)

# The Mobile Device Forensic Examination Process

Digital evidence is fragile and volatile. Improper handling of a mobile phone can alter or destroy the evidence contained on the device. Further, if the mobile phone is not handled following digital forensics best practices, it can be impossible to determine what data was changed and if those changes were intentional or unintentional. To protect the evidence and prevent spoilation, mobile devices need to be analyzed by a trained examiner using mobile device forensic tools.

The initial handling of digital evidence can be divided into four phases: identification, collection, acquisition, and preservation.

## Identification

The identification phase's purpose and scope are to identify the digital evidence relevant to the case. It is possible that this evidence will span multiple devices, systems, servers, and cloud accounts. With a mobile phone, the data is not isolated only to the device. The data contained in the device can be synced to cloud storage or another mobile device or backed up onto a computer.



CITY OF NEW YORK
## CIVIL SERVICE COMMISSION

NANCY G. CHAFFETZ, *Chair*
RUDY WASHINGTON, *Vice Chair*
LARRY DAIS
CHARLES D. MCFAUL
*COMMISSIONERS*

www.nyc.gov/csc
appeals@nyccsc.nyc.gov

AMANDA M. WISMANS
*GENERAL COUNSEL*

JOAN RICHARDS
*DIRECTOR OF ADMINISTRATION*

## NOTICE OF CITY CIVIL SERVICE COMMISSION ACTION

**Samuel Jackson, Esq.**
Attorney for Appellant
sjackson2@dc37.net

| | |
|---|---|
| **Date:** | 08/12/2022 |
| **Case No.:** | 2022-0113 |
| **Appeal Type:** | 76 Disciplinary |
| **Appellant:** | Keisha Hogans |
| **Position/Title:** | Computer Associate |
| **Agency:** | OOC |
| **Final Decision:** | Affirm |

Attached is a decision in connection with your Civil Service Commission appeal.

This decision constitutes the final decision of the City of New York. For information regarding judicial review of this decision, you may wish to review the NYS Courts website at http://nycourts.gov/. Please note that a proceeding pursuant to Article 78 of the New York State Civil Practice Law and Rules must be commenced within four months after a determination becomes final.

**NOTE ON CORONAVIRUS**: As a result of the global COVID-19 (novel coronavirus) pandemic and a concern for public health, Civil Service Commission staff are currently working remotely until further notice. As a result, in-person communication will not be available until further notice, and processing of items submitted by mail will be delayed. Please submit any inquiries to appeals@nyccsc.nyc.gov.

## NEW YORK CITY CIVIL SERVICE COMMISSION

c:  **Keisha Hogans**
Appellant
khogans1@nyc.rr.com

**Krishna Nicole O'Neal, Esq.**
Deputy General Counsel,
Office of the New York City Comptroller
koneal@comptroller.nyc.gov

**Matt Nashban, Esq.**
Office of Administrative Trials and Hearings
mnashban@oath.nyc.gov

**Justina K. Rivera, General Counsel**
Office of the Comptroller
of the City of New York
jrivera@comptroller.nyc.gov

## O'Neal, Krishna

| | |
|---|---|
| **From:** | Wilkinson, Shelly-Ann |
| **Sent:** | Wednesday, January 13, 2021 12:17 PM |
| **To:** | O'Neal, Krishna |
| **Subject:** | FW: (Follow Up  Employee ID # 275907)  Legal Hold  -  Preservation Notice OGC Investigation |

**From:** Ishman, Joseth <jishman@comptroller.nyc.gov>
**Sent:** Monday, November 25, 2019 6:01 PM
**To:** Wilkinson, Shelly-Ann <swilkin@comptroller.nyc.gov>
**Cc:** O'Neal, Krishna <koneal@comptroller.nyc.gov>
**Subject:** Re: (Follow Up Employee ID # 275907) Legal Hold - Preservation Notice OGC Investigation

Hello,

I indented on calling you today, but got tied up. What's a good time to call you tomorrow?

Sent from my iPhone

On Nov 25, 2019, at 5:55 PM, Wilkinson, Shelly-Ann <swilkin@comptroller.nyc.gov> wrote:

<image001.jpg>
Good Evening Joseth,

Per your e-mail below and as a follow-up to my voice message left for you this evening, kindly contact me regarding Employee ID # 275907's Legal Hold – Perseveration Notice OGC Investigation.

Thanks,

<image002.png>
Shelly-Ann O. Wilkinson
Confidential Investigator, Office of the General Counsel
Office of the New York City Comptroller Scott M. Stringer
1 Centre Street, 6th Floor North, New York, NY 10007
(212) 669-7776 | swilkin@comptroller.nyc.gov

**From:** Ishman, Joseth
**Sent:** Friday, November 22, 2019 8:26 PM
**To:** Wilkinson, Shelly-Ann <swilkin@comptroller.nyc.gov>
**Cc:** O'Neal, Krishna <koneal@comptroller.nyc.gov>
**Subject:** RE: (Employee ID # 275907) Legal Hold - Preservation Notice OGC Investigation

OK. I will reach out to you on Monday.

1

**ATTORNEY-CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

This preservation notice outlines the requirements that you must follow to preserve electronically stored information related to the above-referenced matter.

## YOUR NEXT STEPS

1. To enable us to document the measures taken by the agency to meet its discovery obligations, **please confirm that you have read this notice** and acknowledge your duty to preserve by replying to this email by **Tuesday, November 26, 2019 – Please do not reply all.**

2. Until further notice, please preserve all electronically stored information for custodians listed in Annex A and Annex B at the end of this email.

3. Please follow these steps to ensure preservation:

   a) **Enact preservation/legal hold on relevant employee mailboxes.**

      i) Activate legal hold on the mailboxes listed in the Distribution List (Current Employees) and Departed List (Former Employees) above so that incoming or outgoing emails are stored.

      ii) If there are other locations where mailboxes are stored *e.g.*, local PSTs, our IT department is responsible for preservation. If you have any questions or concerns, please contact me to discuss.

   b) **Suspend any auto-deletion, date limits, or size limits for the following:**

      i) Email

      ii) Personal Shares

      iii) Network Shares:  H:\ I:\ J:\ Q:\

      iv) Mobile devices (including Blackberries, iPhones, agency-issued cell phones, tablets, etc.)

   c) **Suspend any activities** (such as major upgrades) that would risk altering or destroying relevant electronically stored information (including metadata). *Please contact me when such activities are being discussed* affecting any of the custodians listed in Annex A or Annex B so that we can agree upon a resolution that accomplishes IT's and/or Records Management's goals and upholds the duty to preserve.

   d) **Do not reformat custodian workstation drives/laptops without preserving relevant electronically stored information.**

   e) **Back-up the following databases and network shares every night:**

      i) Databases:  Email; SQL DB maintenance plan (nightly backup of databases and transaction logs)

      ii) Network Shares:  H:\ I:\ J:\ Q:\

3

**Hogans, Keisha**

| | |
|---|---|
| **From:** | Comptroller Scott M. Stringer |
| **Sent:** | Thursday, August 13, 2020 10:51 AM |
| **To:** | ##Office of the Comptroller |
| **Subject:** | Announcement |

Dear Comptroller's Office Staff,

I am pleased to announce the appointment of Neysa Alsina as our new General Counsel and Deputy Comptroller for Legal Affairs. As General Counsel, Ms. Alsina will serve as my adviser on all legal issues that come before the office, as well as all legal issues related to my role as trustee of four of the five City pension funds. She will also direct the work of the Office of the General Counsel and oversee the Bureau of Law and Adjustment and the Bureau of Labor Law.

Ms. Alsina joins the office after serving as Senior Policy Advisor to Congresswoman Nydia M. Velázquez (NY-7) in Washington, D.C. Prior to that role, she was the Counsel to the New York City Bar Association where she provided legal advice on a broad range of matters, including contract review and negotiation, labor and employment, intellectual property, corporate governance, not-for-profit corporation law, and privacy, among other practice areas. Ms. Alsina also spent eight years in insurance and financial services companies. She advised management on regulatory compliance at Met Life, served as an ethics liaison for the Latin American region of Citigroup, and counseled on a variety of legal matters at Municipal Credit Union. She commenced her legal career as a labor and employment associate at Nixon Peabody, LLP.

In 2018, Ms. Alsina received the City & State Above and Beyond Award, and was named to the list of Crain's New York Leading Women Lawyers. She is also a past recipient of the Hispanic National Bar Association's Regional President of the Year Award and was a 2015 Council of Urban Professionals Fellow. Ms. Alsina is a graduate of Fordham University School of Law and Rutgers University at New Brunswick.

Ms. Alsina's extensive and diverse background in financial services, legal services, and government affairs will be a tremendous asset to the office, and I know she will build upon the impressive body of work the General Counsel's Office has produced over the last six years.

I also want to take this opportunity to thank Marj Henning who served as Acting General Counsel these past few months and provided exceptional leadership and stewardship during the most challenging period in our office's and city's recent history -- and to the entire OGC team for their dedicated support during this transition.

Please join me in thanking Marj and giving Ms. Alsina a warm welcome to the team!

Sincerely,
Scott



**CITY OF NEW YORK**
**OFFICE OF THE COMPTROLLER**
SCOTT M. STRINGER

**KRISHNA NICOLE O'NEAL**
DEPUTY GENERAL COUNSEL
ETHICS OFFICER / DISCIPLINARY TRIAL ADVOCATE

OFFICE OF THE GENERAL COUNSEL

April 20, 2020

**VIA HOME ADDRESS**     **PERSONAL SERVICE**

**REGULAR POST**

**CERTIFIED MAIL &**
**RETURN RECEIPT**

Ms. Keisha Hogans
38 Monroe Street
Apartment EC-12
New York, New York 10002

### NOTICE OF INFORMAL CONFERENCE AND
### STATEMENT OF CHARGES

Dear Ms. Hogans:

In accordance with Section 75 of the Civil Service Law and the Grievance Disciplinary Procedure specified in your union contract, you are hereby notified that the disciplinary charges attached to this notice as Exhibit "A" are preferred against you.

An INFORMAL CONFERENCE regarding these charges will be scheduled for a date, time, and location to be determined. The Comptroller's Office Informal Conference Leader will be identified on a date to be determined. You will receive notification of all future relevant dates as soon as they become available.

When the Informal Conference is scheduled, you may appear and may be represented by an attorney or a union representative at this conference. You should direct all correspondences and contact to your union or attorney about this matter immediately.

Following the conference, the Informal Conference Leader will issue a written decision. The following penalties may be recommended by the Conference Leader: (1) a fine, (2) a reprimand, (3) suspension without pay, (4) demotion to a lower Civil Service title, (5) dismissal, or (6) any other lawful penalty as the Conference Leader deems just and proper.

(continued)

If you accept the decision of the Informal Conference Leader, you must, within five (5) days after receipt thereof, indicate your acceptance by signing a waiver of your right to the procedures available to you under Sections 75 and 76 of the Civil Service Law and/or the Grievance Disciplinary Procedure specified in your union contract. If you do not accept the Informal Conference Leader's recommendation, this matter will proceed to a hearing in accordance with Section 75 of the Civil Service Law unless you elect to proceed in accordance with the Grievance Procedure and file a written waiver of your right to proceed under Section 75 and 76 of the Civil Service Law.

PLEASE TAKE NOTICE that you are allowed eight (8) days from receipt of this Notice to serve and file a written ANSWER to the charges set forth in Exhibit "A" via e-mail to Deputy General Counsel Krishna Nicole O'Neal at koneal@comptroller.nyc.gov with a cc to your representative. Filing an answer is optional.

All further notices or communications addressed to you in connection with these charges will be mailed to your latest address on record with the Office of the City Comptroller, unless you request in writing that the same be sent to you at a different address.

Sincerely,

Krishna Nicole O'Neal
Deputy General Counsel


Served by:

_____

Print


_____          _____
Signature                                                    Date & Time


Received by:

_____

Print


_____          _____
Signature                                                    Date & Time


Page **2** of **3**

## NOTICE OF NYC OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS CONFERENCE AND HEARING RIGHTS

Pursuant to Section 1-23 of the NYC Office of Administrative Trials and Hearings ("OATH") Rules of Practice and Procedure, Title 48 of the Rules of the City of New York, you are hereby notified of the following:

1. You may serve and file an answer to the petition within eight (8) days of service of the petition if service was personal, or within thirteen (13) days of service of the petition if service was by mail. Answers should be served on the Office of the Comptroller, Office of the General Counsel at 1 Centre Street, Room 617, New York, NY 10007, and filed with the OATH Trial Division, located at 100 Church Street, 12th Floor, New York, New York 10007.

2. You have a right to representation by an attorney or other representative at the hearing or conference;

3. A person representing you at the hearing or conference must file a notice of appearance with OATH prior to the hearing or conference.

4. OATH's Rules of Practice and Procedure are published in Title 48 of the Rules of the City of New York, and copies of OATH's rules are available at OATH's offices or on OATH's website (http://www.nyc.gov/html/oath/html/oath-tribunal/oath-tribunal.shtml).

Received by: _____
Signature

Served by: _____
Signature              Print                    Date & Time

Page 3 of 3

Keisha Hogans                                                          Exhibit "A"
April 20, 2020

## SPECIFICATIONS

Keisha Hogans, (hereinafter referred to as "Respondent") under Employee Identification Number 275907 is a Computer Associate, assigned to the Bureau of Information Systems and Technology, Central Imaging Facility ("CIF"), Office of the New York City Comptroller ("OOC"). In or about and between December 2018 and May of 2019, Respondent engaged in obstructing or hindering an OOC's Office of the General Counsel investigation, making or submitting false or misleading statements and/or false accusations, misconduct, neglect of duty, and conduct prejudicial to good order and discipline as follows:

## IN PARTICULAR:

**SPECIFICATION I:** On or about and between February 2019 and December 2019, in furtherance of obstructing and/or hindering an investigation conducted by the Office of the Comptroller's General Counsel or the General Counsel's designee, Respondent repeatedly and knowingly made false and/or misleading statements and/or accusations in connection with such investigation, to wit:

a)      Respondent, in sum and substance, stated she observed one or more Comptroller's Office employees engage in the following in the workplace during work hours:

   i.      profane, obscene, and/or offensive behavior, including but not limited to, sharing and discussing pornographic images and/or details regarding sexual activities.

   ii.     discussions about and/or playing music referencing sexual activity and/or explicit lyrics.

   iii.    showing and/or sharing video footage depicting human feces displayed in the men's bathroom.

   iv.     misuse of Comptroller's Office and/or New York City resources.

   v.      misuse and abuse of Comptroller's Office and/or New York City time and/or neglect of duty.

(b)      Respondent, in sum and substance, repeatedly stated that the CIF metrics system utilized to measure the productivity of data processing within Comptroller's Office internal systems is inaccurate, has changed multiple times and therefore caused managers to incorrectly rate employees on their performance reviews.

Page 1

Keisha Hogans                                                    Exhibit "A"
April 20, 2020

(c)     Respondent, in sum and substance, stated that her supervisor, Jean
Corbett, CIF Manager, engaged in harassing and/or discriminatory conduct in
the workplace.

(d)     Respondent, in sum and substance, stated that she was issued a warning
memo in January of 2018 in retaliation for filing complaints against the
Comptroller's Office.

**SPECIFICATION II:**     On or about November 2019, in furtherance of obstructing and/or
hindering an investigation conducted by the Office of the Comptroller's General Counsel or the
General Counsel's designee as detailed in Specification I above, Respondent submitted false
and/or misleading documentation in connection with such investigation.

**SPECIFICATION III:**     On or about and between December 2018 and January 2019,
Respondent, made false accusations of discrimination and/or knowingly provided false
information regarding one or more Comptroller's employees in the course of an investigation of
an Equal Employment Opportunity complaint(s).

**SPECIFICATION IV:**     On or about and between January 2019 and August 2019, Respondent
made or submitted false and/or misleading statements and/or reports and/or false entries in or on
any Office of the Comptroller's record(s) or on any other City, State, or Federal official record(s)
in connection with any operations or activities, to wit:

a)      Respondent, in sum and substance, reported that she observed one or
more Comptroller's Office employees engage in the following within the
workplace during work hours:

    i.      profane, obscene, and/or offensive behavior,
            including but not limited to, sharing and
            discussing pornographic images and/or details
            regarding sexual activities.

    ii.     discussions about and/or playing music
            referencing sexual activity and/or explicit lyrics.

    iii.    showing and/or sharing video footage depicting
            human feces displayed in the men's bathroom.

    iv.     misuse of Comptroller's Office and/or New
            York City resources.

    v.      misuse and abuse of Comptroller's Office and/or
            New York City time and/or neglect of duty.

Page 2

Keisha Hogans
April 20, 2020

**(b)**    Respondent, in sum and substance, reported the CIF metrics system utilized to measure the productivity of data processing within Comptroller's Office internal systems is inaccurate and has changed multiple times and therefore caused managers to incorrectly rate employees on their performance reviews.

**(c)**    Respondent, in sum and substance, reported that her supervisor, Jean Corbett, CIF manager, engaged in harassing and/or discriminatory conduct in the workplace.

**(d)**    Respondent, in sum and substance, reported that she was issued a warning memo in January of 2018 in retaliation for filing complaints against the Comptroller's Office.

**SPECIFICATION V:**    On or about and between April 2019 and May 2019, on one or more occasions, Respondent engaged in unauthorized personal use of Comptroller-issued technology and/or conducted union business during working hours.

**SPECIFICATION VI:**  On or about and between December 2018 and August 2019, Respondent, by engaging in one or more actions described in Specifications I through V above, Respondent engaged in conduct prejudicial to good order and discipline, and/or neglected her duties.

## The foregoing constitutes, among other things:

A. Obstructing or hindering an investigation conducted by the Comptroller's General Counsel or the General Counsel's designee in violation of the Rules and Procedures of the OOC, specifically Section II, Rule 9(C).

B. Making or submitting a false or misleading statement(s) or report(s) or false entries in or on any Office of the Comptroller's record(s) or on any other City, State, or Federal official record(s) in connection with any operations or activities of the Office of the Comptroller in violation of the Rules and Procedures of the OOC, specifically Section II, Rules 1(B) and 3(L).

C. Knowingly making a false accusation(s) of discrimination or knowingly providing false information in the course of an investigation in violation of the Rules and Procedures of the OOC, specifically Section X, Rule F.

Page 3

Keisha Hogans
April 20, 2020

Exhibit "A"

D. Misconduct, neglect of duty, unauthorized personal use of OOC technology in violation of the Rules and Procedures of the OOC, specifically Section II, Rules 3(K), 3(O) and 6(E).

E. Conducting union business during working hours in violation of the Rules and Procedures of the OOC, specifically Section II, Rule 3(R).

F. Conduct prejudicial to the good order and discipline in violation of the Rules and Procedures of the OOC, specifically Section II, Rule 3(S).

G. Substantial cause rendering Respondent unfit to properly perform her obligations to OOC.

H. Just cause for disciplinary action—including termination under Civil Service Law §75.



**CITY OF NEW YORK**
**OFFICE OF THE COMPTROLLER**
SCOTT M. STRINGER

**KRISHNA NICOLE O'NEAL**
DEPUTY GENERAL COUNSEL
ETHICS OFFICER / DISCIPLINARY TRIAL ADVOCATE

OFFICE OF THE GENERAL COUNSEL

April 20, 2020

**VIA HOME ADDRESS**      **PERSONAL SERVICE**

**REGULAR POST**

**CERTIFIED MAIL &**
**RETURN RECEIPT**

Ms. Keisha Hogans
38 Monroe Street
Apartment EC-12
New York, New York 10002

## NOTICE OF INFORMAL CONFERENCE AND
## STATEMENT OF CHARGES

Dear Ms. Hogans:

In accordance with Section 75 of the Civil Service Law and the Grievance Disciplinary Procedure specified in your union contract, you are hereby notified that the disciplinary charges attached to this notice as Exhibit "A" are preferred against you.

An INFORMAL CONFERENCE regarding these charges will be scheduled for a date, time, and location to be determined. The Comptroller's Office Informal Conference Leader will be identified on a date to be determined. You will receive notification of all future relevant dates as soon as they become available.

When the Informal Conference is scheduled, you may appear and may be represented by an attorney or a union representative at this conference. You should direct all correspondences and contact to your union or attorney about this matter immediately.

Following the conference, the Informal Conference Leader will issue a written decision. The following penalties may be recommended by the Conference Leader: (1) a fine, (2) a reprimand, (3) suspension without pay, (4) demotion to a lower Civil Service title, (5) dismissal, or (6) any other lawful penalty as the Conference Leader deems just and proper.

(continued)

Keisha Hogans                                                                    Exhibit "A"
April 20, 2020

## SPECIFICATIONS

Keisha Hogans, (hereinafter referred to as "Respondent") under Employee Identification Number 275907 is a Computer Associate, assigned to the Bureau of Information Systems and Technology, Central Imaging Facility ("CIF"), Office of the New York City Comptroller ("OOC"). In or about and between December 2018 and May of 2019, Respondent engaged in obstructing or hindering an OOC's Office of the General Counsel investigation, making or submitting false or misleading statements and/or false accusations, misconduct, neglect of duty, and conduct prejudicial to good order and discipline as follows:

## IN PARTICULAR:

**SPECIFICATION I:**   On or about and between February 2019 and December 2019, in furtherance of obstructing and/or hindering an investigation conducted by the Office of the Comptroller's General Counsel or the General Counsel's designee, Respondent repeatedly and knowingly made false and/or misleading statements and/or accusations in connection with such investigation, to wit:

    **a)**    Respondent, in sum and substance, stated she observed one or more Comptroller's Office employees engage in the following in the workplace during work hours:

        i.    profane, obscene, and/or offensive behavior, including but not limited to, sharing and discussing pornographic images and/or details regarding sexual activities.

        ii.    discussions about and/or playing music referencing sexual activity and/or explicit lyrics.

        iii.    showing and/or sharing video footage depicting human feces displayed in the men's bathroom.

        iv.    misuse of Comptroller's Office and/or New York City resources.

        v.    misuse and abuse of Comptroller's Office and/or New York City time and/or neglect of duty.

    **(b)**    Respondent, in sum and substance, repeatedly stated that the CIF metrics system utilized to measure the productivity of data processing within Comptroller's Office internal systems is inaccurate, has changed multiple times and therefore caused managers to incorrectly rate employees on their performance reviews.

Page 1

Keisha Hogans                                                    Exhibit "A"
April 20, 2020

**(c)**    Respondent, in sum and substance, stated that her supervisor, Jean Corbett, CIF Manager, engaged in harassing and/or discriminatory conduct in the workplace.

**(d)**    Respondent, in sum and substance, stated that she was issued a warning memo in January of 2018 in retaliation for filing complaints against the Comptroller's Office.

**SPECIFICATION II:**    On or about November 2019, in furtherance of obstructing and/or hindering an investigation conducted by the Office of the Comptroller's General Counsel or the General Counsel's designee as detailed in Specification I above, Respondent submitted false and/or misleading documentation in connection with such investigation.

**SPECIFICATION III:**    On or about and between December 2018 and January 2019, Respondent, made false accusations of discrimination and/or knowingly provided false information regarding one or more Comptroller's employees in the course of an investigation of an Equal Employment Opportunity complaint(s).

**SPECIFICATION IV:**    On or about and between January 2019 and August 2019, Respondent made or submitted false and/or misleading statements and/or reports and/or false entries in or on any Office of the Comptroller's record(s) or on any other City, State, or Federal official record(s) in connection with any operations or activities, to wit:

**a)**    Respondent, in sum and substance, reported that she observed one or more Comptroller's Office employees engage in the following within the workplace during work hours:

    i.    profane, obscene, and/or offensive behavior, including but not limited to, sharing and discussing pornographic images and/or details regarding sexual activities.

    ii.    discussions about and/or playing music referencing sexual activity and/or explicit lyrics.

    iii.    showing and/or sharing video footage depicting human feces displayed in the men's bathroom.

    iv.    misuse of Comptroller's Office and/or New York City resources.

    v.    misuse and abuse of Comptroller's Office and/or New York City time and/or neglect of duty.

Page 2

Keisha Hogans                                                    Exhibit "A"
April 20, 2020

**(b)**   Respondent, in sum and substance, reported the CIF metrics system utilized to measure the productivity of data processing within Comptroller's Office internal systems is inaccurate and has changed multiple times and therefore caused managers to incorrectly rate employees on their performance reviews.

**(c)**   Respondent, in sum and substance, reported that her supervisor, Jean Corbett, CIF manager, engaged in harassing and/or discriminatory conduct in the workplace.

**(d)**   Respondent, in sum and substance, reported that she was issued a warning memo in January of 2018 in retaliation for filing complaints against the Comptroller's Office.

**SPECIFICATION V:**   On or about and between April 2019 and May 2019, on one or more occasions, Respondent engaged in unauthorized personal use of Comptroller-issued technology and/or conducted union business during working hours.

**SPECIFICATION VI:**   On or about and between December 2018 and August 2019, Respondent, by engaging in one or more actions described in Specifications I through V above, Respondent engaged in conduct prejudicial to good order and discipline, and/or neglected her duties.

### The foregoing constitutes, among other things:

A. Obstructing or hindering an investigation conducted by the Comptroller's General Counsel or the General Counsel's designee in violation of the Rules and Procedures of the OOC, specifically Section II, Rule 9(C).

B. Making or submitting a false or misleading statement(s) or report(s) or false entries in or on any Office of the Comptroller's record(s) or on any other City, State, or Federal official record(s) in connection with any operations or activities of the Office of the Comptroller in violation of the Rules and Procedures of the OOC, specifically Section II, Rules 1(B) and 3(L).

C. Knowingly making a false accusation(s) of discrimination or knowingly providing false information in the course of an investigation in violation of the Rules and Procedures of the OOC, specifically Section X, Rule F.

Page 3

Keisha Hogans
April 20, 2020

D. Misconduct, neglect of duty, unauthorized personal use of OOC technology in violation of the Rules and Procedures of the OOC, specifically Section II, Rules 3(K), 3(O) and 6(E).

E. Conducting union business during working hours in violation of the Rules and Procedures of the OOC, specifically Section II, Rule 3(R).

F. Conduct prejudicial to the good order and discipline in violation of the Rules and Procedures of the OOC, specifically Section II, Rule 3(S).

G. Substantial cause rendering Respondent unfit to properly perform her obligations to OOC.

H. Just cause for disciplinary action—including termination under Civil Service Law §75.

Page 4

If you accept the decision of the Informal Conference Leader, you must, within five (5) days after receipt thereof, indicate your acceptance by signing a waiver of your right to the procedures available to you under Sections 75 and 76 of the Civil Service Law and/or the Grievance Disciplinary Procedure specified in your union contract. If you do not accept the Informal Conference Leader's recommendation, this matter will proceed to a hearing in accordance with Section 75 of the Civil Service Law unless you elect to proceed in accordance with the Grievance Procedure and file a written waiver of your right to proceed under Section 75 and 76 of the Civil Service Law.

PLEASE TAKE NOTICE that you are allowed eight (8) days from receipt of this Notice to serve and file a written ANSWER to the charges set forth in Exhibit "A" via e-mail to Deputy General Counsel Krishna Nicole O'Neal at koneal@comptroller.nyc.gov with a cc to your representative. Filing an answer is optional.

All further notices or communications addressed to you in connection with these charges will be mailed to your latest address on record with the Office of the City Comptroller, unless you request in writing that the same be sent to you at a different address.

Sincerely,

Krishna Nicole O'Neal
Deputy General Counsel

Served by:

_____
Print

_____
Signature                                    Date & Time

Received by:

_____
Print

_____
Signature                                    Date & Time

Page **2** of **3**

## NOTICE OF NYC OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS CONFERENCE AND HEARING RIGHTS

Pursuant to Section 1-23 of the NYC Office of Administrative Trials and Hearings ("OATH") Rules of Practice and Procedure, Title 48 of the Rules of the City of New York, you are hereby notified of the following:

1.  You may serve and file an answer to the petition within eight (8) days of service of the petition if service was personal, or within thirteen (13) days of service of the petition if service was by mail. Answers should be served on the Office of the Comptroller, Office of the General Counsel at 1 Centre Street, Room 617, New York, NY 10007, and filed with the OATH Trial Division, located at 100 Church Street, 12th Floor, New York, New York 10007.

2.  You have a right to representation by an attorney or other representative at the hearing or conference;

3.  A person representing you at the hearing or conference must file a notice of appearance with OATH prior to the hearing or conference.

4.  OATH's Rules of Practice and Procedure are published in Title 48 of the Rules of the City of New York, and copies of OATH's rules are available at OATH's offices or on OATH's website (http://www.nyc.gov/html/oath/html/oath-tribunal/oath-tribunal.shtml).

Received by: _____
                        Signature

Served by: _____ _____ _____
                        Signature                                    Print                        Date & Time

ALJ CASEY:  Would that help?  I mean, if -- you can try it.  I --

MS. O'NEAL:  Let me do that.

ALJ CASEY:  Okay.  Fair enough.  Are you hearing that echo also, folks, or not?  Or is that just me.  Okay.

MS. KILGORE:  Slightly, yes.

MR. WASHINGTON:  I'm -- can I, I'm going to step away just one second, Judge, while she's logging out.

ALJ CASEY:  Sure.

MS. O'NEAL:  Hello?

ALJ CASEY:  Yep.  Let's try it again.  Okay.

MS. O'NEAL:  Is that better?

ALJ CASEY:  Testing 1, 2, 3.  Can you hear me?

MS. O'NEAL:  Yes.

ALJ CASEY:  That's better.  That's better.  It's gone, I think.  Nah -- it's not as bad.  Mr. Washington had to step away for a second.  We'll get there.

[OFF THE RECORD]

[ON THE RECORD]

ALJ CASEY:  We're back on the record.

MR. WASHINGTON:  Alright.

ALJ CASEY:  I think we're on cross, Mr. Washington, if I'm not mistaken.

MR. WASHINGTON:  If I can get one second, Judge.  I just want to pull up the transcript.

ALJ CASEY:  Okay.

MR. WASHINGTON:  Alright.

**CROSS EXAMINATION OF MS. KILGORE**

**BY MR. WASHINGTON**

Q:   Good morning.  Good morning, Ms. Kilgore, how are you?

A:   Good morning.  How are you?

Q:   I'm well.  This is about indexing claims.

A:   Excuse me?

Q:   When you index a claim -- can you hear me?

ALJ CASEY:  Indexing claims.  Indexing claims.

Q:   Can you hear me?

ALJ CASEY:  Ms. Hogans, if, if you can go on mute, Ms. Hogans.  I'm not sure if you're on mute.  There we go.  Okay.  We lost you, Mr. Washington.  There we go.

MR. WASHINGTON:  Can you hear me?  Can anybody hear me?

ALJ CASEY:  Yes, yes.

MS. KILGORE:  Yes.

MR. WASHINGTON:  Okay.

Q:   I wanted to ask you a few questions about indexing claims, Ms. Kilgore.  Alright.

A:   Okay.

Q:   When you index the claim -- okay.  Do you have to read the lawsuit to determine the type, the claim type and the division that it goes to.

A:   Yes.

Q:   Okay.  And do those come, claims come from Jean Corbett or do they come from other managers?

A:   No.  Those notes of claims come from the general public, people who are suing the City of New York.

Q:   Okay.  And does Ron Katz depend on you to index problem claims?

A:   What, what kind of claims?  Proper claims?

Q:   Problem claims, difficult claims.

A:   I mean, sometimes.  If, if, if -- and I wouldn't say Ron per se.

Q:   Okay.  Who, who would you say then?

A:   Jean generally assigns the claims.

Q:   Okay.

A:   The more, the more, I wouldn't say problem claims, but the more priority claims.

Q:   Okay.  And do you receive the more difficult claims?

A:   At times, yes.

Q:   Okay.  Is it just you or is there anyone else in your unite who also receives them?

A:   I -- who, I mean, whoever she decides to assign them to. I know I get certain claims.  Maybe Lisa, sometimes Doug, Tim, so, I guess it's according to whoever, you know, she assigns them to for that day.

Q:   Okay.  What about Ms. Hogans?

it's not already prioritized with a coversheet.

Q:   Okay.  Where do you sit in relations to Ms. Hogans?

A:   I sit behind her.

Q:   You sit behind her?

MR. WASHINGTON:  I can't -- I'm losing --

A:   Yes.

MR. WASHINGTON:  -- everyone.  It's spotty right now.  I can't, I can't hear her, Ms. Kilgore's answer.

Q:   You said you sit behind her?

ALJ CASEY:  [Unintelligible] [09:53:09] [00:08:09-1] Ms. Hogans.

A:   I sit behind her.

Q:   About how far away?  Is there anyone that sits between you and Ms. Hogans?

A:   No.  No.

Q:   And during the time that, during the time that you've been working and sitting next to Ms. Hogans, do you ever hear other people within the unit discussing sports during work hour-, during work hours?

A:   Sports?

Q:   Yes.

A:   I mean --

Q:   Football or basketball.

A:   I, I guess.  I don't know.  They could be.  You know, most of the time, I have my headphones on and if they're having

MR. WASHINGTON:  Yeah, I'm trying to -- it seems like I'm getting feedback.

Q:    Does everyone on, in your area listen to music as they work?

A:    No.

Q:    Okay.  How many people listen to music when they work?  Estimate?

A:    I mean, an estimate?  I guess, I guess we all listen to music.  I don't know.  I mean, I don't go around to say, hey, who's listening to music.

Q:    Okay.  You can't hear the music that people are listening to?

A:    Not if I have my headphones on.

Q:    Does everyone who listens to music use headphones?

A:    No, not everyone.

Q:    Okay.  Do some people listen to music, like, with, like, from the computer itself?

A:    From the computer itself?

Q:    You know, like, from a radio, like -- they don't use their headphones to listen to the music --

A:    Maybe.  Maybe, maybe from the computer, definitely from radios.

Q:    Okay.  So, can we agree that there are people that work within, you know, CIF that listen to their music directly from the radio with no headphones?

A:   Yes, there are some.  There are some.  And Keisha Hogans is one.

Q:   Okay.  I didn't ask you that.

ALJ CASEY:   That comes under other people.  I'll allow it.  Overruled.

Q:   Okay.  And have you ever, has there ever been an instruction from anyone that music needs to be turned down?

A:   Yes.  Jean, Jean has asked the entire crew, you know, if it, you know, if someone complaints about it, she asks us to turn the music down or, you know, to pipe down.  Yes, she has.

Q:   Okay.  Do you ever, do you all ever share videos around the office?

A:   Share videos?

Q:   Yeah, like, Facebook videos.

A:   I mean, if, if there's something that's funny or something like that, yes, we have done that.

Q:   Have you, specifically, ever done that?

A:   I, specifically?  Yes, I have.

Q:   Okay.  And have you ever -- what types of videos have you shown, and have you done this during work?

A:   Excuse me, have I done what?

Q:   Have you shown videos to other people during work?

A:   Yes.  Mm-hmm.  Right, right after break and we --

Q:   Okay.

A:   -- came from the bathroom and sat down, yes.

Q:    Okay.   And what, what -- how would you show it to them?
Would you use your computer?  Would you use your phone?   How would
this be done?

A:    I, my pers-, I would use my personal phone.

Q:    Okay.   And when you show these things on Facebook or --
is it only Facebook or do you show other things to employees on
your phone?

A:    I show pictures.   I mean, my vid-, my family did a
video.   I show, I've shown that.   Well, at -- let me be, let me be
specific, a holiday video.

Q:    Okay.   Okay.   And you show these off of your cell phone?

A:    I have, yes.

Q:    Do you ever show them off of your computer or just
usually on your cell phone?

A:    If there was something on the computer, if there was
something on the computer, yeah, I recall showing something like
news or new something that happened, somebody got hurt or
something, yes.   I, I have done that.

Q:    Well, you also said that you -- things that were funny.

A:    Yes.

Q:    -- you mean, you say -- what do you mean when you say,
funny?   What types of things do you mean that are funny?

A:    There was a baby, one time, where he was just acting up,
you -- just different funny stuff.

Q:    Okay.   Have you ever shown, have you ever shown pictures

of, of, of men?

A:   Of men?

Q:   Mm-hmm.

A:   Have I -- I recall showing a picture of a man.  Mm-hmm.

Q:   Was he clothed?

A:   Definitely.

Q:   Okay.  And to whom did you show these -- and to whom do you normally show these photos and videos and funny things?

A:   I don't normally show them to anyone.  I would just outright say, hey, I want you to see this.  It would be Debra or Lisa or Genovia [phonetic].

Q:   Have you ever shown any videos or funny things to Jean Corbett?

A:   Yes, I've shared stuff with Jean Corbett.

Q:   And have you ever done this, like, during work hours?

A:   It would be during work hours because we're in the office.

Q:   And when these funny things that you show people on your cell phone or whatever, do people laugh when they see these funny things?

A:   Yeah, because they're funny.

Q:   Do you all discuss these funny things?

A:   I mean, it's no big conversation.  You know, you laugh.  You see something, you laugh about it.  You say a few words.  You go, go back to work.  That's it.

MR. WASHINGTON:  Can I just have one second, Your Honor, please?

ALJ CASEY:  Sure.

MR. WASHINGTON:  Judge, if I could, could we take maybe a five-minute break?  I need to use my other computer.

ALJ CASEY:  Sure.  No problem.

MS. O'NEAL:  Judge Casey, is that echo still there because I'm thinking about rebooting my computer.

ALJ CASEY:  Yeah, that might be a good time to do that.  That might be a good time to do that.  Yeah.

MS. O'NEAL:  Will do.  Alright.

MR. WASHINGTON:  You know what, though, Krishna?  I don't think it's you because I'm freezing as I'm talking.

ALJ CASEY:  Yeah, why don't we all log off and log back on.  So, try it again.  Everyone log off and log on again.  This is a problem.

MS. KILGORE:  Oh, wow.  Maybe it's my other --

ALJ CASEY:  Do you have more than one device on?  Do you have, like, a computer and a phone on, by any chance?

MS. KILGORE:  No.  I'm good.  Am I, am I going in and out, Judge?

[END PART 1 OF 5] [OFF THE RECORD]

[START PART 2 OF 5] [ON THE RECORD]

ALJ CASEY:  For the reporter's benefit, it's 10:21.  And, Mr. Washington, any further questions of Ms. Kilgore?

MR. WASHINGTON:  Just a few.

Q:   Ms. Kilgore, do you know Douglas Decker?

A:   Yes.

Q:   Okay.  Where do you sit in relation to Mr. Decker?

A:   Doug sits ac-, behind me across from me.

Q:   Have you ever shown any videos to Mr. Decker?

A:   Have I shown anything to Decker?  Probably have.  I mean, I, I, I pretty much, you know, converse with all my, my, my peers there, so I probably have, probably there's something funny, him or me, Charlie showed me and then I showed Doug.  So, I, I mean, I can't recall per se what it was, but probably have.

Q:   Is there anyone in the office who talks about how often he goes to the bathroom?

A:   How often he goes to the bathroom?

Q:   Yes.

A:   No.  I, I mean, I don't recall that, no.

Q:   You don't recall or no?

A:   I don't recall --

Q:   They're two different answers.

A:   I, I don't recall, sir.  I'm sorry, Mr. Washington.

Q:   Okay.  Alright.  No, don't be sorry.  Just tell me what you know.

A:   Oh, okay.

Q:   You don't have to be sorry.  No problem at all.  So, with regard to the videos that you show, have you ever shown a